

David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
20 Exchange Place
New York, New York 10005
(212) 338-9100

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROSEMARY O'MAHONY,

               Plaintiffs,

   -against-                            **COMPLAINT**

ACCENTURE LTD. and ACCENTURE LLP,

                                        (Jury Trial Demanded)
              Defendants.
-----------------------------------------------------------x

      Plaintiff, Rosemary O'Mahony, by her attorneys, Kaiser Saurborn & Mair, P.C.,

as and for her complaint against the defendants, alleges as follows:

### PARTIES AND VENUE

      1.     Plaintiff, Rosemary O'Mahony, is a resident of the United Kingdom.

      2.     Defendant Accenture Ltd. (together with its subsidiaries, hereafter referred

to as "Accenture"), is a Bermuda company that is listed on the New York Stock

Exchange.   Accenture is one of the world's leading management consulting,

technology services and outsourcing organizations.

      3.     Defendant Accenture LLP is an Illinois Limited Liability Partnership.

Upon information and belief, Accenture LLP is a wholly-owned subsidiary of Accenture

Ltd.

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because one of the claims asserted herein arises under 18 U.S.C. § 1514A.

5.     Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a District in which the defendant resides and is a District in which a substantial portion of the events giving rise to the claims asserted herein occurred.

6.     This action, brought under Title VIII of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514A), seeks to recover damages sustained by plaintiff when Accenture, her employer, retaliated against her because of her investigation of, and objection to, Accenture's fraudulent scheme to evade the payment of millions of dollars of social security contributions that were due to the French government.

## FACTS GIVING RISE TO THE CAUSES OF ACTION

### A.     Ms. O'Mahony's Employment With Accenture

7.     As of August 31, 2004, Accenture had more than 100,000 employees worldwide, approximately 2,300 of which were designated as "partners." From 1988 until October 2006 Ms. O'Mahony was one such partner.

8.     Ms. O'Mahony was a partner and employee of Accenture's United States subsidiary, Accenture LLP, and its predecessor, Andersen Consulting LLP, from 1984 until August 31, 2004.

9.     In or about September 1992, Ms. O'Mahony began an expatriate assignment for Accenture in France to establish and head a new Accenture office in Sophia Antipolis. Initially her assignment involved working part-time in France, but from

2

September 1993 onwards her expatriate assignment was on a full time basis

10.    In 1996, at Accenture's request, Ms. O'Mahony moved to Paris to lead the Technology Competency division for Accenture's West Europe region.

11.    In 2000, again at Accenture's request, Ms. O'Mahony assumed global responsibility for the Technology Competency division in the Resources Industry Group. Ms. O'Mahony's employment remained in France.

12.    As of September 1, 2004, Ms. O'Mahony was transferred from defendant Accenture LLP to Accenture SAS, the French operating subsidiary of Accenture.  She remained an employee of Accenture SAS until October 31, 2006.

B.    **Accenture's Fraudulent Scheme to Evade Social Security Taxes owed in France**

13.    Beginning in or about 1997, American executives of Accenture undertook a concerted course of action to deliberately evade paying millions of dollars of French social security payments that Accenture was legally obligated to make.  Upon information and belief, Accenture violated 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343 in perpetration of the fraud.

14.    Under the terms of the Agreement on Social Security Between the United States of America and the French Republic, dated March 2, 1987 ("Social Security Treaty"), employees who are sent by United States employers to work in the territory of France are subject to the provisions of the French social security system and their employers are legally obligated to make employer-contributions with respect to each such employee in France.  The only exception to this rule applies to employees for

3

whom "the period of work in the territory of [France] is not expected to exceed 5 years" and with respect to whom the employer obtains a Certificate of Coverage.

15.    Accenture obtained the requisite Certificate of Coverage, exempting it from paying social security contributions in France during the first five years of Ms. O'Mahony's assignment in France.  This Certificate of Coverage was for the period September 1992 to August 1997.

16.    Accordingly, as of September 1997 Accenture had a legal obligation to begin paying social security contributions ("French Social Security Contributions") with respect to Ms. O'Mahony to the French social security system.  The French Social Security Contributions included URSSAF contributions (basic healthcare, life insurance and basic retirement fund), ASSEDIC (unemployment insurance fund) and ARRCO and AGIRC (supplemental retirement funds).

17.    Accenture deliberately and wilfully concealed Ms. O'Mahony's employment status from the French authorities and fraudulently withheld payment of the French Social Security Contributions that were legally owed.

18.    Accenture was legally obligated to pay French Social Security Contributions in an amount equal to approximately 36% of Ms. O'Mahony's total compensation for the period September 1997 through September 1, 2004, when she became an employee of Accenture SAS.

19.    During the period September 1997 through September 2004, Ms. O'Mahony received more than $10.5 million in earnings from Accenture.

20.    Upon information and belief, the French Social Security Contributions Accenture fraudulently evaded paying to the French authorities with respect solely to

4

Ms. O'Mahony for the period September 1997 through September 2004, amounted to approximately $3.7 million.

21.     During the period Ms. O'Mahony was on expatriate assignment in France, Accenture LLP had multiple other senior employees and partners on expatriate assignment in France.

C.     **Ms. O'Mahony's Opposition to, and Complaints About, Accenture's Fraudulent Scheme**

22.     Beginning in or about October 2001, Ms. O'Mahony had discussions with Steven Brown, an associate partner in Accenture's corporate finance group in New York, and Carine De Bontridder, a manager in that group, regarding the legal obligation of Accenture to begin making French Social Security Contributions on her behalf.

23.     Beginning in or about November 2001, Ms. O'Mahony made repeated demands to Accenture that Accenture comply with its legal obligation to pay the French Social Security Contributions to the French authorities with respect to her employment compensation.

24.     During the period November 2001 through September 2004, some of Accenture's most senior executives in the United States repeatedly admitted to Ms. O'Mahony that Accenture was legally obligated to pay the French Social Security Contributions.  However, these executives informed Ms. O'Mahony that Accenture had deliberately decided not to make these payments and had deliberately decided to conceal from the French authorities the fact that she was working in France.

25.     In conversations on or about February 28, 2004 and June 10, 2004 with

5

Pamela Craig, Accenture's Global Financial Controller in New York, Ms. O'Mahony reiterated her demand that Accenture make payment of the French Social Security Contributions that were legally mandated by French law.

26.    On July 28, 2004, Ms. Craig told Ms. O'Mahony that she (Craig) and Michael McGrath, Accenture's Global Risk Officer in the United States, would make a final decision as to whether or not Accenture would pay the French Social Security Contributions.

27.    During a series of telephone conversations with Ms. Craig in August and September 2004, Ms. O'Mahony continued to insist that Accenture pay the French Social Security Contributions and expressly informed Ms. Craig that she would not agree to conceal the 'fraud' being committed by Accenture.

28.    On September 23, 2004, Ms. Craig informed Ms. O'Mahony that Jamey Shachoy, Accenture's global tax partner based in California, had affirmatively decided that Accenture's "interests" would best be served by not making any of the French Social Security Contributions and continuing to affirmatively conceal from the French authorities the fact that Ms. O'Mahony had been employed in France since 1998.

29.    Ms. O'Mahony told Ms. Craig that she objected to Accenture's actions and that she would not be a party to tax fraud.

D.    **Accenture's Retaliation Against Ms. O'Mahony Because of Her Complaints and Objections**

30.    The Accenture partnership structure comprises nine tiers, called "levels of responsibility" (Level of Responsibility").  A partner's compensation range is a function

6

of the Level of Responsibility assigned to the partner.

31.     On November 19, 2004, less than two months after Ms. O'Mahony's most recent opposition to Accenture's fraud, Ms. O'Mahony was informed by Accenture that her Level of Responsibility was being reduced from B1 to A3 effective December 1, 2004.

32.     Ms. O'Mahony was given no prior warning of this unprecedented reduction of her role.

33.     The reduced level of A3 represents the Level of Responsibility typically given to partners with between four and six years of seniority as partners, rather than Ms. O'Mahony's 16 years.

34.     As a direct result of the reduction of Ms. O'Mahony's Level of Responsibility her compensation for the period December 1, 2004 through October 31, 2006 was decreased by an amount estimated to exceed $670,000.

35.     The decision to reduce Ms. O'Mahony's level of responsibility was made by Tom Pike, Accenture's global business operations director, who is based in New York.

36.     Pike had no direct contact or reporting relationship with Ms. O'Mahony in 2004. However, Pike had multiple discussions with Pamela Craig during the summer of 2004 regarding Ms. O'Mahony's complaints about, and opposition to, Accenture's fraudulent scheme to evade payment of the French Social Security Contributions.

37.     Accenture reduced Ms. O'Mahony's level of responsibility in retaliation for her complaints about, and opposition to, Accenture's fraudulent scheme to evade payment of the French Social Security Contributions.

7

## FIRST CAUSE OF ACTION

38.    Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "37" as if repeated and incorporated herein.

39.    Defendants retaliated against plaintiff because of her investigation of, opposition to, and complaints about, its fraudulent scheme to evade payment of the French Social Security Contributions.

40.    By reason thereof, defendants have violated 18 U.S.C. § 1514A.

41.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, but not less than $670,000.


WHEREFORE, plaintiff hereby demands judgment against defendant as follows:

(i)    On her first cause of action, awarding damages in an amount to be determined at trial but not less than $670,000;

(ii)    Awarding plaintiff the costs and disbursements of this action; and

(iii)    For such further relief as the Court deems just and proper.

8

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

Dated:     New York, New York
           September 7, 2007

                             KAISER SAURBORN & MAIR, P.C.
                             Attorneys for plaintiffs

By:     _____
                  David N. Mair [DM-8883]
                  20 Exchange Place
                  New York, New York 10017
                  (212) 338-9100

9