# TAB G

1 of 1 DOCUMENT

**FERNANDO PORTES, Plaintiff -against- WYETH PHARMACEUTICALS, INC., Defendant.**

**06 Civ. 2689 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 60824; 90 Empl. Prac. Dec. (CCH) P42,941; 26 I.E.R. Cas. (BNA) 1032*

**August 20, 2007, Decided
August 20, 2007, Filed**

**COUNSEL:** [*1] Michael Shen, Esq., Michael Shen & Associates, P.C., New York, NY, Counsel for Plaintiff.

Michael Delikat, Esq., Orrick, Herrington, & Sutcliffe LLP, New York, NY, Counsel for Defendant.

**JUDGES:** WILLIAM H. PAULEY III, District Judge.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiff Fernando Portes ("Portes") brings this action against Defendant Wyeth Pharmaceuticals, Inc. ("Wyeth") pursuant to the whistleblower provision of the Corporate and Criminal Fraud Accountability Act, Public Law 107-204, codified at *18 U.S.C. § 1514A*, also known as the Sarbanes-Oxley Act ("SOX"). Portes allegedly suffered retaliation and unlawful termination in response to protected disclosures made by him to company officials and to the Occupational Safety and Health Administration ("OSHA"). Defendant moves to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the following reasons, Defendant's motion is granted.

BACKGROUND

The Court assumes the following allegations are true for purposes of the instant motion: Wyeth is a pharmaceutical corporation that has issued securities registered under *Section 12* of the Securities Exchange Act of 1934. (Complaint, dated Apr. 24, 2006 ("Compl.") [*2] PP 9, 193.) In 2000, after Wyeth failed to comply with various regulations, including good manufacturing practices ("GMP") for the production of pharmaceutical and biological products, the Food and Drug Administration ("FDA") issued a Consent Decree (the "Consent Decree") governing the conduct of its operations. (Compl. PP 24-25, 27.) To comply with the Consent Decree, Wyeth implemented a corporate program known as the Sustainable Compliance initiative ("SCI"). (Compl. P 35.)

On September 22, 2003, Wyeth hired Portes as principal project manager for the SCI Department at its Pearl River facility. (Compl. PP 45-47, 72.) In this capacity, he reported directly to Cybil Robbins ("Robbins"), head of the SCI Department, who in turn reported 'to Maura Corcoran ("Corcoran"), Wyeth's Director of Quality. (Compl. PP 12, 49-50.)

Around June 2004, Wyeth assigned Portes to spearhead the implementation of standards for vaccine testing. (Compl. PP 89-90.) Portes uncovered numerous problems attributable to Robbins' work, leading him to believe that Wyeth's lab operations were in violation of the Consent Decree, federal regulations, EU regulations,

2007 U.S. Dist. LEXIS 60824, *2; 90 Empl. Prac. Dec. (CCH) P42,941;
26 I.E.R. Cas. (BNA) 1032

and the provisions of the Barr Mandate. [1] (Compl. [*3] P 94.) Portes communicated his findings to Corcoran, asserting that Robbins was not qualified to supervise the implementation of the standards and that she had incorrectly certified that a "vast number" of standard operating procedures conformed with GMP. (Compl. PP 99-100, 103.) Portes informed Corcoran that although he was confident that he could correct the problems, he would need an extension of time to complete that task. (Compl. P 101.)

> 1   According to the Complaint, the Barr Mandate arose from United States v. Barr Labs., Inc. and prohibits the averaging of test data in drug manufacturing. *812 F. Supp. 458 (D.N.J. 1993).* (Compl. P 94 n.1.) The federal regulations cited by Portes are 21 C.F.R. § 210 (Current Good Manufacturing Practice in Manufacturing, Processing, Packing, or Holding of Drugs; General), 21 C.F.R. § 211 (Current Good Manufacturing Practice for for Finished Pharmaceuticals), and 21 C.F.R. § 600 (detailing general regulations for biological products). (Compl. P 94.) Portes does not refer to specific EU regulations, but rather to the European Medicines Agency (EMEA) and its drug manufacturing rules. (Compl. PP 83, 94, 100, 117.)

Following Portes' statements to Corcoran, [*4] Wyeth allegedly retaliated against him and attempted to impede his efforts to rectify the problems he had uncovered. (Compl. PP 109-111.) Portes was berated by Corcoran for criticizing Robbins. (Compl. PP 112-113.) Corcoran did not respond to Portes' request for an extension of deadlines, and at least four subsequent requests for deadline extensions also received no response from either Corcoran or Robbins. (Compl. PP 112, 114.)

In October 2004, Corcoran pressured Portes to resign for allegedly failing to meet intermediate deadlines in implementing SCI standards -- the same deadlines for which Portes had previously requested an extension. (Compl. PP 121-122.) Portes objected that he was being treated unfairly, because other project managers had missed more important deadlines, and he refused to resign. (Compl. P 126.) Corcoran then placed Portes on a Performance Improvement Plan ("PIP"), an administrative measure normally used to address unsatisfactory work. (Compl. PP 128-129.) Other SCI project managers who failed to meet project deadlines were not placed on PIPS. (Compl. PP 154-157).

On November 3, 2004, Pontes e-mailed Jeff Hutt, Wyeth's Vice President of Quality asking him to [*5] rescind the PIP and again asserting that Wyeth had violated federal regulations and the Barr Mandate. (Compl. PP 11, 145-146.) Hutt did not respond to the e-mail, but Portes nonetheless corrected all of the alleged violations he had uncovered earlier in 2004. (Compl. PP 118, 147, 152-153.)

Thereafter, Fortes filed additional complaints through various channels at Wyeth, alleging that the company was violating regulations relating to the manufacture of pharmaceuticals and complaining of "whistleblower retaliation." (Compl. PP 164-175.) As a consequence of Fortes' disclosures and complaints of retaliation, Wyeth terminated Portes on February 23, 2005. (Compl. P 176.)

Portes filed a SOX whistleblower complaint with OSHA on March 23, 2005. He claims that Wyeth has continued to harass him since his termination. (Compl. P 181.) Specifically, Portes reports that Wyeth's response to his OSHA complaint contained false allegations regarding his work performance. (Compl. PP 183-185.)

Having made no final determination regarding Portes' claim within 180 days of filing pursuant to *18 U.S.C. § 1514A(b)(1)(B)*, the Secretary of Labor issued a notice on October 26, 2005 affirming that Portes has a [*6] statutory right to pursue his claims in this action.

### DISCUSSION

### 1. Standard on a Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*, the Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff['s] favor." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)*. Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929*

2007 U.S. Dist. LEXIS 60824, *6; 90 Empl. Prac. Dec. (CCH) P42,941;
26 I.E.R. Cas. (BNA) 1032

(2007). "The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)* (quotations and citation omitted); accord *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)*.

II. SOX Claims

A. *Section 1514A(a)(1)*

Plaintiff alleges that Defendant violated *SOX § 1514A(a)(1)*, which provides, in relevant part:

No company with a class of securities registered under section *12* of the Securities [*7] Exchange Act of 1934 (*15 U.S.C. 78l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (*15 U.S.C. 78o(d)*), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee -- (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of *section 1341*, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by -- (A) a Federal regulatory or law enforcement agency . . . or (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

*18 U.S.C. § 1514A(a)(1)*. To assert a whistleblower claim under *§ 1514A(a)(1)*, a [*8] plaintiff "must show

by a preponderance of the evidence that (1) [he] engaged in a protected activity; (2) the employer knew of the protected activity; (3) [he] suffered from an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." *Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006)* (citing *Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1375 (N.D. Ga. 2004)*); see also Bishop v. PCS Admin. (USA), Inc., No. 05 Civ. 5683 (WTH), 2006 WL 1460032, at *1 (N.D. Ill. May 23, 2006).

In addition, "before an employee can assert a cause of action in federal court under [SOX], the employee must file a complaint with [OSHA] and afford OSHA the opportunity to resolve the allegations administratively." *Willis v. Vie Fin. Group, Inc., No. Civ.A. 04-435 (MAM), 2004 U.S. Dist. LEXIS 15753, 2004 WL 1774575, at *3 (E.D. Pa. Aug. 6, 2004)*. A plaintiff alleging a violation of *§ 1514A(a)(1)* must file a complaint with the Secretary of Labor not later than 90 days after the date of the alleged violation. [2] *18 U.S.C. § 1514A(b)(1)(A)* and *18 U.S.C. 1514A(b)(2)(D)*. "If the Secretary has not issued a final decision [*9] within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant," then a plaintiff is entitled to bring an action in federal district court. *18 U.S.C. § 1514A(b)(1)(B)*.

2    The Secretary of Labor has delegated responsibility for administrative complaints to OSHA. See *29 C.F.R. § 1980.103(c) (2006)*.

B. Scope of Protected Activity

Defendant challenges Plaintiff's claim solely on the basis of the first element of the Fraser test, contending that, as a matter of law, Plaintiff cannot show he engaged in protected activity. Specifically, Defendant argues that none of Portes' reports were sufficiently related to securities fraud or any violation enumerated in *§ 1514A(a)(1)* to give rise to a SOX claim. [3]

3    Defendant also contends that SOX does not protect disclosures made by an employee in the course of his routine job duties. However, because the Court concludes that Portes has failed to state a claim for other reasons, it need not address this argument.

2007 U.S. Dist. LEXIS 60824, *9; 90 Empl. Prac. Dec. (CCH) P42,941;
26 I.E.R. Cas. (BNA) 1032

SOX protects employees who report activity that they "reasonably believe[] constitutes a violation" of the enumerated code sections, any SEC rule or regulation, or "any provision of [*10] Federal law relating to fraud against shareholders." *18 U.S.C. § 1514A(a)(1)*. A whistleblower need not cite the specific law or regulation that he believes is being violated in his report. *Fraser, 417 F. Supp. 2d at 322*. Rather, the "context" of the disclosure and "the circumstances giving rise to the communication," if closely related to potential fraud against shareholders, may be sufficient to satisfy the pleading requirements of a SOX whistleblower claim. *Fraser, 417 F. Supp. 2d at 323*.

Nonetheless, disclosures are protected only when they "implicate the substantive law protected in Sarbanes-Oxley 'definitively and specifically.'" *Fraser, 417 F. Supp. 2d at 322* (citing *Am. Nuclear Res., Inc. v. United States Dep't of Labor, 134 F.3d 1292, 1295 (6th Cir. 1998)* (requiring that protected disclosures under the Energy Reorganization Act "definitively and specifically" relate to safety)). [4] Where a communication is "barren of any allegations of conduct that would alert [a defendant] that [the plaintiff] believed the company was violating any federal rule or law related to fraud against shareholders," the reporting is not protected by SOX. *Fraser, 417 F. Supp. 2d at 322*; see also *Livingston* [*11] *v. Wyeth, Inc., No. 1:03CV00919 (PTS),2006 U.S. Dist. LEXIS 52978, 2006 WL 2129794, at *10 (M.D.N.C., July 28, 2006)* ("To be protected under [SOX], an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud."); *Platone v. FLYi, Inc., 2003-SOX-27, 2006 WL 3246910, at *8* (Dep't Labor, Sept. 29, 2006) ("[The] relevant inquiry is not what [is alleged in the complaint filed with OSHA], but [what was] actually communicated to [the] employer prior to ... termination.").

4    Given the relative scarcity of caselaw interpreting SOX, courts also "look to caselaw applying provisions of other federal whistleblower statutes for guidance .... The [SOX] Regulations [state expressly] that consideration was given to the regulations implementing the whistleblower provisions of the Wendell H. Ford Aviation Investment Reform Act for the 21st Century ... the Surface Transportation Assistance Act ... and the Energy Reorganization Act." *Collins, 334 F. Supp. 2d at 1374*.

## 1. Disclosures to Supervisors

Plaintiff allegedly made in-person and e-mail disclosures to his supervisors at Wyeth that "definitively and specifically" implicate the substantive law protected in SOX. (Compl. PP 99-100, 145-148, [*12] 164-172, 174-175.) Portes argues that, if Wyeth had violated regulations, the company faced fines and other penalties that might have significantly affected share prices. (Compl. PP 37-39, 58, 82-83, 97.) Portes asserts that, in light of Wyeth's prior references to the Consent Decree in its financial reports, he had a reasonable belief that the company was obligated to report the violations to the FDA, SEC and shareholders. (Compl. PP 36, 41-44, 196-197, 201.) Therefore, Portes argues, his reporting constituted protected activity under SOX.

Plaintiff does not allege that he explicitly referred to fraud, shareholders, securities, statements to the SEC, or SOX in his disclosures to superiors at Wyeth. The purported violations involved the Consent Decree, FDA regulations, EU regulations, and other drug manufacturing guidelines, not SEC rules or other federal law related to fraud against shareholders. Thus, the disclosures were not sufficiently related to shareholder fraud to constitute protected activity.

In Fraser, the plaintiff, a vice president at an investment management company, alleged four instances of protected activity under *§ 1514A(a)(1)*. The second instance involved an e-mail [*13] sent by the plaintiff to the company president, in which he reported "that the New York office's decision to sell WorldCom bonds from New York-based ERISA and trust management accounts was not equally disseminated to all accounts firm-wide." *Fraser, 417 F. Supp. 2d. at 316*. The plaintiff wanted to communicate this information to all firm offices, but was instructed not to do so by another company officer. As a result, he alleged, the company's Los Angeles office continued to hold WorldCom bonds, resulting in "substantial losses in [Los Angeles]- ERISA and trust accounts holding WorldCom bonds." *Fraser, 417 F. Supp. 2d. at 316*. The plaintiff "characterized this conduct as a breach of fiduciary conduct and evidence of a conflict of interest," and alleged that corporate officers retaliated against him for making the report. *Fraser, 417 F. Supp. 2d. at 316*.

In refusing to grant the defendant's motion to dismiss with regard to the e-mail disclosure, the court

characterized the decision as a "close call," and noted:

> While Fraser does not expressly state in this e-mail that Defendants are engaged in illegal conduct related to fraud on shareholders, given the context of the e-mail and the [*14] circumstances giving rise to the communication -- i.e., clients of the New York office benefited from a prudent decision to sell WorldCom bonds, whereas the Los Angeles clients suffered losses related to these holdings, which losses they might have avoided had the New York office communicated the decision to sell -- the e-mail is sufficient to satisfy the pleading requirement for a SOX whistleblowing claim.

*Fraser, 417 F. Supp. 2d. at 323.*

Portes' claim falls well outside the envelope established in *Fraser*. His disclosures to personnel at Wyeth were concerned exclusively with violations of regulations governing the manufacture of pharmaceuticals. The circumstances of the disclosures do not suggest a concern that Wyeth was being unfair to its investors, that its lack of compliance with FDA regulations might have implications for its reports to investors and the SEC, or that it was engaged in other conduct "that would alert [a defendant] that [the plaintiff] believed the company was violating any federal rule or law related to fraud against shareholders." *Fraser, 417 F. Supp. 2d. at 322* (emphasis added).

Moreover, Portes was employed as a chemist and project manager implementing standards [*15] for drug manufacturing, not as an investment analyst at a financial services firm. No inference that Portes was concerned with shareholder fraud could have been derived from his job responsibilities or the nature of his work. In this context, his disclosures to Wyeth are outside the scope of protected reporting under SOX.

### 2. Disclosure to the Department of Labor

Portes also alleges that Wyeth retaliated against him after he filed his administrative SOX complaint with OSHA. [5] Specifically, Portes contends that in Wyeth's response to his OSHA complaint, the company "disparaged [his] reputation and character" by "falsely claiming that he had demeaned his supervisor and co-workers and 'generally damaged relationships with key internal clients of his department.'" (Compl. PP 183.)

> 5 *Section 1514A(a)* prohibits retaliatory action against any "employee." Although Portes was no longer employed by Wyeth when he filed his complaint with OSHA, *29 C.F.R. § 1980.101* defines "employee" to include "an individual presently or formerly working for a company." See also *Robinson v. Shell Oil Co., 519 U.S. 337, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)* (holding in the Title VII context that an employee may sue in the event of retaliation against [*16] him for filing an administrative complaint).

*Section 1514A(b)(1)* requires that allegations of violations of *§ 1514A(a)* first be presented by filing a complaint with the Department of Labor. *Section 1514A(b)(1)(B)* empowers a federal district court to hear only those claims for which this administrative remedy has been exhausted. "The administrative scheme underlying [SOX] is judicial in nature, and designed to resolve the controversy on its merits." *Willis, 2004 WL 1774575, at *5.* While Portes' claim that he was harassed in response to his OSHA complaint could not have been included in his original complaint, he does not allege that he amended it or otherwise reported his retaliation claim to OSHA. Accordingly, Portes cannot assert the claim in federal court. See *Willis, 2004 WL 1774575, at *6* (dismissing a plaintiff's SOX claim where he had failed to amend an OSHA complaint to allege retaliation).

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted. Plaintiff's retaliation claim under SOX concerning his tiling of a complaint with OSHA is dismissed with leave to replead within fourteen days of the date of this Memorandum and Order. The remainder of Plaintiff's [*17] claims arc dismissed with prejudice. The Clerk of the Court is directed to mark this case closed.

Dated: August 20, 2007

New York, New York

SO ORDERED:

2007 U.S. Dist. LEXIS 60824, *17; 90 Empl. Prac. Dec. (CCH) P42,941;
26 I.E.R. Cas. (BNA) 1032

WILLIAM H. PAULEY III                                   U.S.D.J.

# TAB H

LEXSEE 2006 U.S. DIST. LEXIS 52978

### MARK D. LIVINGSTON, Plaintiff, v. WYETH INC., BRUCE KAYLOS and DAVID McCUAIG, Defendants.

### 1:03CV00919

### UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

*2006 U.S. Dist. LEXIS 52978; 88 Empl. Prac. Dec. (CCH) P42,638; 24 I.E.R. Cas. (BNA) 1561*

### July 28, 2006, Decided

**COUNSEL:** [*1] For MARK D. LIVINGSTON, Plaintiff: JOANNE ROYCE, WASHINGTON, DC. JOY RHYNE WEBB, BROWNE FLEBOTTE WILSON, HORN & WEBB, PLLC, DURHAM, NC. THAD M. GUYER, MEDFORD, OR.

For WYETH INC., BRUCE KAYLOS, Wyeth Sanford Managing Director, Defendants: MICHAEL DELIKAT, ORRICK HERRINGTON & SUTCLIFFE, LLP, NEW YORK, NY. TERRY ALLEN CLARK, CONSTANGY BROOKS & SMITH, LLC, WINSTON-SALEM, NC.

For DAVID MCCUAIG, Wyeth Sanford Human Resource Director, Defendant: KEVIN W. STURM, EDWARDS BALLARD BISHOP STURM CLARK & KEIM, P.A., SPARTANBURG, SC. MICHAEL DELIKAT, ORRICK HERRINGTON & SUTCLIFFE, LLP, NEW YORK, NY. TERRY ALLEN CLARK, CONSTANGY BROOKS & SMITH, LLC, WINSTON-SALEM, NC.

**JUDGES:** P. Trevor Sharp, United States Magistrate Judge.

**OPINION BY:** P. Trevor Sharp

**OPINION**

### MEMORANDUM OPINION AND ORDER

### Sharp, United States Magistrate Judge

This matter comes before the Court on the motion for summary judgment filed by Defendants Wyeth Inc., Bruce Kaylos and David McCuaig. (Pleading No. 44.) Plaintiff Mark Livingston has responded in opposition to Defendants' motion, and Defendants have filed a reply. Also before the Court is Plaintiff's motion to strike the affidavits of Defendants' expert witnesses. [*2] (Pleading Nos. 55, 56.) The Court heard oral argument on March 7, 2006. The motions are ready for a ruling.

### I. Procedural History

Plaintiff Mark Livingston filed a Complaint on September 29, 2003 (Pleading No. 1) and a First Amended Complaint on December 15, 2003 (Pleading No. 12, "First Am. Compl."), alleging violation of the employee protection provisions of Section 806 of the Sarbanes-Oxley Act of 2002, *18 U.S.C. § 1514A*, and wrongful discharge under North Carolina law. Plaintiff alleges federal question jurisdiction over his federal claims and supplemental jurisdiction over his state law claims. (First. Am. Compl.) Plaintiff seeks reinstatement to his previous position or a comparable position, back pay, front pay, compensatory and punitive damages, restored benefits, attorney's fees and costs, and any other legal or equitable relief to which he may be entitled. *Id.*

After an extensive period of discovery, Defendants have now moved for summary judgment. (Pleading No. 44.) Plaintiff opposes the motion (Pleading No. 53, Pl.'s Mem. in Opp'n to Mot. for Summ. J., & App.) and has filed separate motions seeking to exclude the affidavits of Defendants' [*3] two expert witnesses. (Pleading Nos. 55, 56.) The motions, supporting memoranda and appendices are all filed under seal.

2006 U.S. Dist. LEXIS 52978, *3; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

## II. Statement of Facts

This case arises out of Mark Livingston's employment with and termination from Wyeth, Inc. ("Wyeth"). Wyeth develops and manufactures pharmaceutical, consumer health and animal health products, operates more than two dozen facilities worldwide and is subject to regulation by a number of federal, state, local and foreign government agencies. (Pleading No. 46, App. in Supp. of Def.'s Mot. for Summ. J. ("Defs.' App."), Tab 24 at I-1, I-12, I-16.) At its Sanford, North Carolina facility, Wyeth manufactures components used in the production of PREVNAR (R), a vaccine for infants and toddlers. (Id., Tab 4, Deposition of John Bruce Kaylos ("Kaylos Dep.") at 85-86, 96-97; First Am. Comp. P 13.) Livingston was employed by Wyeth at its supply chain facility in Sanford, North Carolina between August 7, 2000 and December 19, 2002. Bruce Kaylos is, and at all relevant times was, the Managing Director of the Sanford facility and was Livingston's immediate supervisor. (Kaylos Dep. at 7.) David McCuaig served as Director of Human Resources at the Sanford [*4] facility from approximately September of 2002 through January 2004. (Defs.' App,. Tab 7, Deposition of David McCuaig ("McCuaig Dep.") at 8.)

Wyeth's operations are regulated pursuant to the Federal Food, Drug, and Cosmetic Act ("the Act") and regulations thereunder. *See 21 U.S.C. §§ 331, 351(a)(2)(B)*; 21 C.F.R. §§ 210, 211, and 212. The regulations establish a complex scheme that, among other things, requires current good manufacturing practices ("GMPs") by all manufacturers of pharmaceutical vaccine products. *Id.* The FDA may seize impure or adulterated drugs and may seek to enjoin any company practice in violation of the statute. *Id.* The GMP for training requires that each employee engaged in the drug manufacturing process must have the education, training, and experience, or any combination thereof, to enable that person to perform his or her assigned functions. *See 21 C.F.R. § 211.25.* (Pleading No. 53, Pl.'s App., Tab 23.) The regulations do not state exactly what training is required, leaving it to the regulated entity to create and implement training programs, subject to FDA inspection. Wyeth's [*5] standard operating procedure for training at the Sanford facility is contained in GMP 4024 Rev. G. (*Id.,* Tab 5, Kaylos Dep. at 200.)

Wyeth hired Livingston in August 2000 to serve as Manager of Training and Continuous Improvement ("TCI") at the Sanford, North Carolina facility. As part of his job responsibilities, Livingston was required to ensure that adequate training systems were in place for purposes of complying with federally mandated GMPs. [1] (Pleading No. 12, First Am. Compl. P 13.)

> 1 Plaintiff and Defendants disagree to some extent over Plaintiff's precise job responsibilities. However, for purposes of Defendants' motion for summary judgment, the Court views the facts and the inferences to be drawn therefrom in the light most favorable to the plaintiff non-movant. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

On October 3, 2000, Wyeth entered into a Consent Decree with the FDA following seizures of certain allegedly adulterated product. The seizures were based on FDA [*6] inspection reports identifying alleged GMP manufacturing and quality assurance violations at manufacturing sites in Marietta, Pennsylvania and Pearl River, New York. (Pl.'s App. Tab 16.) The Consent Decree did not specifically target the Sanford, North Carolina facility, but it is undisputed that Wyeth was required to retain a consultant to conduct a "division-wide assessment of its quality programs." Following entry of the Consent Decree, Wyeth sought to address compliance issues in all of its facilities, including the Sanford facility. *Id.* Tab 13; Tab 3. The Consent Decree required Wyeth to respond to the consultant's report and to submit a timetable for responsive actions. *Id.* Wyeth committed to implementing revised Level II guidance documents relating to training by September 30, 2002. (Def.'s App. Tab 13, Sakers Dep. at 27-30.)

Wyeth retained a consultant as required, who advised the company of certain steps that needed to be taken. Livingston claims that Wyeth advised its officers, managers and employees that non-compliance with the Consent Decree would impact negatively on shareholder value because Wyeth could face fines of $ 15,000 per day for missed commitments. [*7] *Id.* P 99; First. Am. Compl. P 24. On May 31, 2001, Wyeth submitted a response to the consultant's report, advising that it would, among other things, revise the quality system guidance documents ("Level II documents") used at Sanford and other facilities. Wyeth provided the FDA with a September 30, 2002 target date for implementing the revisions and verifying compliance. (Livingston Aff. P

2006 U.S. Dist. LEXIS 52978, *7; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

14; Tab 4, Kaylos Dep. at 4-5.) Wyeth used an electronic document control system, known as ISOTrain, to track participation in its training programs. (*Id.,* Kaylos Dep. Ex. 4.) Livingston was appointed project team leader of the Sustainable Compliance Initiative ("SCI"), a group set up to ensure site-wide compliance with the GMP training system. (Livingston Aff. PP 16-19, 23-25.) In this capacity, Livingston directed and oversaw preparations for training system audits at Sanford between January of 2001 and September 2002. *Id.*

The final internal verification before the September 30, 2002 commitment date was to be conducted by Wyeth's Office of Compliance between July 29, 2002 and August 1, 2002. (Pleading No. 53, Pl.'s App. Tab 13, Sakers Dep. at 93-97.) Livingston presents evidence of [*8] what he perceived to be serious gaps in the training documentation and training GMPs, including the results of an outside audit by The Quantic Group in 2000 and an internal audit in 2001. (Pleading No. 46 at pp. 12-14 and App. 13, 16, 17 and 23.) In Livingston's view, the state of documented training at the Sanford facility in the summer of 2002 was so abysmal that it mirrored the conditions in Pearl River, New York and in Marietta, Pennsylvania that prompted entry of the Consent Decree. (Pleading No. 46 at 14 and App. 25 at 1.) According to Livingston, as the deadline for the July/August internal audit approached, the ISOTrain report revealed that only sixty percent of all GMP positions at Sanford had training curricula entered into the system. (*Id.* App. 19, 20)

Livingston became convinced that Wyeth would be unable to meet the commitment date. There is record evidence, however, that even if the required training curricula had not been fully developed and implemented by the FDA commitment date, the Sanford site would nevertheless be deemed compliant provided that a satisfactory "legacy plan" was adopted. (Def.'s App. 2, DeFillipo Dep. at 47-48.) A legacy plan is a means of closing [*9] compliance gaps after the date for compliance passes. (Pl.'s Dep. at 390-95, 544.) Livingston had drafted legacy plans in the past, including a legacy plan addressing GMP 4024 dated April 29, 2002. *Id.* Livingston does not dispute that he subsequently signed off on the September 30, 2002 verification because a legacy plan was in place by that time. *Id.* Further, he admits that having a legacy plan in place by the end of September 2002 would adequately address any open items related to training. *Id.* at 544.

Livingston relies on several memoranda, including a memorandum dated July 10, 2002, to support his claim that he reasonably believed that Wyeth was about to commit wrongdoing. In the July 10, 2002 memorandum, Livingston formally expressed his concerns about gaps in training that might delay verification. The memorandum was addressed to Jim Svitanek (site SCI manager), Bruce Kaylos (site manager and Livingston's supervisor), and other members of the Site Quality Control team, including Margaret Savage, Judy Vollmer, and Mary Ellen DiFillipo. *Id.* Vollmer and DiFillipo were affiliated with Wyeth's corporate office. In the memorandum, Livingston opined that the training [*10] system at Sanford was deficient, and that the facility would not be able to meet the internal audit verification deadline. (Pleading No. 53, Pl. App. Tab 19.) He further stated that any attempt to verify compliance would be providing "false and misleading information to outside auditors, including the FDA" and that he would not be willing to sign off on the verification of compliance. *Id.*

Because he was on vacation, Kaylos allegedly did not receive Plaintiff's memorandum until on or about July 17, 2002. Kaylos and Livingston met in Kaylos' office on July 24, 2002 to discuss the July 10, 2002 memorandum. According to Livingston, Kaylos threatened to fire Livingston or to alter his job responsibilities at Sanford if he persisted in his criticism of the company's compliance status. (Livingston Aff. P 94.) Kaylos denies threatening Livingston in this manner, but testifies that he reminded Livingston that Livingston bore no responsibility for departments that did not meet their internal training commitments. (Pleading No. 53, App. 4, Kaylos Dep. at 161-162 & Ex. 4.) Kaylos further contends that he attempted to discuss performance issues Livingston had been having since the beginning [*11] of 2002, but Livingston would not discuss these issues. (*Id.;* Pleading No. 53, App. Ex. 5.) After the meeting, Kaylos contacted McKnickle in Human Resources to discuss a personal improvement plan ("PIP") for Livingston. *Id.*

Wyeth proceeded with its internal verification process between July 29 and August 1, 2002. Marlene Raschiatore from the Wyeth office of Compliance conducted the internal verification of Sanford's training system and found the system satisfactory, while noting, among other things, that gaps in training documentation would need to be addressed in a legacy plan. (Def.'s App. 12, Raschiatore Dep. at 29-30; Pl.'s App. 22.) Livingston admits that he signed off on Raschiatore's verification,

2006 U.S. Dist. LEXIS 52978, *11; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

but claims that he did so only on the limited terms stated by Raschiatore and because he intended to file complaints regarding Kaylos' conduct with the Compliance and Ethics offices. (Pl.'s App. 1, Livingston Aff. PP 102-104.) There is no dispute that, in the summer and fall of 2002, Livingston knew what a legacy plan was, and knew that if a legacy plan were in place, any open items in compliance by Wyeth by the FDA commitment date would likely be deemed adequately addressed. [*12] (Pl's Dep. at 390-95, 544.)

On or about July 29, 2002, Livingston filed a complaint with Wyeth's Office of Sustainable Compliance ("Office of Compliance") and Office of Ethics and Business Conduct (Office of Ethics), alleging that Kaylos had ignored Livingston's criticism of training system compliance, had threatened Livingston with termination, and had indirectly conveyed the message that Sanford was going to conceal facts, data, and information from the internal verification auditor to the extent that it reflected negatively on operations at Sanford. (Pleading No. 46, App. Tab No. 5, Exs. 56 and 57.) The Compliance Office initiated an investigation of this complaint, which was led by Edward Babiarz. (Def.'s App. 1, Babiarz Dep. at 67-68 & Ex.7.) On or about August 5, 2002, Livingston also met with Wyeth attorney Kenneth O'Brien to discuss Kaylos' conduct. (Pl.'s App. 1, Livingston Aff. at P 106.) Livingston claims that he told both Babiarz and O'Brien not only of his concerns about gaps in training documentation, but also of "widespread GMP compliance failures at the site and [his] concerns of adulterated release of vaccine." Id. P 113. Livingston provides no specific evidence [*13] of release or impending release of adulterated vaccine. By the term "adulterated," in this context, Plaintiff apparently means any vaccine that was in fact prepared by a person whose training is not adequately documented.

On or about July 11, 2002, allegedly prior to Kaylos' receipt of the July 10, 2002 memorandum, Kaylos and McKnickle discussed the possibility of placing Livingston on a PIP to address Livingston's performance issues, including: absences from the site, inaccessibility, and abusive conduct toward team members. After Livingston filed his complaint with the Office of Ethics and Business Conduct and the Office of Compliance on July 29, 2002, Wyeth's legal department recommended that Livingston not be placed on the PIP until the office had investigated his internal complaint against Kaylos. On October 9, 2002, after conducting an investigation of

Livingston's complaint, the Compliance Office closed the file without finding any violations by Kaylos or others. (Def.'s App. 11, O'Brien Dep. at 33-34; Def.'s App. 3, Grantland Dep. Ex. 7; Def.'s App. 1, Babiarz Dep. at 67-68.)

On September 30, 2002, the Sanford GMP training system received full verification by the Wyeth Office [*14] of Sustainable Compliance. (Def.'s App. 5, Livingston Depo. at 445, 565, 572-75, Exs. 58, 59, 64.) Livingston himself signed the necessary approval documentation verifying that Wyeth met the FDA verification deadline subject to implementation of a legacy plan to address training compliance gaps. Id.

After the September 30, 2002 verification and completion of the Compliance Office's investigation, Kaylos and the new Human Resources Director, David McCuaig, [2] placed Livingston on a 90-day PIP on or about October 16, 2002. (Def.'s App. 4, Kaylos Dep. Ex. 1.) The PIP outlined ten separate improvement expectations, including the requirement that, with the investigation closed and the verification accomplished, Livingston must stop making non-constructive comments to internal and external staff or contacts regarding Wyeth's alleged defrauding of the FDA or other departments' non-compliance with training GMPs. (Def.'s App. 4, Ex. 1.) Livingston refused to sign the PIP. Id.

> 2    In September 2002, Wyeth terminated McNickle and hired David McCuaig as Director of Human Resources for the Sanford facility. (Kaylos Dep. at 63.)

[*15] The tension between Livingston, Kaylos and McCuaig increased, with Livingston becoming increasingly suspicious that he was about to be terminated. Livingston asserts that on several occasions between October and his termination in December, Human Resources Director McCuaig stalked him at staff meetings and generally led Livingston to believe that he would be terminated in front of his team members. (Pleading No. 53, Pl.'s Brief in Opp. at 24.) On or about December 13, 2002, Livingston and McCuaig had a public confrontation at an off-site holiday party. McCuaig had not been invited to the party but showed up to wish the group a happy holiday. There was a tense exchange between Livingston and McCuaig in which Livingston told McCuaig to leave the party. (Pl.'s App. 1, Livingston Aff. at PP 147-152.) Livingston testified on deposition as follows:

2006 U.S. Dist. LEXIS 52978, *15; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

I approached Mr. McCuaig, and I asked him, "What are you doing here," and said, "This is a holiday party for the Central Training Team. You're not invited. We have a gift exchange. You have no gift. We have limited food," because of cost-cutting efforts at the plant. I asked Mr. McCuaig, "Why are you bird-dogging me?"

I said, This is why [*16] I'm filing a retaliation lawsuit against you, Kaylos and Wyeth. I need you to leave. If you do not leave, I'm going to ask the police escorting holiday traffic downstairs or directing holiday traffic downstairs to escort you out. Please leave. Thank you."

(Pl.'s Dep. at 193.)

On December 16, 2002, Wyeth suspended Livingston pending investigation of the holiday party incident. *Id.* at P 154. Wyeth formally terminated Livingston on December 19, 2002 as a result of his conduct at the holiday party. (Def.'s App. 11, O'Brien Dep. at 130.) To place Livingston's conduct in context, Defendants point to other unprofessional conduct engaged in by Livingston in the past, prior to his expressing concerns about noncompliance with training requirements. In 2001 and 2002, the Human Resources office received complaints from a number of Wyeth employees about abusive and inappropriate language used by Livingston. Among other things, his colleagues and subordinates complained to the Human Resources Director that Livingston was a poor leader, was often unavailable or absent, routinely lost his temper, was argumentative and unstable, had an inability to relate to his colleagues and regularly [*17] abused his subordinates. (Pleading No. 46, Def.'s Br. at pp. 5-7 & Def.'s App. 18, McNickle Aff. & Ex. 2; App. 8, McNickle Dep. at 71-74, 81-82, 138-143; Def.'s App. 2, DeFillipo Dep. at 23-25; Def.'s App. 16, Bowden Aff.) The record suggests, and Livingston does not appear to dispute, that a number of employees complained, resigned and/or asked for transfers as a result of Livingston's conduct. (*Id.* Def.'s App. 8, McNickle Dep. at 138-143.) On May 13, 2002, Wyeth issued Livingston a written warning for use of "foul and abusive language and unprofessional behavior" toward subordinates.

(Def.'s App. 5, Livingston Dep. at 277-78, 295, 329-32 & Ex. 11; App. 18, McNickle Aff. P 5.) The written warning stated that "further difficulties in this area will result in further discipline up to and including termination." (*Id.,* Livingston Dep. Ex. 11.) Livingston refused to sign the warning. *Id.* Shortly thereafter, on or about May 15, 2002, Livingston sent identical e-mail apologies to eight Wyeth employees regarding his "inappropriate language," "salty remarks," "intense debating style," and behavior "which may have caused [them] personal pain and discomfort." (Def.'s App. 5, [*18] Livingston Dep. at 287-88, 291-95 & Ex. 10.) Defendants also point to evidence that Livingston was inaccessible and was absent from SCI, team meetings and staff meetings more than others. (Def.'s App. 8, McNickle Dep. at 102, 109.)

Livingston does not deny using harsh and/or profane language toward his subordinates during his tenure. He instead argues that the job was inherently stressful and confrontational; that use of profanity was common at the facility; and that, in any event, by the time he was alerted to his performance issues, he had voiced sufficient criticism of training compliance deficiencies to render any disciplinary action retaliatory in nature. (Pleading No. 53 at 16-18.) Livingston disputes Defendants' contention that he failed to attend critical meetings and has testified in response that he was either not required to be at certain meetings or had work conflicts that prevented him from attending. *Id.* at 18-19. Livingston denies that he behaved inappropriately at the holiday luncheon. *Id.* Livingston claims that he was retaliated against for engaging in protected whistleblowing activity, with the retaliation taking the form of a hostile work environment, the [*19] PIP and his ultimate termination. *Id.*

### III. Motions to Strike Expert Affidavits

Livingston claims that he made disclosures protected under Sarbanes-Oxley and that his employer retaliated against him because of those disclosures. Defendants have moved for summary judgment dismissing the Sarbanes-Oxley claim and, among their supporting materials, have included the affidavits of two proposed expert witnesses, Daniel Michels and Roberta Karmel. Livingston moves to strike the affidavits as inadmissible. (Pleading Nos. 55, 56.)

*Federal Rule of Evidence 702* permits the admission of expert testimony covering "scientific, technical, or

2006 U.S. Dist. LEXIS 52978, *19; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

other specialized knowledge [which] will assist the trier of fact to understand the evidence or to determine a fact in issue." *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).* Michels has been retained by Defendants as an expert in the field of FDA regulatory practices and Karmel has been retained by Defendants as an expert in the field of securities law. The affidavits consist primarily of factual summary but also offer opinions on whether it was objectively reasonable for Livingston [*20] to believe that the company was about to engage in conduct that represented shareholder fraud.

The Court finds that both Mr. Michels and Ms. Karmel are well qualified in their proffered areas. However, while the summaries of FDA regulatory practices offered by Mr. Michels and securities law offered by Ms. Karmel may be helpful, their application of law to the facts of this case on an ultimate legal question is not. *See generally Adalman v. Baker, Watts & Co., 807 F.2d 359, 366 (4th Cir. 1986)* (trial court properly excluded expert opinion as to whether applicable securities law required particular disclosures). For this reason, the Court grants Plaintiff's motion to strike the expert witness evidence from consideration on Defendants' summary judgment motion.

**IV. Motion for Summary Judgment**

A. Summary Judgment and Standard of Review

The summary judgment standard of review under *Rule 56 of the Federal Rules of Civil Procedure* is well established. A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." *Fed. R. Civ. P. 56(c)* [*21] . The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *Anderson, 477 U.S. at*

255.

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), cert. denied, 481 U.S. 1029, 107 S. Ct. 1955, 95 L. Ed. 2d 527 (1987).* A mere scintilla of evidence [*22] is insufficient to circumvent summary judgment. *Anderson, 477 U.S. at 252.* Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id. at 248-49.* Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).*

B. Sarbanes-Oxley Whistleblower Claims

Plaintiff's claims under Counts I and II of the First Amended Complaint arise under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). Sarbanes-Oxley was enacted on July 30, 2002. Title VIII of Sarbanes-Oxley is designated as the Corporate and Criminal Fraud Accountability Act of 2002. Section 806, codified at *18 U.S.C. § 1514A,* is the provision that provides "whistleblower" protection to employees of publicly traded companies. Pursuant to *section 806,* an employer may not discriminate against any employee in the terms and conditions of employment because of any lawful act done by the employee to provide information to the [*23] employer, a federal agency or Congress concerning violations of *18 U.S.C. §§ 1341* (mail fraud), *1343* (wire fraud), *1344* (bank fraud), or *1348* (securities fraud), or any federal law relating to fraud against shareholders. *18 U.S.C. § 1514A(a)(1).*

Under the evidentiary framework of Sarbanes-Oxley, the plaintiff must first make a *prima facie* case by establishing by a preponderance of the evidence that: (1) the employee engaged in protected activity as defined by the Act; (2) the employer was aware of the protected activity; (3) the employee suffered an adverse employment action; and (4) circumstances exist which are sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. *Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365 (N.D. Ga. 2004).* Once an employee has met this burden, he is entitled to relief

2006 U.S. Dist. LEXIS 52978, *23; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

unless the employer demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of any protected activity. *Id.*

### 1. Retroactivity of Sarbanes-Oxley

The Sarbanes-Oxley Act became effective [*24] July 30, 2002, after Livingston's July 10, 2002 memorandum but prior to certain other alleged protected activity. Defendants argue that the statute has no retroactive application to activity that occurred before its effective date.

The statute does not state that it shall apply retroactively, and courts have acknowledged that in the absence of a retroactivity clause, the statute should not be applied retroactively. *See In re ADC Telcoms., Inc. Sec. Litig., 409 F.3d 974, 977 (8th Cir. 2005)* (refusing to retroactively apply *28 U.S.C. §§ 1658(b)* of Sarbanes-Oxley); *see also Martin v. Hadix, 527 U.S. 343, 352, 119 S. Ct. 1998, 144 L. Ed. 2d 347 (1999)*(statutes generally presumed non-retroactive). This Court has found no judicial authority addressing whether *18 U.S.C. § 1514A* applies retroactively. However, the parties cite several decisions of the Office of Administrative Law Judges from the United States Department of Labor, the entity charged with administrative review of claims under *18 U.S.C. § 1514A* and whose opinions, in certain circumstances, represent final decisions under Sarbanes-Oxley. Due to the dearth [*25] of federal court decisions addressing the issue, the Court will consider these administrative decisions useful for guidance, although the Court is not bound by them. *Cf. Collins, 334 F. Supp. 2d at 1375 n.10.*

Administrative law judges addressing the retroactivity argument generally have found that Sarbanes-Oxley's whistleblower provision does not apply to conduct that occurred before the date the statute was enacted. *See McIntyre v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 2003-SOX-23 (ALJ Jan. 16, 2004); *Gilmore v. Parametric Technology,* 2003-SOX-1 (ALJ Feb. 6, 2003); *Kunkler v. Global Futures & Forex, Ltd.,* 2003-SOX-6 (ALJ Apr. 24, 2003). However, at least one administrative law judge has found that the Act may apply where the alleged retaliatory action occurred after the statute's enactment. *Lerbs v. Buca Di Beppo, Inc.,* 2004-SOX-8 (ALJ June 15, 2004).

Livingston claims that he engaged in protected activity through September 2002. There is no question that, although he memorialized his complaints in a July 10, 2002 memorandum and again in a July 29, 2002 complaint before Sarbanes-Oxley was enacted, he persisted in communicating those complaints [*26] into the time period after the passage of Sarbanes-Oxley on July 30, 2002. Further, the alleged retaliatory discharge occurred on December 19, 2002, well after enactment of Sarbanes-Oxley. Accordingly, the Court finds that Livingston's Sarbanes-Oxley claim is not barred by the doctrine of non-retroactivity, because protected activity occurred in August and September 2002, after Sarbanes-Oxley was enacted, and the alleged retaliatory discharge occurred in December 2002.

### 2. Protected Activity

Defendants contend that Livingston's claims should be dismissed because the conduct he disclosed could not have constituted a violation of federal laws regulating shareholder fraud and therefore is not "protected activity" within the meaning of *section 806* of Sarbanes-Oxley.

Sarbanes-Oxley prohibits covered employers from taking adverse actions (including discharge, demotion, suspension, threats, and harassment) against an employee because of the employee's protected activity. The Act defines protected activity as

(a) . . . any lawful act done by the employee

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct [*27] which the employee reasonably believes constitutes a violation of *section 1341* [using Postal Service or interstate commerce for frauds and swindles], 1343 [using interstate commerce, wire, radio or television for frauds], 1344 [bank fraud], or 1348 [securities fraud] . . . or any provision of federal law relating to fraud against shareholders, when the assistance is provided to or the investigation is conducted by (A) a federal regulatory or law enforcement agency; (B) any member of Congress or any committee of Congress; or (C) a person with supervisory authority over the employee (or such other person working for the employer who has

2006 U.S. Dist. LEXIS 52978, *27; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

the authority to investigate, discover or terminate misconduct).

*18 U.S.C. § 1514A (Supp. 2005).* Sarbanes-Oxley was enacted to address corporate fraud on shareholders. One way it does so is by protecting employees who report violations of laws that relate to shareholder fraud. It is clear from the plain language of the statute and its legislative history that fraud is an integral element of a whistleblower cause of action. To be protected, the whistleblower must not only subjectively believe that the reported conduct [*28] may constitute fraud on shareholders, there must also be a reasonable, objective basis for suspecting such fraud. *See, e.g.,* S. Rep. No. 107-146, 2002 WL 863249, at * 18-19 (May 6, 2002). The "reasonableness" test used under Sarbanes-Oxley is the same test as that generally used in a variety of legal contexts. *See* Cong. Rec. S7418, S7420 (daily ed. July 26, 2002), reprinted at 2002 WL 32054527.

Livingston alleges that his protected activity consisted of his July 10, 2002 memorandum, his July 29, 2002 internal ethics and compliance complaint, his conversations with Babiarz and O'Brien in August 2002, and persistence through September 2002 in his complaints about training deficiencies and a perceived cover-up of those deficiencies. [3] He claims that he had a reasonably objective basis for believing that if Sanford went forward with compliance verification as scheduled, it would be providing false and misleading information to compliance auditors, including the FDA, thereby potentially subjecting Wyeth to fines and penalties. (First. Am. Compl. PP 79-80.) According to Livingston, based on the history of FDA compliance issues at Wyeth, the gravity of [*29] the Consent Decree (as portrayed by management itself), and management's stubborn refusals to heed his criticisms, it was reasonable for him to believe that Wyeth was "probably violating some SEC 'rule or regulation,' or some 'provision of Federal law *relating* to fraud against shareholders." (Pl.'s Mem. in Opp'n to Summ. J., at 30-31.) In support, he points to: the July 10 and 24 memoranda; his own affidavit testimony regarding his concerns; and documents chronicling the Consent Decree and compliance initiatives, including documents suggesting that, as of June 2002, only 60% of the Sanford employees had documented participation in training. [4]

3  Plaintiff's evidence of a "cover-up" is his own affidavit testimony that when he met with Bruce

Kaylos on July 24, 2002, Kaylos told him not to share his assessment with corporate headquarters. In that same affidavit, however, Plaintiff says he directed his July 10 assessment to Kaylos with copies to two persons at corporate headquarters, negating any reasonable perception by Plaintiff of a potential conceal of information from corporate headquarters. (Pl.'s Aff. PP 82-93.) Moreover, it is undisputed that Plaintiff's assessment was not suppressed in any fashion during the internal audit in late July.

[*30]
4  In the Sarbanes-Oxley count of his Complaint, Livingston cites only the July 10, 2002 memorandum as protected activity that *contributed to* the retaliatory conduct. (First Am. Compl. P 82.) In his opposing brief and affidavit, however, he asserts that he feared that the Sanford facility was releasing adulterated product as a result of GMP compliance deficiencies and disclosed this concern to O'Brien and Babiarz in connection with the ethics complaint.

Defendants argue that none of the evidence adduced by Livingston would have provided a reasonable basis for believing that Wyeth was about to commit some form of wrongdoing. Having reviewed the entire record on summary judgment, the Court agrees. To be protected under Sarbanes-Oxley, an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud. It may be that the employee need not know precisely what securities law is about to be violated, but there must be some basis for an objectively reasonable belief, considering the employee's experience and knowledge, that the corporation is about to commit [*31] wrongdoing. There is nothing in the record -- or in Livingston's allegations -- indicating that Wyeth made false or misleading statements, or omitted relevant information, in any documents provided to its shareholders. (See First Am. Compl. PP 49-51.) Disclosures made in 2000 and 2001 regarding the Consent Decree do not relate to the statements of Livingston that he alleges caused his termination. The annual report from 2002, also cited by Livingston in his Complaint, contains information consistent with the compliance efforts signed off on by Livingston and documented in the summary judgment record.

Nor was there an objectively reasonable basis, at the time of the allegedly protected activity, for Livingston to

Case 1:07-cv-07916-VM-MHD    Document 8-3    Filed 11/02/2007    Page 17 of 69

Page 9

2006 U.S. Dist. LEXIS 52978, *31; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

equate the perceived training deficiencies with imminent wrongdoing. On the record before the Court, it is entirely speculative to say that because Defendants disagreed with Livingston's belief that the facility could not meet the September 30, 2002 deadline, this meant that management planned to conceal critical information. Aside from Livingston's self-serving averments in his Affidavit, on matters of which he does not have personal knowledge or which are contradicted by [*32] his deposition testimony, the record is insufficient to support a finding that Defendants appeared to be ready to commit wrongdoing. Livingston admits in his affidavit that "the Consent Decree did not specifically require [training compliance standards] to be implemented by a specific date." (Pl.'s App. 1, P 14.) Although Defendants concede that Wyeth had committed to a September 30, 2002 target for implementing certain training guidelines, Livingston admits that even if compliance concerns persisted on that date, a legacy plan could be created for purposes of avoiding penalties under the Consent Decree. (Pl.'s Dep. at 390, 544.) This concession is fatal to Plaintiff's claims. No reasonable employee in Plaintiff's position could have believed Wyeth was headed toward wrongly concealing training deficiencies. Any such deficiencies, as Livingston well knew, would be deemed by the FDA to be adequately addressed if a legacy plan were adopted by Wyeth to afford it additional time to close any compliance gaps.

Livingston contends that the potential financial impact of non-compliance was so significant that the concerns about training deficiencies should have been communicated to shareholders. [*33] Even if it were reasonable to believe that the FDA might, in the future, take some type of enforcement action based on GMP and/or training compliance issues at Sanford, it is not clear that Wyeth would have been obligated to report these alleged violations before the FDA took any action. Information must be sufficiently material to a company's financial picture before it will form the basis for securities fraud. Under Supreme Court authority, for information to be material, there must be "a substantial likelihood that a reasonable shareholder would consider [the matter] important to his decision to invest." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976); see also Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).* Given the importance of "materiality" under the securities laws, Administrative Law Judges have rejected whistleblower retaliation claims where the information disclosed would not be sufficiently material to shareholders. Livingston's disclosures about issues of potential concern to the FDA, particularly where those concerns could be alleviated for the foreseeable future through legacy plans, are similar to the complaints [*34] advanced by the employee in *Minkina v. Affiliated Physician's Group,* 2005-SOX-19 (Dept. of Labor, Feb. 22, 2005) (Pleading No. 46, Def.'s App. 36.) Minkina claimed retaliation for reports she made to OSHA concerning what she believed to be dangerous air quality conditions in her workplace. In finding that her complaints were not protected activity under Sarbanes-Oxley, the Administrative Law Judge stated, "quite simply, while the Complainant may have a valid claim for poor air quality, Sarbanes-Oxley was enacted to address the specific problem of fraud in the realm of publicly traded companies and not the resolution of air quality issues, even if there is a possibility that poor air quality might ultimately result in financial loss." *Id.* at 5-6. *See also Nixon v. Stewart & Stevenson Servs., Inc.,* 2005-SOX-1, at 13-14 (Dept. of Labor, Feb. 6, 2005) (Defs.' App.37) (complaint regarding alleged failure to disclose potential violations of environmental regulations not material because mere possibility of future legal proceedings too speculative); *Harvey v. Safeway, Inc.,* 2004-SOX-21, at 31-32 (Dept. of Labor, Feb. 11, 2005) (Defs.' App. 32) (complaint of wage irregularities [*35] under Fair Labor Standards Act not material and not protected activity).

Finally, the evidence does not support a finding that it was reasonable for Livingston to believe that the Sanford facility was shipping (or would ship) adulterated product. Even assuming that at some point Livingston had a *subjective* belief that gaps in training might increase the chances that adulterated product would be released to the public, that belief was not an *objectively* reasonable one on the evidence adduced. *Cf. Tuttle v. Johnson Controls Battery Division,* 2004-SOX-76 (ALJ Jan. 3, 2005) (granting summary judgment against Complainant where Complainant alleged that he was terminated due to complaints that Respondent had shipped significant numbers of defective batteries, finding that the activities alleged did not involve intentional deceit or result in fraud against shareholders or investors). Moreover, it appears that Plaintiff's allegations about "adulterated product" refer solely to product that is "presumed" adulterated because it was prepared in part by a worker whose training was not fully documented. The Court has already found that there is no

evidence to have supported an objective [*36] belief in mid-2002 that Wyeth was about to be found in violation of the Consent Decree by reason of training issues at the Sanford facility.

3. Causation

Defendants further maintain that even assuming Livingston could show that he engaged in activity protected by Sarbanes-Oxley, his protected activity was not a contributing factor in the decision to discharge him in December 2002. In support, Defendants submit evidence that they contend shows that Livingston had relationship problems with his subordinates, peers and supervisors; was inaccessible; missed meetings; and exhibited insubordinate conduct. According to Defendants, Livingston was terminated for reasons other than his criticism of GMP compliance efforts.

To establish causation, Livingston must be able to demonstrate by a preponderance of the evidence "that protected behavior or conduct was a contributing factor in the unfavorable personnel action alleged in the complaint." *29 C.F.R. § 1980.109(a)*. This is not a demanding standard. The allegedly protected conduct need not be the sole factor, but only a factor in the unfavorable personnel action. *Collins, 334 F. Supp.2d at 1379* [*37] (citing *49 U.S.C. § 42121(b)(2)(B)(iii); Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed.Cir. 1993))*. Temporal proximity between the protected conduct and the unfavorable action has been found to establish causation. *Id.* (citing *29 C.F.R. § 1980.104(b)(2)*).

Defendants contend that the passage of time between Livingston's July 10, 2002 memorandum and his termination on December 19, 2002 precludes a finding of causation based upon temporal proximity. However, there is other evidence of at least some allegedly hostile conduct following more closely on the heels of Livingston's criticism of compliance efforts.

Defendants may still prevail if they can prove by clear and convincing evidence that the adverse action was motivated by legitimate, non-discriminatory reasons. *29 C.F.R. § 1980.109*. Defendants argue that they fired Livingston based solely on his insubordination toward McCuaig at the holiday party. It is undisputed that Livingston not only asked McCuaig, the Director of Human Resources, to leave the holiday party, he threatened to have the police remove McCuaig from the

party. There also is undisputed [*38] evidence that Livingston had been counseled and reprimanded for professional misconduct well before July 2002. The Court finds as a matter of law that Defendants have established by clear and convincing evidence that a non-discriminatory rationale independently caused Plaintiff's termination. Based on Livingston's own testimony, no reasonable trier of fact could disagree that Livingston would have been discharged for his insubordination at the holiday party, irrespective of his alleged protected activity. Plaintiff, acting in front of subordinate employees, threatened to have a superior official removed from an office party *by police officers* who were nearby. Such an act of insubordination and insolence without question called for and supported Plaintiff's immediate termination, and Plaintiff was in fact suspended immediately and fired within six days on the basis of his actions at the holiday party.

In conclusion, the evidence adduced, viewed in the light most favorable to Plaintiff Livingston, does not support an inference that Livingston had a objectively reasonable belief in August and September 2002 that Wyeth was about to engage in wrongdoing that would impact shareholders. [*39] Moreover, even if there were protected activity, Defendants have pointed to clear and convincing evidence that Livingston would have been terminated for insubordination unrelated to the protected activity. Summary judgment will therefore be granted on Counts I and II.

C. Claim for Wrongful Discharge Under North Carolina Law

In Count III of his First Amended Complaint, Livingston asserts a claim for wrongful discharge in violation of North Carolina law. He alleges that although his employment was at will, his discharge violated a public policy of North Carolina because he was discharged for reporting concerns about non-compliance with training GMPs and/or refused to sign off on the company's verification. Defendants move for summary judgment dismissing this claim.

North Carolina recognizes the common law doctrine of employment at will. That is, an employee may be discharged at any time and for any reason at the will of the employer, absent a contract for a definite term. *See Tuttle v. Kernersville Lumber Co., 263 N.C. 216, 139 S.E.2d 249 (1964)*. However, since 1985 North Carolina courts have recognized at least one exception to the

employment-at-will doctrine: discharge [*40] in violation of public policy. *See Sides v. Duke Hospital, 74 N.C. App. 331, 338, 328 S.E.2d 818 (1985).* In *Sides,* the plaintiff, a nurse anesthetist, alleged that she refused a doctor's request to administer what she considered a dangerous dose of anesthesia to a patient. *Id. at 333.* The doctor then personally administered the anesthesia and the patient went into cardiac arrest and suffered permanent brain damage. He then sued the doctor and the hospital. Before plaintiff was deposed, several physicians who worked at the hospital and hospital attorneys advised her not to tell all that she knew about what happened and that she would "be in trouble" if she did. *Id.* Rejecting this advice, plaintiff testified truthfully at both the deposition and trial, and the jury returned a large verdict for the patient. *Id.* Three months later, plaintiff was discharged. *Id. at 334.* She sued for wrongful discharge. The trial court dismissed the case for failure to state a claim, but the Court of Appeals recognized a cause of action in circumstances where, as in Sides, discharging an employee for refusing to testify untruthfully clearly contravened public [*41] policy. Id.

The North Carolina Supreme Court first considered the public policy exception in *Coman v. Thomas Mfg. Co., 325 N.C. 172, 175, 381 S.E.2d 445 (1989).* The plaintiff, a truck driver, alleged that his employer required him to falsify his logs so as to show the company's compliance with federal regulations. *Id at 173.* He was also instructed that he would have to continue driving for periods of time which violated the regulations if he wanted to maintain his employment. When he refused, he was informed that his pay would be cut in half. *Id. at 173-74.* The Supreme Court held that these facts -- which involved falsification of federal records -- came "within the reasoning of Sides and that the complaint stated a cause of action for wrongful discharge." *Id. at 175.* The court noted that the North Carolina Administrative Code incorporated the federal regulations and that a North Carolina statute provided for criminal penalties for seeking to evade or defeat such regulations. *Id. at 176.* The court found that the actions of defendant would impair and violate that policy, because they essentially encouraged the plaintiff [*42] to violate the public policy. *Id. at 176.*

The *Coman* court did not define what constitutes "public policy" for purposes of a wrongful discharge claim. Indeed, "there is no bright-line test for determining when the termination of an at-will employee violates

public policy." *Teleflex Info. Sys., Inc. v. Arnold, 132 N.C. App. 689, 691, 513 S.E.2d 85 (1999).* The North Carolina Supreme Court has said that

> Although it may be tempting to refine the definition of "public policy" in order to formulate a more precise and exact definition, we decline to do so. Any attempt to make the definition more precise would inevitably lead to at least as many questions as answers. True to common law tradition, we allow this still evolving area of the law to mature slowly, deciding each case on the facts before us.

*Amos v. Oakdale Knitting Co., 331 N.C.348, 353, 416 S.E.2d 166 & n. 1 (1992)* (plaintiffs stated claim by alleging that employer discharged them for refusing to work for less than the statutory minimum wage in violation of North Carolina public policy expressed in the Wage Act, *N.C.G.S. § 95-25.3*). Since *Amos,* the North Carolina courts, [*43] in identifying "public policy," have looked not only to state statutes but also to the state constitution and state and federal regulations to define "public policy." *See, e.g., Deerman v. Beverly Cal. Corp., 135 N.C. App. 1, 12, 518 S.E.2d 804 (1999)* (Board of Nursing regulations); *Lenzer v. Flaherty, 106 N.C. App. 496, 515, 418 S.E.2d 276 (1992)* (the state constitution). "At the very least, public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos, 331 N.C. at 353.* The courts of North Carolina have further noted that the exception is "grounded in considerations of public policy designed either to prohibit status-based discrimination or to insure the integrity of the judicial process or the enforcement of the law." *Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 333-34, 493 S.E.2d 420 (1997).*

According to Livingston, the public policy at issue in this case is the policy against distribution of adulterated drugs, as expressed in the North Carolina Food, Drug and Cosmetic Act, and in the federal Food, Drug and Cosmetic Act. *See N.C. Gen. Stat. § 106-122 et seq.* [*44] (2003); *21 U.S.C. § 301 et seq (1999 & Supp. 2005).* Both of these statutes prohibit the distribution of adulterated drugs and require compliance with good manufacturing practices. *Id.* Livingston contends that he was terminated for internally reporting that Defendant Wyeth was not in compliance with these laws or for

2006 U.S. Dist. LEXIS 52978, *44; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

refusing to violate these laws.

Defendants contend that there is insufficient record evidence from which a jury could find that they violated the law or that they required Livingston to violate the law. The Court agrees, noting that this case is in a different procedural posture from the vast majority of the cases addressing wrongful discharge claims. The most helpful cases on the issue before this Court, *e.g. Coman, Amos* and *Deerman,* were decided at an earlier stage of the proceedings, when the moving defendant was challenging only the allegations contained in the pleadings. The posture of this case is summary judgment, and Livingston must be able to forecast sufficient evidence to go to a jury.

Having reviewed the record, the Court finds insufficient evidence to create a triable issue on whether Livingston was discharged [*45] for reporting the violation of a law expressing the public policy of North Carolina. At the time Livingston wrote the July 10, 2002 memorandum, Wyeth was about to conduct an internal audit to gauge its readiness for the September 30, 2002 commitment date. Even if there were gaps in compliance at that time, it was entirely speculative, from the evidence adduced, for Livingston to believe that Wyeth planned to misrepresent facts during the September verification or that the company was about to ship adulterated product. Admittedly, there is sharp disagreement -- particularly between Kaylos and Livingston -- about how Livingston expressed his concerns. That disagreement, however, does not support a finding that Plaintiff believed Wyeth was about to violate the law. Indeed, he admits in his affidavit that "at no time [during his meeting with Kaylos] did I claim that 'Kaylos and Wyeth were trying to mislead the FDA and those involved with the July 29 verification.'" (Livingston Aff. P 95.) In spite of the picture that Livingston attempts to paint now, the evidence shows that he was *not* telling his supervisors about violations of the law, as he now urges, but rather, consistently with [*46] his job duties, was telling them that additional measures were necessary to be ready for verification. This was but one step in the process of complying with the Consent Decree and FDA regulations. The Court does not consider Livingston's conduct comparable to those cases in which the courts of North Carolina have found a predicate for a wrongful discharge claim. It is obviously not this Court's intent to discourage employees from voicing concerns about their company's compliance with the law. The Court simply holds that a plaintiff alleging wrongful discharge under the public policy exception must show something more than existence of a public policy and complaints intended to address internal compliance procedures. There must be a forecast of evidence that rests on more than speculation that laws grounded in public policy will be violated at some future date. [5]

    5   Defendants cite *Guy v. Travenol Labs, Inc., 812 F.2d 911 (4th Cir. 1986)* as authority for rejecting Livingston's claim. In *Guy,* the Fourth Circuit rejected a wrongful discharge claim when the employee alleged he had told his employer that others in the company were falsifying records about the quality and quantity of pharmaceuticals the company manufactured, and refused to falsify those records himself. *Id. at 917.* The North Carolina Supreme Court subsequently decided *Coman,* and that decision has been said by some courts to undermine the decision in *Guy.* Indeed, the plaintiffs in *Coman, Amos* and *Deerman* all were found to have stated a claim for wrongful discharge where the alleged policy was expressed in federal or state statutes or regulations and the plaintiffs alleged that they were discharged due to their refusal to violate those laws. The Court need not rely on *Guy* to decide the instant motions.

[*47] Further, there is insufficient evidence to support a finding that Defendants required Livingston to violate the law or risk losing his job. At best, the evidence shows that Livingston was criticized by Kaylos for his internal memorandum. (Livingston Aff. PP 93, 100, 102.) Livingston signed off on an internal checklist that, according to Livingston, did not attest to compliance. (Livingston Aff. P 122 ("The document I signed on September 30, 2002 focused on completion of these action items as identified by verification auditor Raschiatore. There was no understanding that the Office of Compliance verification document I signed had anything to do with attesting to the GMP compliance status of the Wyeth Sanford site."); *see also* Livingston Aff. P 95.) Simply put, Livingston's own testimony contradicts his argument that he was forced to violate the law or lose his job.

Finally, as discussed hereinabove, Defendants point to evidence that Plaintiff Livingston would have been terminated for reasons independent of his alleged protected activity -- his inexcusable insubordination

2006 U.S. Dist. LEXIS 52978, *47; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561

toward the Human Resources Director at the December 2002 holiday party. Defendants having demonstrated [*48] that an essential elements of Livingston's claim for wrongful discharge do not exist, and Livingston having failed to produce evidence to support the claim, Defendants are entitled to summary judgment on the claims under North Carolina law for wrongful discharge (Count III).

**Conclusion**

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff's motions to strike Defendants' experts (Pleading Nos. 55 and 56) are **GRANTED. IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Pleading No. 44) is **GRANTED** with respect to Plaintiff Livingston's claims under Sarbanes-Oxley (Counts I and II) and under North Carolina law (Count III) and that those claims are **DISMISSED with prejudice.** The Court having found in favor of Defendants on the substantive claims, Livingston's claim for punitive damages (Count IV) is

also **DISMISSED.**

A separate judgment will be entered contemporaneously with this Memorandum Opinion and Order.

**JUDGMENT**

For the reasons set forth in the Memorandum Opinion and Order filed contemporaneously with this Judgment,

**IT IS HEREBY ORDERED AND ADJUDGED** that this action be, and the same hereby is, dismissed [*49] with prejudice.

/s/ P. Trevor Sharp

United States Magistrate Judge

Date: July 28, 2006

# **TAB I**

LEXSEE 2007 DOLSOX LEXIS 63

In the Matter of: KATHY J. SYLVESTER and THERESA NEUSCHAFER
Complainants, v. PAREXEL INTERNATIONAL LLC Respondent.

CASE NOS: 2007 SOX 39 and 2007 SOX 42

U.S. Department of Labor
Office of Administrative Law Judges

*2007 DOLSOX LEXIS 63*

August 31, 2007

[*1]

DECISION AND ORDER DISMISSING COMPLAINTS

By Edward Terhune Miller, Administrative Law Judge

**OPINION:**

Statement of the Case

This case involves complaints by Theresa Neuschafer and Kathy J. Sylvester filed under the employee protective provisions of § 806 of the Sarbanes-Oxley Act (Corporate and Criminal Fraud Accountability Act of 2002, Public Law 107-204, *18 U.S.C. § 1514A, et seq.*)(SOX or the Act), and the regulations promulgated thereunder at 29 C.F.R. Part 1980. The applicable statutory provision prohibits any company with a class of securities registered under § 12 of the Securities Exchange Act of 1934, or required to file reports under § 15(d) of that act, or any officer, employee or agent of such company from discharging, harassing, or in any other manner discriminating against an employee with respect to terms and conditions of employment because the employee provided to the employer or Federal Government information relating to alleged violations of *18 U.S.C. § 1341* (mail fraud), § 1343 (wire, radio, TV fraud), § 1344 (bank fraud), or § 1348 (securities fraud), or any rule or regulation of the Securities [*2] and Exchange Commission (see, e.g. 17 C.F.R. Part 210 (2005), Form and Content of the Requirements for Financial Statements), or any provision of Federal law relating to fraud against shareholders.

The Federal mail and wire fraud statutes identified in the Complainants' complaints make it unlawful to use the mails, private parcel services, and various wire, radio, or television transmissions for purposes of planning or executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises..." *18 U.S.C. §§ 1341,* 1343. Although these statutes are not by their terms limited to fraudulent activity that directly or indirectly affects investors' interest, the alleged fraudulent conduct alleged in relation to such statutes "must at least be of a type that would be adverse to investors' interests." *See Platone v. FLYi,* ARB Case No. 04-154, ALJ Case No. 2003-SOX-27 (Sept. 29, 2006)(slip at 15). n1

n1 Complainants' reliance on *Reyna v. Conagra Foods, 2007 WL 1704577,* No. 3:04-CV-39 (M.D.Ga.) (June 11, 2007) for the proposition that under § 806 fraud violations under *18 U.S.C. §§ 1341,* 1343, 1344, or 1348, do not have to relate to fraud on shareholders is misplaced, because in this respect the case stands alone and in conflict with other authorities such as *Platone,* ARB Case No. 04-154, ALJ Case No. 2003-SOX-27; *Portes v. Wyeth Pharmaceuticals, 2007 WL 2363356, 06* Civ. 2689 (S.D.N.Y. Aug. 20, 2007); *Fraser v. Fiduciary Trust Co.*

*Int'l, 417 F. Supp.2d 310, 322 (S.D.N.Y. 2006),* among others.

[*3]

The Complainants allege that they suffered retaliation and unlawful termination by Respondent in response to their allegedly protected disclosures reporting violations by other employees of certain clinical drug testing protocols which they allege constitutes clinical fraud. Respondent has moved to dismiss the complaints pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or in the alternative pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted. n2 Complainants have filed a consolidated reply. Respondent filed a consolidated reply in support of its motions to dismiss, and a Notice of Supplemental Authority dated August 22, 2007, identifying the recently issued decision in *Portes, 2007 WL 2363356.* The complaints have been consolidated for hearing and decision.

n2 The Rules of Civil Procedure for the District Court of the United States shall be applied in any situation not provided for or controlled by the Rules of Practice and Procedure for Administrative Hearings Before Administrative Law Judges at 29 CFR Part 18, or by any statute, executive order, or regulation. 29 CFR §18.1. There is no provision in 29 CFR Part 18 for a Rule 12(b)(1) motion.

[*4]

Standards on Respondent's Motions to Dismiss

Complainants bear the burden of proving subject matter jurisdiction over their claims before this tribunal. *See Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 607 (2d Cir. 1994).* They must allege facts establishing that they engaged in protected activity within the definition of the Act. Complainants bear the burden of proof if a challenge is posed to the actual basis for subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *See Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)* (citing *Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).*

Respondent has framed two types of motions to dismiss based upon subject matter jurisdiction under Rule 12(b)(1): (1) a facial attack which questions the sufficiency of the pleading, and (2) a factual attack on the pleadings alleging subject matter jurisdiction. *See Hughart v. Raymond James & Ass.,* 2004-SOX-9 (Sec'y Dec. 17, 2004) (citing *Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320* (6<th> Cir. 1990)). In [*5] the first type of motion, the allegations in the complaint must be taken as true. *See Ohio Nat. Life Ins. Co. v. United States, 922 F.2d 320* (6<th> Cir. 1990). *See also Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Witt v. Roadway Express, 136 F.3d 1424, 1428 (10 Cir. 1998).* The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).*

In the second type of factual challenge, commonly called a "speaking motion" no presumptive truthfulness applies to the factual allegations. Rather, if the facts presented generate a factual controversy, this tribunal must weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist, but has wide discretion to allow affidavits, documents and conduct a limited evidentiary hearing to resolved disputed jurisdictional facts. *See Ohio Nat'l, 922 F.2d at 325* [*6] (internal citations omitted). "[F]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).* In these consolidated cases this tribunal need not proceed beyond the facial attack questioning the sufficiency of the pleading. Thus, determination of jurisdiction in these cases is not linked to a determination of disputed material facts.

Issue

Whether Complainants have alleged facts which establish protected activity within the scope of the Act and jurisdiction over the subject matter in this tribunal as a matter of law.

Findings of Fact

This tribunal assumes the following material facts and allegations by Complainants are true for purposes of resolving Respondent's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1); *Ohio Nat'l, 922 F.2d 320:*

1. Respondent Parexel International LLC (Parexel or Respondent) is a Limited Liability Company, formed under the laws of Delaware and publicly traded with a class of securities registered [*7] under § 12 *(15 U.S.C. § 78l)* and is required to file reports under § 15(d) *(15 U.S.C. § 78o(d))* of the Securities Exchange Act of 1934. As such, it is a company within the meaning of *18 U.S.C. § 1514A.*

2. Respondent operates various research facilities for testing drugs in a clinical setting on behalf of drug manufacturers or other sponsors, including a clinic located with Harbor Hospital in Baltimore, Maryland, (Baltimore Unit) where Complainants worked and where all pertinent actions took place.

3. Complainants were employed by Respondent under circumstances such that they are employees within the applicable definitions under the Act and 29 CFR § 1980.101.

4. Complainant Kathy Jean Sylvester was employed by Respondent from September 2003 until she was discharged on June 15, 2006. She was a shareholder of Respondent while employed by Respondent. She filed a timely discrimination complaint under the Act on September 11, 2006. (2007 SOX 39)

5. Sylvester served as Case Report Forms Department Manager from July 1, 2005, to June 15, 2006. In such capacity she was responsible, [*8] among other things, for the accurate reporting of data and related research results from clinical studies conducted by Respondent pursuant to the law and regulations promulgated by the United States Food and Drug Administration ("FDA").

6. A key duty of Sylvester as Case Report Forms Manager was to ensure the reporting of accurate research data and adherence to Good Clinical Practice (GCP) to the FDA, a responsibility regulated by the United States Code of Federal Regulations (CFR).

7. The GCP was produced by the FDA to provide a unified standard for designing, conducting, recording, and reporting trials that involve human subjects, and describes the essential regulatory documents that individually and collectively permit evaluation of the conduct of a clinical study and the quality of the data produced.

8. On or about Thursday, March 16, 2006, Sylvester reported to Elizabeth Jones, Nurse Manager, and Meimpie Fourie, Clinical Research Coordinator/Manager, that Karen Smith, Clinical Research Nurse, and Mary Ann Green, Research Assistant, were reporting false clinical data in violation of the FDA regulated GCP by falsely recording the time points at which Neurocognitive testing [*9] was performed by clinical subjects at designated times other than when true testing was performed in a Phase I study by Respondent for the drug manufacturer AstraZeneca (March Report). The false entries were witnessed by Ramona Setherley, Clinical Research Nurse. Fourie was Coordinator for the Study. All identified personnel were employees of Respondent. P30 Sylvester's report is not alleged to have expressly referred to any fraud on shareholders.

9. On or about May 26, 2006, Sylvester reported to Jones that Smith had fraudulently documented Pharmokinetic (PK) blood sample time points over the prior several weeks. (May Report) Smith placed the PK samples in her pocket, and later scanned the PK samples into Respondent's Clinbase system "at the appropriate time the PK samples should have actually been drawn. The PK samples should have been contemporaneously drawn from the subjects at the time points mandated by the study protocols pursuant to GCP. This fraudulent activity involves three current studies conducted by Parexel including Advanced Magnetics, Proctor & Gamble, and Astra Zeneca (sic)." (P31) The inaccuracy of the timing and recording of such samples could potentially result [*10] in flawed analysis and corrupt and inaccurate data. (PP 31,

32) This report also is not alleged to have expressly referred to any fraud on shareholders.

10. After Sylvester reported Green's conduct, her relations with other employees deteriorated and they retaliated against her. Personnel to whom Sylvester reported such retaliation, including Jones, Lisa Roth, Human Resources Director, and Rachel Garrido, Unit Director, failed or refused to investigate or take remedial action. (P40, 41, 42)

11. Smith and Green learned of Sylvester's complaint from Jones, who did not take appropriate remedial action. Green reacted adversely against Neuschafer, and Sylvester was blamed, and was issued a disciplinary letter of warning on March 21, 2006, which she interpreted as a preliminary step toward termination for reporting the clinical research fraud, and in retaliation for Sylvester's "reporting the violation of GCP and fraudulent research data by" Smith and Green.

12. At the time of the receipt of this letter Sylvester protested to her management that Respondent was disciplining her in retaliation for revealing the fraudulent clinical practices at Parexel, but her protest was ignored.
 [*11]
13. Sylvester was terminated by Unit Director Rachel Garrido, her supervisor and Senior Director of Business Operations, and Roth on June 15, 2006. Garrido told her that the termination decision was a "corporate decision" and that she was terminated because she was "not a team player." (P43) Upon her termination Sylvester's computer hard drive was taken from her computer and sent to corporate headquarters in Waltham, Massachusetts, in an allegedly unprecedented action. (P44)

14. Theresa A. Neuschafer was employed by Respondent as a Clinical Research Nurse (LPN) from August 16, 2004, until she was discharged August 10, 2006. (P 4) She filed a timely complaint alleging discrimination under SOX on October 30, 2006 (2007 SOX 42). She was a shareholder of Respondent while employed by Respondent. She was considered by coworkers to be a friend of Sylvester and notoriously unwilling to engage in false reporting or other conduct in violation of GCP (PP7, 9)

15. Neuschafer reported to Fourie on Wednesday, March 15, 2006, that two coworkers, Smith and Green, "were reporting false clinical data." Fourie indicated that the fact that the cognitive testing was not being properly recorded at [*12]  the time it was being done was "no big deal." (P14) Neuschafer had reviewed four charts of study subjects, discovered that the Neurocognitive testing time points were not complete, and questioned Smith and Green, and Ramona Setherly, Research Nurse. Smith responded by grabbing the four charts and falsely filling in the current times in violation of GCP. Sylvester was a witness to some or all of the incident. (P11) Neuschafer alleges in her complaint that Neuschafer was obligated to make this report to Jones and Fourie pursuant to Respondent's Code of Business Conduct and Ethics, and Respondent did not investigate her report as required by that Code. (P15) Neuschafer told Sylvester what had occurred. (P16) Sylvester reported the incident the following day.

16. Neuschafer's report related only the specified misreporting of clinical data by one or two coworkers. Her report is not alleged to have expressly referred to any fraud on shareholders. (P14)

17. Neuschafer later reported separate additional clinical misconduct to Sylvester, her coworker, who on or about May 26, 2006, reported that misconduct to Jones, who was Neuschafer's supervisor. Neuschafer reported to Sylvester that Smith [*13]  had fraudulently documented Pharmacokinetic (PK) blood sample time points over the prior several weeks, by placing the PK samples in her pocket after they were drawn and later scanning them into Respondent's Clinbase system at the times they should have been drawn. The Advanced Magnetics, Proctor & Gamble, and AstraZeneca studies were involved. (PP33, 34) Neuschafer does not allege that she herself reported the alleged misconduct of May 26, 2006, to her manager, Jones, or any other supervisor or person authorized to investigate employed by Respondent. There is no allegation that Neuschafer reported the alleged misconduct to anyone other than Sylvester, or that anyone other than Sylvester received a report from Neuschafer regarding improper blood draws or recording thereof by Smith. She does not allege that her report expressly referred to any fraud on shareholders.

18. Respondent issued Neuschafer a written disciplinary letter, and later terminated her employment effective August 10, 2006. Neuschafer was terminated from her employment by Jones, her supervisor, then the Manager of Clinical Operations, on August 10, 2006, allegedly in retaliation for making the March report. Neuschafer [*14] alleges she was also disciplined in March because she made the March report, but did not file any complaint until October 2006, which is more than ninety days after the March discipline was imposed. There is no allegation that Sylvester participated in the decision to terminate Neuschafer, but Jones, Neuschafer's supervisor, is alleged to have had knowledge of Neuschafer's report or allegedly protected activity, even though Sylvester is alleged to have made the report regarding Smith to Jones. When Jones terminated Neuschafer on August 10, 2006, she stated that the reason for termination was that Neuschafer's personality did not fit in. Neuschafer was not told of any misconduct or mistakes she made at work that caused her termination. (P4, 48)

19. Complainants Sylvester and Neuschafer allege that Respondent told, and trained its employees to understand, and that Complainants believed, that false recording of clinical studies data was clinical fraud that could lead to imprisonment; that clinical falsification such as that Complainants reported was a Sarbanes-Oxley violation; that accurate recording of clinical data is covered under a section of the Respondent's Code of Business Conduct [*15] and Ethics that discusses the Securities and Exchange Commission; that all employees of Respondent are told that Sarbanes-Oxley covers breaches of controls such as clinical study protocols which could affect Respondent's financial statements, because of the prospect of a wide range of penalties for falsification of data and fraud that might be imposed, and thus shareholders' interests. Complainants allege that they followed Respondent's management statements, memoranda, and training as to what constituted protected activity.

20. Complainants' allegations also include numerous legal conclusions to the effect that the entry of false clinical research data is protected activity under the Act in any event, and that the flow of such false data constitutes imminent mail and wire fraud, actual mail and wire fraud, or both, depending upon whether it was an initial or recurring activity involving release of such data to the FDA, study sponsors, and others. Complainants allege that the recording of false clinical data calls into question the integrity of the results of clinical drug studies; supports an allegation that Respondent is knowingly committing both mail and wire fraud by reporting [*16] false study data and results to the FDA, study sponsors, and others; places into question the reputation, integrity, competency, and criminality of the Respondent; and that all such matters would be of interest to, and would involve fraud upon, shareholders.

21. Complainants Sylvester and Neuschafer have made extensive other allegations in their pleadings that pertain to assumptions and predictions regarding the processing and transmission the allegedly false clinical data which they reported, and possibly other false data, and potential omissions or consequences of the entry of such false or inaccurate data such as disclosure, reporting obligations and potential defaults thereof, and possible penalties which might be imposed. Those allegations are conclusory and speculative in nature and do not demonstrate actual personal knowledge, beyond the fact of entry of false clinical data as alleged. Complainants also have alleged various financial consequences of the entry of false clinical data upon Respondent as well as its shareholders which are similarly conclusory and speculative in character.

Conclusions of Law and Discussion

SOX Claims

The complaints are filed pursuant [*17] to § 1514A(a)(1) of the Act, which provides in relevant part:

No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee --

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by -- (A) a Federal regulatory or law enforcement agency . . . or (C) a person with supervisory [*18] authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

*18 U.S.C. § 1514A*(a)(1).

To establish a whistleblower claim under § 1514A(a)(1), a complainant must prove by a preponderance of the evidence that (1) [she] engaged in a protected activity; (2) the employer knew of the protected activity; (3) [she] suffered from an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action. *See Portes, 2007 WL 2363356* (citing *Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp.2d 310, 322 (S.D.N.Y. 2006); Collins v. Beazer Homes USA, Inc., 334 F.Supp. 2d 1365, 1375 (N.D. Ga. 2004).* Respondent challenges the claims by motions under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), contending that as a matter of law Complainants cannot show they engaged in protected activity, and contending that none of Complainant's allegedly protected activities as described in their pleadings or otherwise were [*19] sufficiently related to securities fraud or any violation enumerated in § 1514A(a)(1) to support a SOX claim.

The law in this regard is now reasonably well defined. SOX protects employees who report activity that they "reasonably believe[] constitutes a violation" of the enumerated code sections pertaining to mail, wire, and other specified kinds of communications fraud, any SEC rule or regulation, or "any provision of Federal law relating to fraud against shareholders." *18 U.S.C. § 1514A*(a)(1). A whistleblower need not cite the specific law or regulation that he believes is being violated in his report or other allegedly protected activity. *See Portes, 2007 WL 2363356; Fraser, 417 F.Supp.2d at 322.*

The "context" of the disclosure and "the circumstances giving rise to the communication," if closely related to potential fraud against shareholders, may be sufficient to satisfy the pleading requirements of a SOX whistleblower claim. *Portes, 2007 WL 2363356; Fraser, 417 F.Supp. 2d at 323.* But disclosures are protected only when they [*20] "implicate the substantive Law protected in Sarbanes-Oxley 'definitively and specifically'" *Portes, supra* at 7; *Fraser, 417 F.Supp.2d at 322* (citing *Am. Nuclear Res. Inc. v. United States Dep't of Labor, 134 F.3d 1292, 1295* (6<th> Cir. 1998)(requiring that protected disclosure under the Energy Reorganization Act "definitively and specifically" relate to safety)). n3 Where a communication is "barren of any allegations of conduct that would alert [a respondent] that [the complainant] believed the company was violating any federal rule or law related to fraud against shareholders," the reporting is not protected by SOX. *Portes, 2007 WL 2363356; Fraser, 417 F.Supp.2d at 322. See also Livingston v. Wyeth, 2006 WL 2129794* at *10, No. 1:03CV00919 (M.D.N.C., July 28, 2006) ("To be protected under [SOX], an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud."); *Platone, 2006 WL 3246910* at *8 ("The relevant inquiry is not what [is alleged in the complaint [*21] filed with OSHA], but [what was] actually communicated to [the] employer prior to . . . termination.").

n3 Because of the hitherto relative scarcity of SOX case law authority, authority under analogous whistleblower statutes have been recognized as helpful. *See Collins, 334 F.Supp.2d at 1374.*

In *Livingston, 2006 WL 2129794,* Livingston complained that if Wyeth submitted data to the FDA without disclosing or correcting certain alleged deficiencies, Wyeth could be penalized by the FDA to its detriment, and could be violating some SEC rule or regulation or law relating to fraud against shareholders. The court held that the complaints did not qualify as protected disclosure under SOX because, "[t]o be protected activity under the Sarbanes-Oxley, an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud." Id. at *30. The court also held that a suggestion that management would conceal critical information was entirely speculative in the face of disagreement over training deficiencies, and Livingston could not have held an

objectively reasonable belief relating to shareholder [*22] fraud when he made his report. But even if it were reasonable to believe that FDA might in the future take some type of enforcement action based on the compliance issue reported, until FDA acted, this would not amount to information sufficiently material to the company's financial picture to form the basis for securities fraud, or to create a substantial likelihood that a reasonable shareholder would consider the information import to a decision to invest. Id. at *33 (citing *Minkina v. Affiliated Physician's Group,* 2005 SOX 19 (Sec'y Feb. 22, 2005); *Nixon v. Stewart & Stevenson Services, Inc.,* 2005 SOX 1 at 13-14 (Sec'y Feb. 16, 2005); *Harvey v. Safeway, Inc.* 2004 SOX 21 at 31-32 (Sec'y Feb. 11, 2005)). *See also Platone,* 2006 WL 3246910 at *15-16. Thus, whether or not the Complainants' essentially similar reports amount to reports of fraud, they do not qualify as material under the Act to the extent that materiality is in issue with regards to the parade of possible adverse consequences that false data entries might generate as alleged by Complainants.

Protected activity under § 806 of SOX may be deemed to have three essential elements: (1) [*23] the report or action must involve a purported violation of a federal law or SEC rule or regulation relating to fraud against shareholders; (2) the complainant's belief about the purported violation must be objectively reasonable; (3) and the complainant must communicate her concern to either her employer, the federal government, or a member of Congress. *See Hughart* 2004 SOX 9 at 47. The first element of this test mandates that the report or action specifically relate to fraud against shareholders. *See Bishop v. PCS Admin., 2006 WL 1460032,* No. 05 C 5683 (N.D. Ill. May 23, 2006). To fall within the protection of the Act, "the employee's protected communications must relate 'definitively and specifically' to any of the listed categories of fraud or securities violations under *18 U.S.C.A. § 1514A*(a)(1)." *Platone, 2006 WL 3246910.* Complainants' reports as described in their pleadings do not do this.

"Fraud" is an integral element of a cause of action under § 806 and incorporates a requisite accusation of intentional deceit that under SOX would pertain to a matter that is material to [*24] or that would impact shareholders or investors. *See Tuttle v. Johnson Controls,* 2004 SOX 76 at 3 (Sec'y Jan. 3, 2005); *Grant v. Dominion East Ohio Gas,* 2004 SOX 63 at 40 n. 40 (Sec'y Mar. 10, 2005) (citing *Hopkins v. ATK Tactical Systems,* 2004 SOX 19 (Sec'y May 27, 2004) (discontinued employee's request for explanations about projects, accounting, and software without reference to fraud or intention deception of stockholders is not protected activity)); *Brookman v. Levi Strauss & Co.,* 2006 SOX 36 (Sec'y April 27, 2007) (report to SEC charging submission of fraudulent reports to EEOC does not qualify as protected charge of shareholder fraud or securities violations under Act.); *Lerbs v. Buca Di Beppo, Inc.,* 2004 SOX 8 (Sec'y June 15, 2004)(queries about classification of questionable entries on general ledger believed to reflect misrepresentation of true financial position to investors insufficiently specific to be protected in the absence of identified particular concerns about illegal behavior).

The alleged fraudulent conduct must "at least be of a type that would be adverse to investors' interests" and meet the standards for materiality under the securities laws [*25] such that a reasonable shareholder would consider it important in deciding how to vote. *Platone, 2006 WL 3246910* at *15-16. Sylvester's complaint on its face does not satisfy these requirements because she alleges only that she reported that certain of Respondent's employees were falsely recording and reporting clinical data in violation of FDA regulations in two different ways on two different occasions, respectively. Neuschafer's complaint on its face does not satisfy these requirements because, in substance, Neuschafer alleges only that she reported to Sylvester that her coworkers were reporting such false clinical data. Thus, neither complaint satisfies the legal requirements for protected activity under SOX, because each complainant alleges at most that she reported that her coworkers were reporting false clinical data contrary to FDA requirements. Any such additional references to FDA regulations or violations thereof do not involve, inherently or otherwise, reference to shareholder fraud or violations of federal criminal statutes related to shareholder fraud or SEC statutory or regulatory requirements.

Complainants' many explanations and conclusory [*26] assertions in their complaints which attempt to expand or elaborate the scope of their actual reports of clinical fraud, which they allege comprise protected activity, to establish a connection with shareholder fraud are immaterial as a matter of law. The relevant inquiry is not what Complainants have alleged or argued in their complaints, but what Complainants actually communicated to Respondent prior to their respective terminations as alleged in their pleadings. *Platone, 2006 WL 3246910* at *17. *See also Lerbs v. Buca Di*

*Beppo,* 2004 SOX 8 at 13 (Sec'y June 15, 2004); *Trodden v. Overnite Transp. Co.,* 2004 SOX 64 at 5 (Sec'y Mar. 29, 2005). n4 Until the allegedly protected a activities are shown to have a sufficiently definitive and specific relationship to any of the listed categories of fraud or securities violations under *18 U.S.C. § 1514A*(a)(1), what Complainants might have believed or been told by Respondent regarding any relationship of such false reporting to SOX is irrelevant and immaterial to the legal sufficiency of their complaints under SOX. Complainants' beliefs in such regard would also not [*27]  be objectively reasonable.

> n4 Respondent points out that Neuschafer did not in her report, or subsequently, allege systemic fraud, that numbers of her coworkers were false reporting clinical data, that the alleged misreporting or fraudulent report was induced or rewarded by manager of Respondent, or that she reported to anyone a belief that her report or reports were not investigated by the study coordinator, as opposed to manager, to whom she delivered her report. She also has not alleged that she reported to anyone that she believed her report was suppressed or covered up despite the nearly five month interval between her alleged protected activity and her alleged retaliatory termination. Any such allegations must be gleaned from her complaint filed long after her allegedly protected report.

The conclusory allegations reflecting legal conclusions which are not allegations of material fact are not deemed to be controlling. Many of Complainants allegations which would necessarily be assumed to be true for purposes of resolving the Respondent's motions, are immaterial, or are merely conclusory statements lacking requisite factual underpinnings, are speculative, or are conclusory [*28]  and unsupported legal conclusions. Since they do not establish disputed material facts and related legal conclusions which would defeat Respondent's motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), they have been considered and disregarded as unnecessary to determination of Respondent's motion under Rule 12(b)(1).

Complainants' allegations of disclosures to supervisors seek to implicate the substantive law protected in SOX by alleging that Respondent's indoctrination and training of employees and representations to shareholders in effect establish the requisite nexus between the complaints and protected activity under SOX. Complainants allege, in substance, that, by violation of clinical drug testing protocols by the entry of false or inaccurate information, Respondent would face fines and other penalties, and would have engaged in fraudulent conduct that would affect its financial status and reporting and shareholders' interests. Complainants allege that references by Respondent in training and management communications to its employees concerning accuracy of drug trial data reporting as related to SOX provided them with a reasonable belief that the [*29]  Respondent was obligated to report such violations to the FDA, SEC, and shareholders with potentially adverse effects upon shareholder interests. n5 Thus, Complainants allege such reports as they made constituted protected activity under SOX. However, the allegations do not demonstrate that their disclosures of false clinical data recorded in violation of drug testing protocols "definitively and specifically" implicate the substantive law of SOX and fraud on shareholders, and thus the employee protection provisions of § 806 of that law.

> n5 Sylvester alleges in her complaint that the accurate reporting of data by her and Respondent to the FDA is critical for the shareholders of Respondent because the FDA and U.S. Code of Federal Regulations require that GCP be followed to ensure the accuracy of the data collected in subject clinical trials. Violation of GCP could constitute a violation of Federal law including the CFR, *18 U.S.C. § 1961* (pattern of racketeering activity under the Racketeering and Influenced Corrupt Organizations Act), *18 U.S.C. 1342* (mail fraud), *18 U.S.C. § 1343* (wire fraud), *18 U.S.C. 1344* (financial institution fraud) or other federal or state law. However, until enforcement action is taken, such allegations are speculative and are deemed insufficiently material to Respondent's financial picture to form a basis for securities fraud or to affect shareholders investment decisions. *See Livingston* at 33.

[*30]

There is no allegation in the pleadings that Complainants, notwithstanding their alleged beliefs, expressly referred to fraud, shareholders, securities, statements to the SEC, or SOX in their reports of false reporting of clinical data in violation of applicable drug testing protocols made to other employees and supervisors at Respondent. The purported

violations might have involved internal and FDA protocols, FDA regulations, and possibly other drug testing guidelines, but not SEC rules or other federal laws related to fraud against shareholders, and thus were not sufficiently related to shareholder fraud to constitute protected activity. *See Portes, 2007 WL 2363356; Livingston, 2006 WL 2129794.* Complainants' reports to personnel at Respondent related to alleged violations of regulations or applicable protocols governing the testing of medical drugs or procedures. The circumstances of the disclosures as alleged do not disclose communication to such personnel at Respondent their alleged concern that Respondent was being unfair to its investors, that its lack of compliance with FDA regulations or applicable protocols might [*31] have implications for Respondent's reports to investors or the SEC, or that Respondent was engaged in other conduct "that would alert [a respondent] that [the complainant] believed the company was violating any federal rule or law related to fraud against shareholders." *See Portes, 2007 WL 2363356* (citing *Fraser, 417 F.Supp.2d at 322); see also Hunter v. Northrop Grumman Synoptics,* 2005 SOX 8 (Sec'y June 28, 2005) ("[r]aising a concern about a violation of an ethics policy is not protected activity.").

Since Complainants were employed in nursing or related capacities, not as investment analysts at a financial services firm, no reasonable inference that they were concerned with shareholder fraud could have been derived from their job responsibilities or the nature of their work. In this context, their disclosures to Respondent are outside the scope of protected reporting under SOX. That they were shareholders at the time of the disclosures, without more, is not shown to have had any appreciable effect upon their concerns with shareholder fraud at the time of the disclosures beyond their self-interest and atypical situation [*32] as whistleblowers.

To suggest that Claimants seem to rely upon the old adage that, "for want of a nail the kingdom was lost" in no way belittles the significance of inaccurate assessment and reporting of clinical drug trail data in the larger scheme of things. But concern with responsible conduct of clinical trials and accurate reporting of clinical trial data in such circumstances does not justify relief under SOX for these Complainants. Despite the torrent of secondary and tertiary consequences of the allegedly inaccurate, false, or even fraudulent clinical data generated by one or two coworkers and reported by Complainants, and the alleged failure or refusal of the company managers to investigate and follow up the complaints with corrective action recited in their respective complaints, the material allegations in the complaint do not reasonably extend beyond a complaint that these Complainants were fired for complaining about breach by one or two coworkers of clinical medical testing protocols. Such complaints about the accuracy and conduct of clinical drug or medical procedure trials do not qualify as protected activity under SOX because they do not have a definitive and specific [*33] relation to fraud involving shareholders as required by the Act, *Platone, Portes, Livingston,* and other authorities. It follows that Respondent's motion under Rule 12(b)(1) for dismissal of the consolidated complaints for failure of the pleadings on their face to establish subject matter jurisdiction under the Act should be granted.

ORDER

The motions of Respondents to dismiss the complaints of Neuschafer and Sylvester are granted, and the complaints are dismissed.

# TAB J

LEXSEE 2007 DOLSOX LEXIS 53

In the Matter of ROGER FREDRICKSON, Complainant v. THE HOME DEPOT U.S.A.,
INC., Respondent

CASE NO.: 2007-SOX-13

U.S. Department of Labor
Office of Administrative Law Judges

*2007 DOLSOX LEXIS 53*

July 10, 2007

[*1]

RECOMMENDED DECISION AND ORDER GRANTING MOTION FOR SUMMARY DECISION AND
CANCELLING FORMAL HEARING

LEE J. ROMERO, JR., Administrative Law Judge

**OPINION:**

This proceeding arises under the Sarbanes-Oxley Act of 2002, technically known as the Corporate and Criminal
Fraud Accountability Act, P.L. 107-204 at *18 U.S.C. § 1514A* et seq., (herein SOX or the Act), and the regulations
promulgated thereunder at 29 C.F.R. Part 1980, which are employee protective provisions.

On May 21, 2007, Respondent Home Depot filed a Motion for Summary Decision seeking dismissal of
Complainant's complaint against it arguing that Complainant cannot establish a **prima facie** case because: (1)
Complainant's communications did not constitute protected activity under SOX; (2) Complainant did not complain to a
person with the authority to investigate, discover, or terminate misconduct; and (3) Complainant cannot establish that
alleged protected activity was a contributing factor to his discharge as the persons responsible for his discharge lacked
knowledge of his alleged protected activity.

Respondent's Motion further provides that Complainant cannot prevail, even if he were to establish [*2] a **prima
facie** case because Respondent demonstrated a legitimate business reason for the unfavorable job action, which it would
have taken absent the alleged protected activity.

On June 18, 2007, Complainant filed a response to Respondent's Motion with notarized affidavit contending that:
(1) Respondent's motion mischaracterized Complainant's protected action in that Complainant contends he was fired in
retaliation for properly taking store markdowns over the objection of his superiors, complaining about "return to
vendor" charge back practices, and refusing to follow the fraudulent practice; (2) whether or not Ms. Heifner had
authority to investigate, discover, or terminate misconduct is a question of fact to be decided at trial and may not be
determined by Respondent's assertions and self-serving affidavits; (3) whether Complainant's statement to Ms. Heifner
was a contributing factor in his discharge requires determination by the fact finder; (4) whether Complainant would
have been discharged for the reason asserted by Respondent calls for determination by the finder of fact; and (5)
Respondent has a history of presenting affidavits which prove to be inaccurate, misleading, and [*3] even false,
therefore no affidavits supplied by Respondent should be relied upon for purposes of summary judgment, and cannot be
substituted for live testimony.

## Background

Complainant was deposed by the parties on March 26, 2007. (Complainant's deposition, p. 2). He was employed on April 19, 2006, as department supervisor at a Home Depot store. During the first week of June 2006, Complainant purposed to mark down hooks for use in his department using a computer located in the service department. He was told by Brandi Heifner, service department supervisor, that nothing was to be marked down for store use anymore, and that everything was to be entered as damaged goods. Complainant responded stating "you can't do that. It's illegal." Ms. Heifner responded "that's Tom's orders," referring to Tom Burns, the store manager. (Complainant's deposition, pp. 34-35, 242).

Complainant refused to follow Ms. Heifner's instructions, stating "If you want to write them down to damaged goods, you're welcome to, but I'm not going to do it." She took the hooks and entered the information into the computer herself. Amy Higginbotham, an employee who reported to Brandi Heifner, was present during [*4] the conversation. Complainant stated that the department heads had authority only to supervise the employees in their department. (Complainant's deposition, p. 50). Like Complainant, Ms. Heifner was a department head. Complainant was not an employee in Ms. Heifner's department, although Complainant contends she had authority to "supervise" computer entries done in her department. (Complainant's deposition, pp. 25-26).

Complainant testified in deposition that he was not told directly that marked-down items were recorded as a loss to the store, but he had heard in meetings that damaged goods were charged back to the vendor. He stated that he believed items recorded as damaged goods were charged back to the vendor. (Complainant's deposition, pp. 40-42). He further stated he believed that recording goods used by the store as damaged goods constituted "falsifying the books of the company." (Complainant's deposition, p. 36).

The details of Complainant's conversation with Ms. Heifner are not in dispute. Complainant testified that he reported the conduct which he believed was illegal to Brandi Heifner, with Ms. Higginbotham present. (Complainant's deposition, pp. 46-47, 49). After his conversation [*5] with Ms. Heifner, Complainant mentioned the incident to Ted Parent, a non-supervisory employee, and three or four other non-supervisory employees at the service desk. (Complainant's deposition, pp. 51, 54).

Complainant did not discuss his conversation with Ms. Heifner or concerns about markdown practices with Mr. Burns, the store manager, or Joe Martinez, Complainant's direct supervisor. Complainant stated Mr. Martinez was on vacation and unavailable until his discharge date. Additionally, Complainant did not know of other lawsuits involving markdowns and the return to vendor process **until after his termination.** (Complainant's deposition, pp. 59, 258-259).

A "day or so" after Complainant's conversation with Ms. Heifner, Complainant entered other items into the computer under the "store use" category, contrary Ms. Heifner's instructions. Complainant was aware Mr. Burns watched the books closely, and reviewed "the things that went through the files every day." Complainant concluded that Mr. Burns was aware of his computer entries which contravened Mr. Burns' instructions as relayed by Ms. Heifner. (Complainant's deposition, pp. 59-60). Complainant believed Mr. Burns may have been [*6] referring to the input issue when he commented "I get the feeling I'm losing you." (Complainant's deposition, p. 62).

Complainant believes he thereafter suffered adverse job actions in that: (1) Mr. Burns instructed two persons assigned to Complainant's department to work in a different department which hindered Complainant's job performance; (2) Brian Miller, a management employee, was unreasonably belligerent with Complainant about his temporary presence in another department; and (3) Mr. Miller made unreasonable physical demands of Complainant including forcing him to work in 100+ degree weather, and work without a meal break. (Complainant's deposition, pp. 62-63, 78-79, 85, 87-88).

Complainant stated he developed a knee problem as a result of Mr. Miller's unreasonable physical demands.

However, he did not report the matter to Mr. Burns or any other Home Depot manager for fear of losing his job. (Complainant's deposition, pp. 90-92).

On June 16, 2006, Complainant was in the Home Depot store to have reports signed. During an incident, the details of which are in dispute, Complainant's hand impacted the groin area of a vendor representative, Tim Quick. Complainant contends the impact [*7] was accidental and minimal. (Complainant's deposition, pp. 95-96). On June 17, 2006, Complainant was told by Mr. Miller that he was being investigated over the incident involving the vendor. (Complainant's deposition, pp. 104-105). The following Monday, Complainant stated he tried to speak with Mr. Quick, but Mr. Quick ignored him and left the store. Complainant's employment was terminated on June 20, 2006. (Complainant's deposition, pp. 109-111).

The only persons whom Complainant knew were involved in the investigation that led to his termination were Brian Miller and two people, formerly unknown to Complainant, who were present at his termination. Complainant stated he had not told Brian Miller or the others present at his termination of any activity he considered to be illegal. (Complainant's deposition, pp. 189-190).

Complainant filed a complaint with the Occupational Safety and Health Administration (OSHA) alleging SOX violations. OSHA dismissed the complaint on November 30, 2006, which finding has now been appealed to the Office of Administrative Law Judges.

## DISCUSSION

### A. Summary Decision

The standard for granting summary decision is set forth at 29 C.F.R. § 18.40(d)(2001). [*8] See, e.g. Stauffer v. Wal Mart Stores, Inc., Case No. 99-STA-21 (ARB Nov. 30, 1999)(under the Act and pursuant to 29 C.F.R. Part 18 and Federal Rule of Civil Procedure 56, in ruling on a motion for summary decision, the judge does not weigh the evidence or determine the truth of the matter asserted, but only determines whether there is a genuine issue for trial); Rollins v. American Airlines, Inc., ARB Case No. 04-140, Case No. 2004-AIR-9 (ARB April 3, 2007); Webb v. Carolina Power & Light Co., Case No. 93-ERA-42 @ 4-6 (Sec'y July 17, 1995). This section, which is derived from Fed. R. Civ. P. 56, permits an administrative law judge to recommend decision for either party where "there is no genuine issue as to any material fact and . . . a party is entitled to summary decision." 29 C.F.R. § 18.40(d). Thus, in order for Respondent's motion to be granted, there must be no disputed material facts upon a review of the evidence in the light most favorable to the non-moving party (i.e., Complainant), and Respondent must be entitled to prevail as a matter of law. Gillilan v. Tennessee Valley Authority, Case Nos. 91-ERA-31 and 91-ERA-34 @ 3 (Sec'y August 28, 1995); Stauffer, [*9] supra.

The non-moving party must present **affirmative evidence** in order to defeat a properly supported motion for summary decision. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).* It is enough that the evidence consists of the party's own affidavit, or sworn deposition testimony and a declaration in opposition to the motion for summary decision. *Id. at 324.* Affidavits must be made on personal knowledge, set forth such facts as would be **admissible** in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. F.R.C.P. 56 (e).

A non-moving party who relies on conclusory allegations which are unsupported by factual data or sworn affidavit . . . cannot thereby create an issue of material fact. See *Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993);* Rockefeller v. U.S. Department of Energy, Case No. 98-CAA-10 (Sept. 28, 1998); Lawrence v. City of Andalusia Waste Water Treatment Facility, Case No. 95-WPC-6 (Dec. 13, 1995). Consequently, [*10] Complainant may not oppose Respondent's Motion for Summary Decision on mere allegations. Such responses must set forth specific facts showing that there is a genuine issue of fact for a hearing. 29 C.F.R. 18.40(c).

2007 DOLSOX LEXIS 53, *10

The determination of whether a genuine issue of material fact exists must be made by viewing all evidence and factual inferences in the light most favorable to Complainant. Trieber v. Tennessee Valley Authority, Case No. 87-ERA-25 (Sec'y Sept. 9, 1993).

The purpose of a summary decision is to pierce the pleadings and assess the proof, in order to determine whether there is a genuine need for a trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* Where the record taken as a whole could not lead a trier of fact to find for the non-moving party, there is no genuine issue for trial. *Id. at 587.*

Accordingly, in order to withstand Respondents' Motion, it is not necessary for Complainant to prove his allegations. Instead, he must only allege the material elements of his prima facie case. Bassett v. Niagara Mohawk Power Co., Case No. 86-ERA-2, 4 (Sec'y. July 9, 1986).
 [*11]
**B. Elements of a prima facie case under SOX**

The whistleblower provision of Sarbanes-Oxley, set forth at *18 U.S.C. §1514A,* states, in pertinent part:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 *(15 U.S.C. 78l)* . . . or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee --
>
>> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by . . .
>
>> (C) a person with supervisory authority over the employee (or such other person working for the employer [*12]  who has the authority to investigate, discover, or terminate misconduct) . . . .

*18 U.S.C. § 1514A* (a)(1); see also 29 C.F.R. § 1980.102 (a), (b)(1).

Complainant must make a **prima facie** showing that his protected activity was a contributing factor in the unfavorable personnel action alleged in the complaint. If Complainant is successful in establishing a **prima facie** case, Respondent may nonetheless avoid liability if it demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior. See, Platone v. FLYi, Inc., ARB No. 04-154, Case No. 2003-SOX-27 (ARB Sept. 29, 2006); *49 U.S.C. § 42121*(b).

**The Burden of Proof**

In a Sarbanes-Oxley "whistleblower" case, a complainant must establish by a preponderance of the evidence that: (1) he engaged in protected activity as defined by the Act; (2) his employer was aware of the protected activity; (3) he suffered an adverse employment action, such as discharge; and (4) circumstances exist which are sufficient to raise an inference that the protected activity [*13]  was likely a contributing factor in the unfavorable action. See *Mactal v. U. S. Dep't of Labor, 171 F.3d 323, 327 (5th Cir. 1999);* Welch v. Cardinal Bankshares Corporation, ARB No. 05-064, Case No. 2003-SOX-15, @ 8 (ARB May 31, 2007).

**1. Protected Activity**

To constitute protected activity under SOX, a Complainant must communicate information which he reasonably believes constitutes fraudulent activity. "The 'reasonable belief' standard requires [Complainant] to prove both that he actually believed that the [relevant law or regulation has been violated] and that a person with his expertise and knowledge would have reasonably believed that as well. Welch, supra. Thus, complainant's belief "must be scrutinized under both subjective and objective standards." Melendez v. Exxon Chemicals Americas, Case No. 1993-ERA-6 (ARB July 14, 2000).

The Administrative Review Board (ARB) has held: "an employee's protected communications must relate 'definitively and specifically' to the subject matter of the particular statute under which protection is afforded." Platone v. FLYi, Inc., supra, at 17 (ARB Sept. 29, 2006).

Sarbanes-Oxley was enacted for [*14] the purpose of eliminating perpetration of fraud against shareholders as evidenced by the plain language of the Act as a whole. SOX goes to great lengths to assure that information assimilated to the investing public is not fraudulent by, among other measures, establishing the Public Company Accounting Oversight Board to ensure auditors' independence, assessing responsibility to the Audit Committee of the Board of Directors of a company, requiring management to attest to the accuracy of internal controls and financial reports, and installing criminal penalties for intentional misrepresentations to the investing public. *15 U.S.C. § 7211; 15 U.S.C. § 7241; 15 U.S.C. § 78j-1; 18 U.S.C. § 1350.*

In the securities area, fraud may include "any means of disseminating false information into the market on which a reasonable investor would rely." *Ames Department Stores Inc., Stock Litigation, 991 F.2d 953, 967 (2d Cir. 1993)* (addressing SEC antifraud regulations). While fraud under the Act is undoubtedly broader, an [*15] element of intentional deceit that would impact shareholders or investors is implicit. See Hopkins v. ATK Tactical Systems, Case No. 2004-SOX-19 (ALJ May 27, 2004); Tuttle v. Johnson Controls, Battery Division, Case No. 2004-SOX-0076 (ALJ Jan. 3, 2005). To impact shareholders or investors, fraud as related to a third party, such as a vendor, must be of sufficient import to constitute information upon which a reasonable investor would rely.

The Supreme Court, in addressing other types of shareholder fraud, held that to "fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted (or misstated) fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988)* (quoting *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976)).*

In the instant case, Complainant maintains that he had a reasonable belief of fraud relating to recordation of items as damaged rather than for "store use," whereby refunds for such merchandise were wrongfully extracted from [*16] vendors. Complainant stated he was informed of the new policy by Ms. Heifner who related the instructions originated with Mr. Burns, the store manager. Therefore, Complainant had no reasonable basis to believe that the policy extended beyond the store for which he worked. Such an alleged fraudulent policy, isolated to a single Home Depot store, even if true, is not of a magnitude sufficient to support a reasonable belief that a reasonable investor would rely upon such information, or that it altered the 'total mix' of information available to an investor. Thus, based on Complainant's deposition testimony, it is clear he had no reasonable belief that Respondent had engaged in any conduct or activity which violated any of the laws or regulations enumerated in the SOX Act or that Respondent engaged in conduct that constituted fraud against its shareholders.

Accordingly, I find that there are no disputed material facts that Complainant failed to offer any evidence to establish a **prima facie** case as he cannot establish, under the facts presented, a reasonable belief of fraud actionable under the Act.

### 2. Requirement to report misconduct to person in authority

As noted above, the [*17] underlying purpose of the Sarbanes-Oxley Act was to protect the investing public. In addition to the plain language of the statute, the legislative history of the Act reflects the intent to protect the investing

public by exposing and correcting fraudulent behavior. See e.g., *S. Rep. No. 107-146, 2002 WL 863249* (May 6, 2002) (explaining that the pertinent section "would provide whistleblower protection to employees of publicly traded companies who report acts of fraud to federal officials with the authority to remedy the wrongdoing or to supervisors or appropriate individuals within their company"). The provision is designed to protect employees involved "in detecting and stopping actions which they reasonably believe are fraudulent." Id.

To achieve this underlying purpose, the Act anticipates and encourages employees to report fraudulent conduct, to outside agencies, Congress, and **company personnel in a supervisory capacity over the employee or "such other person working for the employer who has the authority to investigate, discover, or terminate misconduct."** *18 U.S.C. § 1514A* (a)(1)(c). Communication of [*18] an employee to their supervisor would be a natural course of reporting, following established lines of authority. Likewise, reporting wrongful conduct to another employee vested with the power to take remedial steps would be a logical course to effect change. However, communication of wrongful conduct to parties lacking supervisory authority over the whistleblower, or "authority to investigate, discover, or terminate misconduct," does not constituted protected activity, as it does not serve the underlying purpose of the Act.

Respondent contends that neither Ms. Heifner nor any of the other persons to whom Complainant complained constitute a person having supervisory authority over Complainant or "authority to investigate, discover, or terminate misconduct." Complainant asserts that this is a question of fact, and may not be determined by Respondent's assertions and self-serving affidavits, without offering any affirmative evidence to the contrary.

The proponent of a rule has the burden of proving it. Complainant, therefore, bears the initial burden of showing sufficient evidence to establish a genuine issue of fact as to whether or not Ms. Heifner was an appropriate person to receive [*19] Complainant's protected communication.

In this case, Complainant stated he complained to Ms. Heifner, a department supervisor, while Ms. Higginbotham, a non-supervisory employee was present. Complainant additionally contends he communicated his conversation with Ms. Heifner to three or four service department employees. Complainant argues that Ms. Heifner had "supervisory authority" over the computer postings done in her department. He additionally argues that the store manager, Mr. Burns, had constructive knowledge of his alleged protected activity because Complainant later posted other items to the "store use" category, and Mr. Burns regularly reviewed the computer postings.

The parties agree that Complainant and Ms. Heifner were both department supervisors, having supervisory authority only over the employees within their respective departments. Therefore, Ms. Heifner did not have supervisory authority over Complainant. Complainant testified that he gave Ms. Heifner the information for her to make the initial computer entries to "damaged goods." She relayed the instructions of the store manager, but did not forbid Complainant from making the compute.r entry. Complainant thereafter [*20] entered other goods to the "store use" category which he considered correct, indicating he did not consider himself bound by Ms. Heifner's instructions.

I find and conclude that Ms. Heifner's actions did not constitute her "supervision" of the postings since she neither forbad nor prevented Complainant from making entries to the "store use" category. I further find that Complainant's communications with Ms. Heifner and the non-supervisory employees cannot constitute protected activity under the Act as none of them either have supervisory authority over Complainant or have authority to investigate, discover, or terminate misconduct.

Sarbanes-Oxley includes several provisions to encourage employees to come forward with information of wrongdoing. For example, it mandates that the audit committee of a company must establish procedures for "the confidential, anonymous submission by employees of the issuer of concerns regarding questionable accounting and auditing matters." *15 U.S.C.A. § 78j-1* (m)(4)(B). Thus, the Act seeks to protect employees from retaliation for their purposeful protected communications. There is nothing in the Act to indicate that [*21] it intended to protect any constructive communication, as such does not require purposeful effort by the employee and thus would not subject him to retaliation for such effort. Therefore, for a communication to be protected, it arguably must be an express, not

constructive, communication.

In this case, Complainant merely entered an item into the computer system as he thought was proper. He did not take steps to report the conduct to Mr. Burns. Rather, Complainant assumed Mr. Burns would discover his computer entry based on Complainant's perception that Mr. Burns reviewed "things that went through the files every day." At best, this would constitute a constructive communication of the issue of proper input of items for store use.

Consequently, I find that Complainant did not engage in protected activity by virtue of Mr. Burns' alleged constructive discovery of Complainant's computer input, which was contrary to Mr. Burns' instructions.

Accordingly, I find and conclude that there are no disputed material facts that Complainant has failed to establish a **prima facie** case in that he did not complain to an appropriate person or agency for purposes of the Act.

### 3. Did Complainant establish [*22] that sufficient circumstances existed to raise an inference that his alleged protected activity was likely a contributing factor to adverse job action?

Respondent contends Complainant has failed to present evidence of a causal nexus between any adverse job action and Complainant's alleged protected activity. Complainant alleges he suffered adverse job action in that he was required to perform excessive work in the heat, work without a lunch period, and was eventually discharged. He contends he engaged in protected activities of complaining about Respondent's improper recordation of items used by the store, proper recordation of such items, and refusal to follow the procedure outlined by Ms. Heifner. He further contends that whether such activity contributed to the adverse job action requires determination by the fact finder.

As stated above, Complainant bears the burden of showing sufficient evidence of his contention to establish a genuine issue of fact. Here, he must show that circumstances existed to raise an inference that his alleged protected activity likely contributed to the adverse job action. Once that initial burden is met, it may not be overcome for purposes of summary [*23] decision by Respondent's contentions and affidavits.

Assuming, **arguendo,** Complainant engaged in the alleged protected activity, he has failed to establish a causal nexus between any adverse job action and his protected activity. No evidence has been introduced to establish that Mr. Miller, Mr. Burns, nor any of the persons involved in Complainant's discharge had knowledge of his alleged protected activity. The inference that Mr. Burns, through his examination of the computer records, may have discovered Complainant's input of an item marked for "store use," contrary to Mr. Burn's instructions, is not affirmative evidence to establish knowledge. Complainant alleges only that Respondent's stated reason for discharge was a pretext for the job action. However, Complainant's allegations must be supported by evidence to raise the factual issue.

I find that the work demanded of Complainant was insufficient to constitute an adverse job action. While working in the heat and without a break is certainly not desirable, Complainant neither complained of the tasks at the time nor did he suffer continuing adverse consequences. There is no showing that it reflected adversely upon his performance, [*24] nor resulted in a reprimand or other job consequence. Therefore, I find it insufficient to support a finding that Complainant suffered an adverse job action because of these factors.

Consequently, I find there are no disputed material facts that Complainant has failed to establish a **prima facie** case in that he did not establish sufficient circumstances existed to infer that his alleged protected activity was a likely contributing factor in any adverse job action.

### C. Did Respondent establish that Complainant would have suffered the same adverse job action absent the alleged protected activity?

Respondent argues that Complainant's conduct regarding the vendor representative was the sole reason for Complainant's discharge, and that he would have experienced the same consequence regardless of the alleged protected activity. Complainant contends, again, that this is a factual issue and calls for determination by the finder of fact.

Complainant does not deny the incident in which the vendor representative's groin was impacted, although the circumstances and gravity of the conduct are disputed. Complainant also testified that the vendor representative refused to speak with him [*25] thereafter. Respondent introduced evidence that other employees have been discharged for conduct reasons. Given Respondent's written policy, discharge under these circumstances was not unreasonable or disparate. Complainant has offered no evidence that there are disputed material facts related to Respondent's job action or disparity in its application. As stated above, Complainant has not introduced evidence to support a finding that the management employees and vendor representative involved in Complainant's discharge had knowledge of his alleged protected activity.

Accordingly, I find that Respondent has established that Complainant would have been discharged for a legitimate business reason absent the alleged protected conduct.

**CONCLUSION**

In light of the evidence presented and based on the foregoing, and construing all facts in the light most favorable to Complainant, I find that there are no disputed material facts that Complainant failed to offer any affirmative evidence that he engaged in activities protected under the SOX Act, and that Respondent has established Complainant would have experienced the same adverse job action of discharge absent the alleged protected conduct. [*26] Accordingly, Respondent is entitled to summary decision as a matter of law.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Respondents' Motion for Summary Decision be, and it is, **GRANTED.**

**IT IS FURTHER HEREBY ORDERED** that the formal hearing scheduled for August 20, 2007, be **CANCELLED.**

**ORDERED** this 10th day of July, 2007, at Covington, Louisiana.

NOTICE OF APPEAL RIGHTS. This decision shall become the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1980.110, unless a petition for review is timely filed with the Administrative Review Board ("Board"), US Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington DC 20210, and within 30 days of the filing of the petition, the ARB issues an order notifying the parties that the case has been accepted for review. The petition for review must specifically identify the findings, conclusions or orders to which exception is taken. Any exception not specifically urged ordinarily shall be deemed to have been waived by the parties. To be effective, a petition must be filed within ten business days of the date of the decision of the administrative law judge. The date of the postmark, facsimile [*27] transmittal, or e-mail communication will be considered to be the date of filing; if the petition is filed by person, by hand-delivery or other means, the petition is considered filed upon receipt. The petition must be served on all parties and on the Chief Administrative Law Judge at the time it is filed with the Board. Copies of the petition for review and all briefs must be served on the Assistant Secretary, Occupational Safety and Health Administration, and on the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210. *See* 29 C.F.R. § § 1980.109(c) and 1980.110(a) and (b), as found in OSHA, Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002; Interim Rule, 68 Fed.

# **TAB K**

LEXSEE 2005 DOL SOX LEXIS 4

In the Matter of COLIN M. HARVEY, Complainant v. SAFEWAY, INC., Respondent

Case No.: 2004 SOX 21

U.S. Department of Labor
Office of Administrative Law Judges

*2005 DOLSOX LEXIS 4*

February 11, 2005

[*1]

INITIAL DECISION AND ORDER - GRANT OF MOTION TO DISMISS & DISMISSAL OF COMPLAINT

By Richard T. Stansell-Gamm, Administrative Law Judge

**COUNSEL:**
Mr. Colin M. Harvey, Pro Se; Mr. Joseph Harkins, Attorney, Ms. Maria Perugini Baechli, Attorney, For the Respondent.

**OPINION:**

This matter arises under the employee protection provision of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, (Public Law 107-204), *18 U.S.C. § 1514A* ("Act" or "SOX") as implemented by 29 C.F.R. Part 1980 (Final Rule *69 Fed. Reg. 163,* August 24, 2004) n1 . This statutory provision, in part, prohibits an employer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 and companies required to file reports under section 15(d) of the Securities Exchange Act of 1934 from discharging, or otherwise discriminating against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee provided to the employer or Federal Government information relating to alleged violations of *18 U.S.C. §§ 1341* [*2] (mail fraud and swindle), 1343 (fraud by wire, radio, or television), 1344 (bank fraud), 1348 (security fraud), any rule or regulation of the Securities and Exchange Commission ("SEC"), or any provision of federal law relating to fraud against shareholders.

> n1 The interim final rule under 29 C.F.R. Part 1980 (Interim Final Rule, *68 Fed. Reg. 31860,* May 28, 2003) was in effect at the time Mr. Harvey's employment relationship with Safeway ended and at the time of the hearing. Since the hearing, the final rule has been promulgated. Because the final rule does not conflict with the interim final rule in any matter pertinent to the issues for determination before me, I will reference the final rule without addressing the retroactive nature of the rule, since such a determination is moot. *See Thorson v. Gemini, Inc., 205 F.3d 370, 376 (8th Cir. 2000)* (citing *Bowen v. Georgetown University Hospital et al., 488 U.S. 204, 208 (1988)).*

**Procedural History**

In his October 23, 2003 SOX complaint, Mr. Harvey alleged Safeway, Inc. ("Safeway" or "Respondent") constructively terminated his employment [*3] on or about July 27, 2003. On December 17, 2003, the Regional Administrator for the Occupational Safety and Health Administration ("OSHA"), U.S. Department of Labor ("DOL"),

who investigated Mr. Harvey's complaint, notified the parties that the complaint did not allege facts and evidence to meet all the required elements of a *prima facie* case of discrimination under SOX. Mr. Harvey objected to the stated findings and requested an administrative hearing in a letter dated January 6, 2004, received on January 21, 2004.

Pursuant to a Notice of Hearing, dated January 21, 2004, I set a hearing date of February 24, 2004 (ALJ 1). n2 However, on February 19, 2004, with a supplemental filing on February 20, 2004, Respondent requested additional time to prepare the case because of a delay in Respondent's receipt of the original Notice of Hearing. I approved the request. Subsequently, pursuant to a Notice of Hearing, dated February 24, 2004, I conducted a hearing on March 23, 2004 in Washington, D.C. (ALJ 2). Mr. Harvey, Mr. Harkins and Ms. Baechli were present.

> n2 The following notations appear in this decision to identify exhibits: CX - Claimant's exhibit; RX - Respondent's exhibit (these exhibits had been previously labeled "EX"); ALJ - Administrative Law Judge exhibit; and TR - Transcript

[*4]

**Parties' Positions**

Complainant n3

> n3 TR, pages 15 to 20, 111 to 113; and, Complainant's written argument submitted April 20, 2004.

Mr. Harvey asserts he engaged in protected activity because the Sarbanes-Oxley Act requires only that an employee provide information he reasonably believes constitutes a violation of section 1341 or any provision of federal law relating to fraud against shareholders. The Act contains no requirement that a complainant actually state the reported action is a violation of SOX. Additionally, the Act imposes no amount-in-controversy threshold in order to present a SOX complaint.

Mr. Harvey reasonably believed that the SOX employee protection provisions were invoked when he filed his complaints with the store management staff as well as the senior executives that the Respondent violated the Fair Labor Standards Act. Mr. Harvey "had the trigger for protection and notification under the Act in [his] July 29, 2003 letter." The letter provided Respondent with knowledge of Mr. Harvey's SOX complaint. Under SOX, there are a number of federal laws, which when violated constitute a violation under SOX because "violations of such laws and regulations end [*5] up being a cost, a charge and a lost to the shareholders' investments as well as the improper accounting of the company funds budgeted to prevent these violations." In Mr. Harvey's case, the violations of Fair Labor Standards Act ("FLSA") involved an accounting issue because unpaid wages would be incorrectly reported as part of Safeway's revenue and profit. Therefore, Mr. Harvey engaged in protected activity when he complained to Respondent's management about not being paid for all of the hours he worked.

Respondent knew that Mr. Harvey engaged in protected activity because he directly sent his complaints to both the store's management staff and senior executives of Respondent. Additionally, in Mr. Robert Gordon's July 17, 2003 letter responding to Mr. Harvey's concern, he stated that Respondent "will not terminate or otherwise discipline an employee for acting in good faith to report concerns he or she may have about compliance with applicable laws and policies." This letter shows that Respondent was aware of Mr. Harvey's protected activity.

Mr. Harvey suffered adverse employment action when he received a message from Ms. Barnes, stating "she was left a note by [assistant store manager] [*6] Amy Knolls asking her to call [him] telling [him] not to return to work because [he is] not on the schedule." Earlier, Ms. Knolls had told Mr. Harvey he was hired to work six days a week, eight hours per day. She did not indicate that he was hired part-time as Mr. Wescott stated at the hearing. Attached to the closing statement is a description of the 401K plan offered to Mr. Harvey by Safeway, which is a plan in which only full-time employees may participate. n4 Ms. Knolls also did not tell Mr. Harvey his correct rate of pay, which was $ 6.60 per hour with a $ 1.00 premium when he worked the night shift, which was not paid on Sundays or holidays.

n4 I informed the parties at the hearing that I would only consider evidence offered and admitted into evidence during the course of the March 2004 hearing (TR, pages 12 to 14). Since neither attachment to Mr. Harvey's April 2004 closing argument was presented at the hearing for my consideration and admission into evidence, I have not considered the information on the attached 401 K program or the weather summary.

Subsequently, once Mr. Harvey was reassigned to another store, that store's assistant manager told him, "[he] better come [*7] to work or else," which Mr. Harvey interpreted as a threat to his job. All of these actions by Respondent constitute constructive discharge of his employment.

Mr. Harvey's protected activity contributed to the unfavorable personnel action as evidenced by his being singled out by a grocery manager who told him that the store would not continue to employ seven night stockers. In addition, Mr. Harvey was not being appropriately paid for his responsibilities as the Person-in-Charge. To date, he has not been paid the proper amount and Mr. Wescott refused Mr. Harvey's request for an audit of his hours worked and compensation received.

The veracity of Mr. Harvey's excuse for not being able to report to work at his new store assignment has been questioned. In response, as another attachment to his closing argument, Mr. Harvey submitted weather reports from that time period, which indicate the presence of severe weather. The storms caused a power outage and precluded Mr. Harvey from taking care of his personal hygiene, so he did not feel comfortable going to work.

Mr. Harvey requests that the Motion to Dismiss made by Respondent's attorney be denied and that he prevail under SOX. He seeks [*8] back pay in the amount of $ 1,500 per month from August 2003 to the present and "my own attorney fees for the 250 hours it [took Mr. Harvey] to prepare and present [his] case," at a rate to be decided at the court's discretion. Additionally, he requests compensatory damages in the amount of $ 25,000 plus "an amount equal to the sum total of all compensatory damages and costs."

Respondent n5

n5 TR, pages 21 to 28, 109 and 110; and, Respondent's closing argument submitted April 30, 2004.

For several reasons, Mr. Harvey is not entitled to the requested relief under the employee protection provisions of SOX. In particular, his complainant has no merit and should be dismissed.

First, Mr. Harvey's SOX complaint should be dismissed because the subject of his alleged protected activity simply involved issues involving the correct pay for his hours worked. According to Mr. Harvey, he engaged in a SOX protected activity by complaining (via letter and oral communication to store management and executives of Safeway) about wage and hours that were not calculated and paid accurately under the Fair Labor Standards Act. However, the protected activity under the Act relates to an employee's [*9] communication of concerns about violations of Federal law involving fraud against the shareholders. The Act "was not intended to capture every complaint an employee might have as a potential violation of the Act." Rather, the "goal of the legislation was to 'protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws.'" Though Mr. Harvey asserted that the FLSA is a law relating to fraud against shareholders, his complaint did not contain violations of securities laws.

Although Mr. Harvey may have subjectively believed his wage complaint was a protected activity under SOX, the standard for determining whether a complainant's belief is reasonable involves an objective assessment. Under an objective standard, Mr. Harvey's belief that he engaged in protected activity by complaining about wage underpayment, where the amount in controversy is less than $ 300, is insufficient to satisfy the reasonableness requirement for a finding of protected activity. His wage and hour complaints did not involve auditors, accountants, financial officers or securities counsel. Moreover, no employee dealing with Mr. Harvey's pay was involved in [*10] fraud, defined as an act done intentionally to mislead or harm investors. At most, there were a few "glitches" in the weekly pay of a new employee that were corrected well before the pay shortages or corrections could work their way into the company's financial disclosure to investors. Mr. Harvey's complaint did not affect "the 'true financial condition of the company,' the core

purpose of the Act."

Second, in regards to notice of a SOX protected activity, Mr. Harvey's mere reference to SOX in his July 29, 2003 correspondence to the company executives did not place the Respondent on notice that he had a securities law concern under the provisions of the Act. The specifics of his letter to senior management involved nothing beyond wage payment issues. In response to the letter, senior management attempted to address his specific concerns about his pay. In particular, Safeway's actions were taken to help Mr. Harvey understand that he had not been terminated, regardless of his mention of the Act.

Third, the Respondent did not engage in any adverse personnel action against Mr. Harvey. Any loss of employment Mr. Harvey suffered was effectively self-imposed. He misunderstood a telephone [*11] message he received indicating he was not on the store's schedule for a particular night. Mr. Harvey mistakenly interpreted his absence from that night's schedule as a termination action and did nothing to assure the accuracy of his interpretation. In reality, Mr. Harvey remained on the work schedule for another two weeks beyond the incident night. In a subsequent meeting, Mr. Wescott, a human resources advisor, assured Mr. Harvey that he was not terminated and offered him a transfer to another store, which Mr. Harvey accepted. Yet, Mr. Harvey never reported to his new work location and was therefore considered to have resigned because of job abandonment.

Fourth, Mr. Harvey did not carry his burden of proving by a preponderance of the evidence that his wage and hour complaints contributed to the eventual loss of his employment at Safeway. Following his complaints, Safeway paid Mr. Harvey for alleged deficiencies in his pay and arranged a transfer as he requested in order to keep Mr. Harvey employed by Safeway. If Mr. Harvey had reported to work at the new store, he would still be employed. Indeed, "Mr. Harvey admitted that he did not return to work because he was 'angry.'" Safeway [*12] had a legitimate reason, Mr. Harvey's failure to show up for work, for the eventual termination of his employment.

Finally, although Mr. Harvey has not established a *prima facie* case of impermissible discrimination under the Act, Safeway has nevertheless demonstrated by clear and convincing evidence that it would have taken the same separation action regardless of Mr. Harvey's protected activity. Safeway treated Mr. Harvey as they would any other employee. The company has clearly demonstrated legitimate reasons for its actions concerning Mr. Harvey; from the initial change in his work schedule to his separation for job abandonment due to his failure to report to work after being transferred. The purpose of the Act is to protect employees from retaliation who make disclosures of corporate wrongdoing in regards to securities law. That purpose will not be furthered by protecting Mr. Harvey from the termination action caused by his failure to responsibly communicate with his employer and to report for work.

In summary, Mr. Harvey's complaint does not relate to federal securities laws and is therefore not a protected activity under SOX. Safeway responded to Mr. Harvey's concerns arising [*13] under the FLSA, maintained Mr. Harvey's employment and would have continued to do so had he reported for work. Mr. Harvey has not met his burden to establish any of the elements of his SOX claim except that he "subjectively feels Sarbanes-Oxley is a vehicle for every workplace wrong."

### Issues

1. Motion to Dismiss (whether Mr. Harvey engaged in a protected activity under the Act).

2. Whether Safeway took an adverse personnel action against Mr. Harvey

3. If Mr. Harvey engaged in a protected activity and Safeway took an adverse personnel action, whether his protected activity contributed to the adverse personnel action.

4. If Mr. Harvey's protected activity was a contributing factor in the adverse personnel action taken against him, whether Safeway has demonstrated by clear and convincing evidence that it would have

taken the adverse personnel action against Mr. Harvey in the absence of the protected activity.

**SUMMARY OF DOCUMENTARY EVIDENCE AND TESTIMONY**

My decision in this case is based on the sworn testimony presented at the hearing and following documents admitted into evidence: CX 1 to CX 9, RX 1 to RX 15 and RX 17 to RX 20.

**Complainant's Case**

Documentary  [*14]   Exhibits

CX 1 -- Seven of Mr. Harvey's earning statements from Safeway dated June 19, June 26, July 3, July 10, July 17, July 24, and July 31, 2003. His weekly hours of work ranged from 40 to 28.49.

CX 2 -- Mr. Harvey received a cash pay out on July 21, 2003 in the amount of $ 121.31. The payment was made for a Sunday adjustment and Sunday premium for weeks ending June 14, 2003 and July 12, 2003.

CX 3 (and RX 7) -- Ms. Amy Knolls wrote a letter to Mr. Harvey indicating that she figured out some of the problems regarding his pay and had received approval to issue a check for that amount. Ms. Knolls said she would "make sure" to avoid the problem in the future when she is processing payroll.

CX 4 (a) (and RX 1) -- Mr. Robert Gordon, Senior Vice President and General Counsel, wrote to Mr. Harvey on July 17, 2003 in response to his letter of July 7, 2003. Mr. Gordon stated, "Safeway encourages employees to speak up about issues of this nature. The Company will not terminate or otherwise discipline an employee for acting in good faith to report concerns he or she may have about compliance with any applicable laws or policies." He forwarded the letter to Donna Gwinn to [*15]  address the payroll and personnel issues Mr. Harvey had raised.

CX 4 (b) (and RX 2) -- Ms. Lucy Madert wrote to Mr. Harvey on July 23, 2003 "to clarify the issue regarding [Mr. Harvey's] job responsibilities as a night stocker" stemming from her conversation with Mr. Harvey on July 21, 2003. She explained to Mr. Harvey:

> Under the collective bargaining agreement between Safeway and the United Food and Commercial Workers Union, Local 400, employees who stock the stores overnight are classified as Food Clerks. Food clerks are permitted to perform duties such as teller, cashier, stocker, working in perishable departments and inventory control.

The Collective Bargaining Agreement also outlines wage rates for the different job classifications and designates the starting rate of pay for night stockers at $ 6.60 per hour plus a $ 1.00 premium. Stockers do not receive the $ 1.00 premium for hours worked on Sunday because those hours are compensated at time and a half.

Ms. Madert also informed Mr. Harvey that she will look into his union membership and ask the union business agent to get Mr. Harvey a copy of the collective bargaining agreement. Finally, Ms. Madert expressed her appreciation [*16]  for Mr. Harvey's feedback at the meeting.

CX 4 (c) (and RX 5) -- On August 5, 2003, Ms. Lori Raya wrote to Mr. Harvey in response to his letter directed to Ms. Larree Renda. She explained that local management may be having problems interpreting or applying the provisions of the collective bargaining agreement with Local 400 in that area. Ms. Raya commented that appropriate action was being taken on the security matter that concerned Mr. Harvey but she could not discuss the situation in detail in deference to the privacy of the individuals involved.

Regarding Mr. Harvey's concerns about operational practices he believes are inefficient, Ms. Raya suggested he talk to the store manager about his observations. With respect to price tags, Ms. Raya explained Safeway's reasons for

2005 DOLSOX LEXIS 4, *16

accomplishing price tag changes in the way that they do.

CX 4 (d) (and RX 8) -- On August 11, 2003, Mr. William Wescott wrote to Mr. Harvey for two purposes. First, he acknowledged receipt of Mr. Harvey's letter to the Eastern Division President describing his concerns and indicated that the Director of Human Resources, Ms. Donna Gwinn, had asked him to look into the situation. Second, Mr. Wescott requested [*17] a meeting with Mr. Harvey.

CX 4 (e) and (RX 13) -- On December 22, 2003, Ms. Lucy Madert wrote to Mr. Harvey enclosing a check dated August 29, 2003, in the amount of $ 57.95. The check represented payment for relief work performed by Mr. Harvey while employed at the Safeway, Bauer Drive store.

CX 5 (and RX 13) -- Mr. Harvey received a check, dated August 29, 2003, for $ 57.95, based on earnings of $ 62.75.

CX 6 -- Mr. Harvey wrote to Mr. Robert Gordon, Senior Vice President and General Counsel for Safeway, on July 7, 2003 to inform him of some problems he had encountered during his four-week tenure with the company. First, every paycheck Mr. Harvey received was short several hours. As indicated in the enclosed letter, the assistant store manager said one computer had not "talked" to another and that they were working on the problem. If the computers were the problem, Mr. Harvey asked Mr. Gordon to consider how many other employees "could be similarly affected and even more if they don't understand or comprehend their paychecks fully and just rely on the company to make sure it is accurate." During one pay period, when Mr. Harvey worked more than 70 hours in preparation [*18] for a store visit, he was only paid for about 40 hours. When he complained to an assistant store manager, he was told to go home, figure out his hours; then, he would be paid the next week. Mr. Harvey went home but became very upset about the shortage. Consequently, he returned to the store and talked to the store manager who said he would get him another check.

Next, Mr. Harvey indicated that he was taking on more duties than those typical for a night stocker. He had started unloading pallets. And, on at least one occasion, when he arrived at 11:00 p.m. for his night shift, he was placed in charge of the store and a new cashier. In that situation, he was concerned about who to contact during an emergency. He also complained that store management did not respond to his request for a pay adjustment because he was doing more than just stocking shelves at night. The managers reacted as if he were bothering them. The additional work and supervisory responsibilities went beyond the job description and he was not being adequately compensated for those tasks. His night premium pay was also short.

Further, one night after Mr. Harvey had difficulty opening a door for a delivery, the warehouse [*19] truck driver used obscene language towards him. When Mr. Harvey reported the incident to store management, they did not take any action.

Additionally, Mr. Harvey discussed a situation involving the sale of outdated meat to store employees that had been under investigation and resulted in the termination and suspension of two employees. He sought involvement from the senior executive in the matter that he believed was not being fairly remedied. He was concerned that the two employees were being punished for doing what they were told to do and trying to take actions in the best interests of the store.

Lastly, Mr. Harvey brought up operational inefficiencies that he had observed. One problem related to the stocking of the same items nightly. He suggested the use of extenders and extra shelves. Mr. Harvey was also concerned with having to put out "hundred or thousands of price tags."

In the final paragraph, Mr. Harvey emphasized his belief that Safeway encouraged its employees to bring problems to management's attention. He stated:

> One of two things are going to happen once this letter is received, all the issues I raised are going to be dealt with or the company might just decide [*20] to terminate especially since I am still in my 90 day probation period. If I am terminated I can walk out the door with my chest out and my chin high because

I gave Safeway a [sic] 150% of my effort at the caliber of an [sic] $ 25 an hour employee and never complained about the work, I complained about not being fairly compensated.

CX 7 -- Mr. Harvey wrote to Mr. Steven Burd, Chairman, President and CEO of Safeway, on July 29, 2003. Attaching Mr. Gordon's July 17, 2003 letter, Mr. Harvey presented the president with his experience that was contrary to Mr. Gordon's statement that Safeway does not terminate or otherwise discipline an employee for acting in good faith to report concerns about compliance with applicable laws and regulations. Specifically, three days after receiving Mr. Gordon's letter responding to his initial concerns, Mr. Harvey became sick and missed two days of work. On the third day, when he planned to return to work, he received a phone message from a person in charge informing him that she saw a note at the store asking her to call Mr. Harvey and tell him not to return to work because he was not on the schedule. Mr. Harvey remarked, "So much for your Corporate [*21] Governance and Code of Ethics policies." According to Mr. Harvey, "Sarbanes-Oxley states that it is unlawful to suspend, harass, terminate or coerce an employee because the employee has filed a report to persons of a supervisory nature in the company of possible fraud against shareholders under several federal laws."

Mr. Harvey also summarized the events that followed the submission of his July 7, 2003 complaint. On July 21, 2003, he met with Ms. Madert and Ms. Knolls. At that time, Mr. Harvey indicated that he had been paid for all of the discrepancies he had found. Ms. Madert explained Safeway's payroll policies to him, but Mr. Harvey had not been instructed on the procedures and did not believe they were in place in his store. She suggested that Mr. Harvey keep track of all his hours. While he initially thought the idea was ridiculous, he realized it was a good suggestion since he "and other employees are not being paid for hours worked." In response to Mr. Harvey's concern about the grocery manager's callous attitude regarding the underpayment of his wages, Ms. Madert replied, "he is just a Grocery Manager." In regards to his hourly rate, Ms. Madert told him that if he didn't [*22] like the $ 6.60 an hour, he should consider leaving Safeway. Concerning his lack of training as a person in charge, Ms. Knolls handed him a copy of the contact phone book. However, Mr. Harvey pointed out that he had other problems being in charge. As an example, he described a situation were he wrote a note about the attendance of an employee who had forgotten his time card. Ms. Knolls indicated that his note was legally insufficient to enable the employee to be paid for the work.

Mr. Harvey next complained about the treatment he received from the new grocery manager. Early one morning, she criticized Mr. Harvey's decision to work extensively on one side of an aisle. After criticizing his performance, she queried whether he thought the store would keep five night stockers. The new grocery manager had a reputation for being "super" and taking no prisoners. Mr. Harvey considered her actions "abusive" and "disrespectful," especially since he was a new employee.

Finally, Mr. Harvey repeated his concern raised in the July 7th letter about two employees who were terminated and suspended for selling meats that were going to be thrown away. Since he later discovered that one of the employees [*23] may have been acting with the permission of his supervisor, Mr. Harvey requested the sympathy and personal involvement of, "you, Mr. Gordon, as the most senior legal employee." n6 in the situation concerning two employees of Safeway. Mr. Harvey is certain George, the fired employee, had done no wrong and acted with his supervisor's permission. No one spoke out about the situation because the termination appeared to be part of a process where Safeway was terminating long-term employees and replacing them with lower paid employees.

n6 Mr. Harvey addressed the letter to Mr. Burd but this portion of the letter directed his concerns to Mr. Gordon. At the hearing, Mr. Harvey testified that he did not copy and paste the content of the various letters he sent to Safeway executives. (TR, pages 81 and 82).

CX 8 -- On December 17, 2003, Regional Administrator for OSHA, DOL, wrote to Mr. Harvey dismissing his complaint filed under SOX because it did not meet all of the required elements of a *prima facie* case.

CX 9 -- The District Director of the Employment Standards Administration, Wage and Hour Division, DOL, wrote to Mr. Harvey on January 21, 2004 to acknowledge receipt of [*24] information Mr. Harvey sent to initiate an

investigation under the Fair Labor Standards Act regarding Safeway, store # 1668.

Sworn Testimony of Mr. Colin Harvey

(TR, page 38 to 108)

[Direct examination n7 ] Mr. Harvey began working at Safeway in the Rockville, Maryland store on Norbeck Road, Store # 1668 on June 2, 2003. He was a night stocker, primarily responsible for unloading merchandise from trucks. Mr. Harvey's direct supervisor was Tim and the store manager was Mr. Mark Mercer. The assistant manager Ms. Amy Knolls, offered the job to Mr. Harvey and told him he would be receiving $ 7.60 per hour. He didn't discover until two weeks later that his base wage was $ 6.60 an hour with a $ 1 premium for working the night shift, which he started around 10:00 pm. Mr. Harvey worked every day his first three weeks as an employee before having a scheduled day off.

n7 Since Mr. Harvey was proceeding *pro se,* I conducted the direct examination.

Mr. Harvey was paid every week, typically receiving a check on Thursdays. In the paycheck for June 19, 2003 (CX 1), Mr. Harvey noticed that he did not receive pay for all of the hours he had worked. Having worked seven days in a row, he [*25] determined that the check was eight hours short. The employees clocked in with a swipe card and the summarized time sheet was posted in the break room. After reviewing the break room time sheet, Mr. Harvey approached the grocery manager, who was also one of the two assistant store managers in the store, about the issue. The assistant store manager encouraged Mr. Harvey to go home and review the hours carefully. If a shortage had occurred, the grocery manager said he would pay Mr. Harvey in the next paycheck since there was nothing he could do at the present time. Mr. Harvey went home but became upset because he believed someone at the store should take care of the problem. So, he returned to the store and spoke with Mr. Mercer, the store manager. Mr. Mercer made a copy of the pay stub and told Mr. Harvey that another assistant manager, Ms. Amy Knolls, would look into the situation and take care of it. The following Monday, Mr. Harvey again spoke with Mr. Mercer, informing him how many hours he believed were missing. Mr. Mercer indicated that Mr. Harvey's pay would be corrected in the upcoming paycheck. Mr. Mercer seemed genuinely concerned.

On June 26, 2003, Mr. Harvey received another [*26] paycheck, which included an adjustment for the prior week, plus a Sunday premium adjustment of eight hours for the current week. The first adjustment accounted for the hours that Mr. Harvey had been missing from the prior week for his work on a Sunday. Ms. Knoll explained that the shortage may have been caused by "one computer not speaking to the other computer." The paycheck adjustment corrected the mistake from the earlier check.

The June 26, 2003 check also included an amount listed as a payroll adjustment offset but Mr. Harvey is not sure what that amount represented and why it was taken out after tax deductions. He never asked anybody about it because he felt as though he was being a bother.

Around July 7, 2003, after two incidents of missed hours in his paycheck, Mr. Harvey wrote a letter of complaint to the executives of Safeway in California and the President of the Maryland division to notify them of his missed hours of pay problem. He attached Ms. Knoll's response about the computer problem. At that time, he felt no one was really concerned about the company's failure to pay him for the hours he had actually worked. Because he was only making $ 6.60 an hour, he believed [*27] management did not think it was a big deal. His letters were also prompted by two other incidents. One day, after he experienced some difficulty getting the store's delivery door open, a delivery truck driver used obscene language towards him. On another occasion, Mr. Harvey was left in charge of the store and one inexperienced cashier. Mr. Harvey was bothered by the incident because he had not been properly trained in Safeway operating procedures (for example, he didn't know where the telephone contact numbers were located) and was not hired for that kind of responsibility. When these events accumulated, Mr. Harvey wrote the letter to the company executives to tell them about his situation. Later, Mr. Harvey heard that Ms. Knolls felt his letters were personal attacks.

On the July 17, 2003 pay stub (CX 1), there are 1.57 hours for prior week adjustment and 7.43 hours for Sunday

prior week adjustment, meaning more Sunday hours were missed. Mr. Harvey believes that hours are missed when he should be receiving time and a half pay, which occurs on Sundays. When Mr. Harvey found the second incident of missed hours, he talked to Ms. Knolls and Mr. Mercer about it. Ms. Knolls explained that [*28] the process of putting hours worked by employees into the computer was not working properly. Mr. Harvey believes there was another incident of missing hours from his paycheck in one of his last two paychecks but he is not certain of the details.

On July 21, 2003, Mr. Harvey met with Ms. Knolls and Ms. Madert, a human resources advisor. Both Ms. Madert and Ms. Knolls made a special effort to meet with Mr. Harvey during his shift at 11:30 that evening. At that meeting, he received a cash pay-out (CX 2), which Mr. Harvey believes reflects payment for missed hours on June 14, 2003 and July 12, 2003. Ms. Madert indicated that his letters had come back through the system and she had been asked to talk to him about his situation. She stated that it was the employee's responsibility to accomplish the time procedures to ensure he received the correct pay for the amount of hours worked. After this meeting, Mr. Harvey attended work on July 22, 23 and 24.

Mr. Harvey's last day of work at the Norbeck store was on July 24, 2003. He was sick with the flu and did not attend his scheduled shifts on July 25 and July 26. On July 25, Mr. Harvey called the store to let the manager know he was too sick [*29] to come to work. The woman who answered the phone did not know where the manager was so Mr. Harvey left a message that he would not be in that day. The following day, Mr. Harvey called in and spoke to his immediate supervisor, Tim, to be sure that he got the message about his illness. Tim indicated that he had not received Mr. Harvey's earlier message about being sick but said he now understood his absence.

The next day, July 27, 2003, before Mr. Harvey left for work that evening, he received a phone message from Ms. Tamara Barnes, the designated person in charge for the evening shift. At about 5:30 p.m., she left a message stating that she saw a note from Ms. Knolls asking him not to come to work because he was not on the schedule. At that point, Mr. Harvey believed he had been terminated by Ms. Knolls in retaliation for writing the July 7th letter and complaining about his pay being short

On July 29, 2003, after receiving the call terminating his employment, Mr. Harvey wrote another letter to the senior executives at Safeway. Mr. Harvey noted that in the company's response to his first letter, he was informed that Safeway did not terminate its employees for speaking out. Yet, after [*30] raising his concerns and writing the July 7, 2003 letter, he had been informed that he was no longer on the schedule. In the first paragraph of his letter, Mr. Harvey referenced SOX.

In response to his second letter, Mr. Wescott, another human resources advisor for Safeway, called Mr. Harvey to set up a meeting regarding Mr. Harvey's concerns. They met on August 14, 2003. Mr. Harvey told Mr. Wescott about the 10 to 12 times he had been left alone, in charge of the store. Mr. Wescott believed Mr. Harvey might be entitled to a higher rate of pay for those occasions. Concerning Mr. Harvey's absence on the schedule, Mr. Wescott informed Mr. Harvey that "as far as he's concerned, and as far as Safeway is concerned, [Mr. Harvey] is not terminated." He explained that the person from the store who had left Mr. Harvey a message called on her own initiative. Mr. Harvey accepted Mr. Wescott's offer to return to work at that Safeway or another store; he preferred a return to work at a different store closer to his home. Towards the end of August, Mr. Wescott called Mr. Harvey and informed him that he found a store in Chevy Chase in the District of Columbia where Mr. Harvey could work.

Mr. Harvey [*31] was due to begin work at the new store on a Monday at the beginning of September. However, due to a severe storm, his apartment had lost power. As a result, the night before he was scheduled to start at the new store, he called the new assistant manager and asked if his start date could be delayed by one day so he could make sure he had a shower and was able to brush his teeth. The assistant store manager indicated that he didn't see how Mr. Harvey's problem would preclude his coming into work. He informed Mr. Harvey that "[he] better come to work that particular night or else." Mr. Harvey did not go to work that day or any subsequent day because he believed he had been constructively discharged in light of the new assistant manager's threat; the company had been making things difficult for him. Mr. Harvey did not call the store again to tell the company he was not coming to work. He was "just angry" and

"fed up." Mr. Harvey summarized:

> They make $ 20 billion a year and they could only pay me $ 6.60 an hour, and the assistant store manager told me to come to work, and, you know, I'm trying to explain to him about my personal hygiene and he has a responsibility if a person has  [*32]  personal issues, and if an employee calls him with a personal problem, personal issues, and that's the kind of response he's going to give me, I'm just through. . . I was just fed up, and again I just left it at that point. (TR, page 68)

After his conversation with the new assistant store manager, Mr. Harvey did not have any communication with Safeway. He did not receive a termination notice. On December 22, 2003, Mr. Harvey received a letter from Ms. Madert, which included a check for $ 57.95 for relief work. Mr. Harvey believes the relief work pay accounted for underpayment during the hours he worked alone with only another cashier, thus entitling him to a higher pay rate. The check was dated August 28, 2003 though Mr. Harvey did not receive it until late December.

Between July 27, 2003 and the beginning of September when Mr. Harvey planned to return to a different Safeway to work, he looked for employment unsuccessfully. He relied on his parents for support.

The protected activity in which Mr. Harvey engaged was "not being paid under the Fair Labor Standards Act," which violates a federal law. The underpayment constitutes fraud against the shareholders.

Mr. Harvey believes that [*33]  an unfavorable personnel action was taken by Safeway when he was told not to return to work on July 27, 2003. His belief stems from conversations he had with Mr. Kesler, a loss prevention investigator, who indicated that Ms. Knolls felt personally attacked by the letters that Mr. Harvey wrote to the executives, which included a copy of the letter she had written acknowledging the problems with pay.

[Cross-examination] Mr. Harvey possesses some college education; he was enrolled in additional college business courses when he started working at Safeway. Mr. Harvey worked for a local retailer in the home improvement business for 13 years; then he worked for Trak Auto, also a retail establishment for one year; followed by nine years working for Home Depot. He resigned from all of his previous jobs. Mr. Harvey has several claims pending against Home Depot, some of which are Sarbanes-Oxley employment discrimination complaints.

He has worked as an hourly employee in the past, including seven years during his employment at Home Depot and so he is aware of various systems for recording time and being paid.

Mr. Harvey filed a complaint with the U.S. Department of Labor, Wage and Hour Division,  [*34]  under the FLSA about his pay problems with Safeway on October 11, 2003 (RX 18). Mr. Harvey wrote a letter containing references to the same things in his FLSA complaint as when he filed his complaint with DOL, OSHA under SOX (RX 19). In fact, the bodies of the two complaints are "similar." Mr. Harvey did some research on Sarbanes-Oxley to determine that his complaint was also relevant under that law as well. He only mentioned violations of SOX in the second complaint that he filed. He typed the two complaints separately and "from memory." After referencing a website on whistle blowing, Mr. Harvey concluded that wage and hour violations under FLSA "are possible violations under Sarbanes-Oxley."

In Mr. Harvey's July 29, 2003 letter to the executives of Safeway, he refers to internal policies of Safeway (CX 7). He only mentioned SOX in the last sentence when he explained that a Sarbanes-Oxley complaint involves an employee's reasonable belief that a violation of federal law has occurred that causes fraud upon the shareholders. He never spoke with any of the Safeway employees about securities law, SEC rules or a fraud statute.

When Mr. Harvey met with Ms. Madert and Ms. Knolls at 11:30 [*35] p.m. on July 21, 2003, he knew they had made a special effort to meet with him. The meeting arose in response to Mr. Harvey's letter to Mr. Gordon, Safeway's general counsel, which prompted him to ask Ms. Donna Gwinn, the eastern division director of human resources, to get involved with the situation. Ms. Gwinn then designated Ms. Madert to handle the situation by making contact with Mr. Harvey. Mr. Harvey's main concern going into the meeting was the issue of not getting paid for hours he worked and

the issue did not seem resolved afterwards. During the meeting, Ms. Madert explained that accurate accounting of hours was his responsibility and that he should be reviewing the "exceptions list," which was a list of hours logged by employees and posted in the break room.

(At the hearing), Mr. Harvey acknowledged that both the employer and employee have a shared responsibility to ensure accurate recording of hours.

Ms. Lori Raya also responded to Mr. Harvey's July 7th concerns in a two page letter, indicating that Mr. Harvey should talk to the store manager about some of his operational suggestions. However, because Mr. Harvey and Mr. Mercer worked different schedules, the occasion for [*36] Mr. Harvey to speak with Mr. Mercer never arose.

On Sunday, July 27, 2003, Mr. Harvey received the phone call that "informed me not to return to work because I'm not on the schedule. Those were the exact words." Mr. Harvey understood that message to mean that he was not on the schedule anymore because he was being retaliated against for "personally attacking [Ms. Knolls]." He never called to verify that he was not scheduled to work later in the week even though Sunday was only the first day of the week-long schedule. He assumed the message was referencing the whole week. Mr. Harvey did not discuss the schedule with his supervisor or anyone else at Safeway. At that point, he wrote to Mr. Gordon again to inform him of the personnel action taken by Safeway because Mr. Gordon had specifically said in his response to Mr. Harvey's first letter that he would not be retaliated against for raising personnel concerns.

In response to Mr. Harvey's second letter, an executive from Safeway, the president of the northeast division contacted Mr. Harvey to investigate the letter he had sent about being terminated and not being paid properly. After playing phone tag for a few days, Mr. Harvey finally [*37] spoke with Mr. Wescott and the two set a meeting for mid-August. Mr. Wescott told Mr. Harvey that he was not terminated from the company. The two disagreed about whether the message given to Mr. Harvey about not being on the schedule indicated that he had been terminated, but nonetheless Mr. Harvey understood at this point that he was not terminated. It was Mr. Harvey's intention, upon conclusion of the meeting, to go back to work for Safeway.

Given the option by Mr. Wescott, Mr. Harvey chose to return to work at a different store. Mr. Harvey preferred working at a store closer to home and so Mr. Wescott arranged for a position at the Connecticut Avenue (Chevy Chase) store the first week of September. Mr. Harvey intended to start work there as scheduled but suffered from a power and water outage after a storm which disabled him from going to work his first scheduled day. He called the store around 6:00 or 7:00 in the evening to let management know that he was having problems and would be unable to attend work later that evening. He waited to call until then because he had hoped that he would have electricity and water back in enough time to go to work. When Mr. Harvey explained the [*38] situation to Mr. Marlow, the assistant manager with whom Mr. Harvey spoke, his exact words according to Mr. Harvey were, "what does [your personal hygiene] have to do with you coming to work?" The conversation ended with Mr. Marlow saying, "[Mr. Harvey] better come to work or else." After his conversation with Mr. Marlow, Mr. Harvey knew that he was still expected to report to work but Mr. Harvey did not choose to find alternative means to take care of his personal hygiene; he preferred to delay his start date by one day.

After not attending his first day of work, Mr. Harvey did not call Mr. Marlow that week to find out the rest of his schedule, though he assumed the schedule started on Sunday and ran through the rest of the week. Mr. Harvey believed that Safeway was going to terminate him based on "everything that had happened to [him]," and it "just got to the point where [he] felt like he couldn't work for Safeway anymore." However, by not reporting for work that week, Mr. Harvey understood that he was in effect terminating himself.

Mr. Harvey signed a document acknowledging receipt of Safeway policies (RX 17). One of the policies was an absenteeism policy (RX 15), which Mr. Harvey [*39] claims to have no knowledge of because he signed the papers without reading them. He remembers receiving the document but did not read it upon receipt or later when problems arose concerning his employment.

Since the first week in September, Mr. Harvey has been sending out resumes to apply for jobs. He has not collected unemployment compensation and is being financially supported by his parents. He has not worked for any other employer since then because he has not found a job. He has earned about $ 2000 doing handyman jobs. He never went to the Safeway in Chevy Chase on Connecticut Avenue.

**Respondent's Case**

Documentary Exhibits

RX 1 -- *See* CX 4 (a).

RX 2 -- See CX 4 (b).

RX 3 -- Mr. Craig Kesler, an investigator, prepared a memo based on his interview with Mr. Harvey that took place on July 22, 2003, in response to Mr. Harvey's letter dated July 7, 2003. He noted that Mr. Harvey believed store management had knowledge that a frozen food employee was buying outdated meat at a reduced priced. Mr. Harvey did not have first hand knowledge. He did state that one employee in particular had authorized the purchase of dated meat at a discounted price. All of the information [*40]  he provided came from other employees. Mr. Harvey believed the employee was honest and dedicated to the company.

Mr. Harvey indicated the investigation was not the focus of his letter. He also clarified that when he wrote "...I was the only night stocker in the store that night," he did not mean that he was alone because a cashier was still on duty. He has never been in the store alone.

RX 4 -- The weekly work schedule for grocery/night stockers for the week ending August 2, 2003 demonstrates that Mr. Harvey was scheduled to work from 11:00 p.m. until 7:30 a.m. on Sunday, July 27, 2004, Wednesday, July 30, 2003, and Saturday, August 2, 2003.

RX 5 -- *See* CX 4 (c).

RX 6 -- The weekly work schedule for grocery/night stockers for the week ending August 9, 2003 demonstrates that Mr. Harvey was scheduled to work from 11:00 p.m. until 7:30 a.m. on Sunday, August 3, 2003, Wednesday, August 6, 2003, and Saturday, August 9, 2003.

RX 7 -- *See* CX 3.

RX 8 -- *See* CX 4 (d).

RX 9 -- Effective August 30, 2003, Mr. Harvey, a food clerk, was transferred from store 1668-81 to 4832-85 by Mr. William Wescott. Mr. Wescott signed the form on September 4, 2003.

RX 10 [*41]  -- The weekly work schedule for grocery/night stockers for the week ending September 6, 2003 demonstrates that Mr. Harvey was scheduled to work from 11:00 p.m. until 7:30 a.m. on Sunday, August 31, 2003, Monday, September 1, 2003, Tuesday, September 2, 2003, Wednesday, September 3, 2003, Friday, September 5, 2003 and Saturday, September 6, 2003.

RX 11 -- Mr. Clifton Marlow, Assistant Manager for Store # 4832 (the Connecticut Avenue store), wrote an e-mail on September 12, 2003 to Mr. Wescott describing the phone call he received from Mr. Harvey on September 2, 2003 at about 10 p.m. Mr. Harvey told Mr. Marlow that he would be unable to work that night due to loss of electricity in his apartment complex caused by a thunderstorm. Since he had no power, he would not be able to shower before coming into work. Mr. Marlow asked how that would affect Mr. Harvey's ability to work and he responded "that he would smell." Mr. Marlow told Mr. Harvey that he was expected at work and suggested that he be at work because his excuse was unacceptable. Mr. Harvey agreed and stated that he would be in that night.

RX 12 -- An e-mail confirmation, dated December 15, 2003, shows that Mr. Harvey [*42] was terminated on September 20, 2003 by reason of job abandonment. Mr. Wescott prepared the separation papers. Mr. Harvey's last day worked was listed as July 31, 2003.

RX 13 -- *See* CX 4 (e) and CX 5.

RX 14 -- Applicable provisions of the Collective Bargaining Agreement between Local 400, chartered by the United Food and Commercial Workers International Union, AFL-CIO-CLC, and Safeway, Inc, effective March 26, 2000 through March 27, 2004. Article 9 describes Night Crew Employees. Section 9.4 provides that "each employee working on the night shift will receive an additional one dollar ($ 1.00) per hour, which shall be over and above the regular rate of pay for the same or similar day job." Schedule "C" is a wage rate table for full and part time food clerks. The chart indicates that any food clerk with 0 to 3 months of experience is paid at the rate of $ 6.60 per hour. Schedule "F" provides for variations in the agreement such as "Food Clerks who work a portion of the week as Relief Manager shall receive the rate of Assistant Store Manager for the hours of actual relief."

RX 15 -- Safeway's program for Absenteeism from Scheduled Work states that job abandonment occurs [*43] when an employee is absent without notice for three consecutive shifts and results in termination.

RX 17 -- On May 31, 2003, Mr. Harvey signed an acknowledgement indicating that he received, reviewed, will study and abide by selective provisions and manuals, including Safeway's Program for Absenteeism from Scheduled Work.

RX 18 -- On October 11, 2003, Mr. Harvey wrote to the Wage and Hour Division, Employment Standards Administration, DOL, to file a complaint under the FLSA against Safeway. Mr. Harvey complained that from June 3, 2003 until the termination of his employment on July 27, 2003, his paychecks were consistently short six to ten hours every week. He discussed his failed attempts at getting the situation remedied by management who were uncooperative. Mr. Harvey believes Safeway has a practice of paying employees less than the amount employees actually work, which represents a "windfall in money saved because of unaccounted payroll dollars not paid to employees hence more profits for the company."

Mr. Harvey addressed his "termination ordeal," which he believed resulted from his letter of July 7, 2003 to company executives in which he complained about not being paid [*44] for the hours worked. On July 21, 2003, he participated in a meeting requested by Safeway's management, where a human resources advisor and his store's assistant manager explained to him payroll policies and his rate of pay. Mr. Harvey likewise discussed his attempt to document the work of another employee who had forgotten his time card. Mr. Harvey further noted an incident where a new grocery store manager told him that he was doing unacceptable work.

Mr. Harvey described his termination, which he received through a phone message indicating that he was not on the schedule. He responded by again writing to the executives and letting them know he had been terminated. This prompted another meeting with a different human resources advisor, Mr. Wescott, who contacted Mr. Harvey and requested a meeting to address his underpayment issues, perceived termination and potential transfer to a new store. At that time, Mr. Wescott indicated Mr. Harvey had not been terminated; and, he arranged for Mr. Harvey's employment at a different Safeway store.

Mr. Harvey then described how he was unable to report to work on his first scheduled day at the new store because he had no electricity in his apartment [*45] and couldn't bathe. When he informed the store manager and asked if he could report the next day, the supervisor responded, "what does that have to do with you coming to work?" The conversation ended with the manager telling Mr. Harvey he "better come to work or else." In Mr. Harvey's opinion, "It became more than obvious to me that Safeway persons surely do not want me in their employment."

RX 19 -- On October 20, 2003, Mr. Harvey wrote to the Regional Administrator, OSHA, DOL, to file a complaint under SOX against Safeway. Mr. Harvey described how he was not paid for all of the hours he worked during the

two-month period he worked for Safeway. He then set out in detail his circumstances regarding his July 7, 2003 letter, Mr. Gordon's reply letter, his meeting with Ms. Madert and Ms. Knoll, his termination by telephone, his meeting with Mr. Westcott, his reassignment and inability to start his new assignment. n8

   n8 Mr. Harvey's SOX complaint to OSHA is almost verbatim with his complaint to the Wage and Hour Division. *See* RX 18

   Concerning the underpayment of his hours, Mr. Harvey believed "Safeway is increasing its profits on unaccounted wages from the salaries of employees [*46]  which are not paid to these employees." Mr. Harvey knew of at least 10 employees that were not paid their weekly wages and had to wait two weeks to get paid hours shorted from their salaries. Other mentally challenged and non-English speaking employees may not be able to even comprehend the discrepancies in their paychecks. Mr. Harvey had heard that Safeway managers received big bonuses for low payroll figures that increased store profits. Mr. Harvey asserted that the Safeway managers and representatives did not appear to be aware of the several federal and state laws they were violating such as the FLSA.

   RX 20 -- A 2003 calendar.

   Sworn Testimony of Ms. Lucy Madert

   (TR, pages 114 to 145)

   Ms. Madert is a human resources advisor at Safeway. She has worked for Safeway for seven years and been in the human resources field for thirty years. Ms. Madert oversees human resources issues for approximately 18 stores, which includes answering questions from store managers and employees and investigating other personnel issues.

   Mr. Harvey wrote to the corporate offices, specifically to Mr. Robert Gordon, senior vice president and general counsel, in July 2003 about not being paid properly.  [*47]  Mr. Gordon passed the letter (RX1) to Ms. Donna Gwinn who then asked Ms. Madert to handle the situation because the Norbeck Road store was one of the stores for which Ms. Madert had responsibility.

   Mr. Harvey's usual shift as a night stocker began at 11 p.m. and ended at 6 or 7 a.m. Ms. Madert met with Mr. Harvey and first assistant manager, Ms. Amy Knolls, on July 21, 2003 at 11 in the evening. During the meeting, Mr. Harvey addressed a) his paychecks in which he had not received pay for all the hours he worked; b) the amount of compensation he was receiving at $ 6.60 per hour versus the tasks he was doing and the appropriate pay for those particular duties; c) an investigation about loss prevention occurring at the store; and, d) how the Union worked and who his business agent was under the collective bargaining agreement.

   First, Ms. Madert explained to Mr. Harvey time and attendance procedures to make sure he knew how his time was accounted for and calculated. She gave Mr. Harvey a check for $ 121 and asked him whether that amount covered what was owed to him. He stated that the amount was satisfactory. Regarding his rate of pay, Mr. Harvey believed he should be making more than [*48]  $ 6.60 per hour plus a $ 1 premium for working during the night because of his work taking merchandise off of the trucks and stocking shelves. However, Ms. Madert explained that the collective bargaining agreement specified certain job classifications and the corresponding rates of pay. Since Mr. Harvey was hired as a food clerk, he was being paid the rate mandated for a new employee in that position. His duties were within the realm of a food clerk's duties, which included stocking shelves.

   Mr. Harvey was also concerned that he should receive relief pay when he was filling in for the Person-in-Charge at the store and holding the keys to the store. Ms. Madert brought that concern to Mr. Wescott's attention who looked into it.

   When Ms. Knolls and Ms. Madert were explaining payroll and attendance procedures to Mr. Harvey, he indicated that he did not want to hear about that and that he already understood them. Ms. Madert explained the card swiping

system, in which employees swiped their scan cards through the reader at the beginning and end of their shifts, as well as before and after any breaks they may take during the course of their shifts. The next day a computer print out of the [*49] employees' time called the exception report is hung in the break room. This gives employees the opportunity to make sure their times are logged in correctly. If an employee finds a problem, he/she would talk with a manager and fill in the correct hours on an exception card, which the manager would then authorize and use to edit the schedule.

Ms. Madert asked Mr. Harvey again if he was satisfied with the voucher he received that evening or whether there were other pay shortages that needed to be addressed. Mr. Harvey told Ms. Madert there were no other issues. Ms. Madert said she would get back to Mr. Harvey on the issue of relief pay. Mr. Harvey also expressed concern over a loss prevention investigation that was ongoing. Because Ms. Madert knew from Mr. Harvey's employment application that he had worked in loss prevention, she assured Mr. Harvey she would set up a meeting between him and the investigator because she thought he may have good information to provide. Finally, though it was not her responsibility, Ms. Madert told Mr. Harvey she would contact the business agent for Local 400 and let him know Mr. Harvey was interested in talking to him. Ms. Madert called the Union business [*50] agent after the meeting. On July 23, 2003, Ms. Madert wrote a memorandum commemorating the meeting (RX 2).

A head night stocker supervises the night stockers until about 4 a.m. when a grocery manager arrives. The head night stocker gets an additional $ 25 per week; however, if someone fills in for the head night stocker, there is no additional pay. Should an employee fill in for the night stocker for an entire week, he would then be eligible for the additional pay. The collective bargaining agreement (RX 14) under Article 9 (on page 14) explains the pay schedule for night crew employees as stated by Ms. Madert. Schedule C is a chart with the classifications of employees and mandates pay for each food category. It indicates that a food clerk with 0 to 3 months of grocery experience would start at $ 6.60 per hour. Schedule F of the Agreement (on page 45) describes Variations in the Agreement. The section addressing food clerks accurately states Ms. Madert's understanding of relief pay.

Ms. Madert received a memo from Mr. Craig Kesler, the loss prevention security investigator, informing her that he had met with Mr. Harvey as she requested (RX 3). Mr. Harvey did not have any personal [*51] knowledge of the situation under investigation.

Ms. Madert sent a letter to Mr. Harvey along with a check for his relief pay on December 22, 2003 (RX 13). There was a delay in mailing the check because after Mr. Harvey filed his Sarbanes-Oxley complaint, Ms. Madert requested Mr. Harvey's personnel file from Mr. Wescott. When she reviewed the file, she found the check sitting in Mr. Harvey's file that had been cut to compensate him for relief pay due. This was the last correspondence Ms. Madert had with Mr. Harvey.

Ms. Madert was not aware that Mr. Harvey's complaints had something to do with securities laws and fraud against the shareholders until after Mr. Harvey wrote to corporate executives the second time. She did not know at the time of her meeting with him. Based on Mr. Harvey's letters to the corporate executives, Ms. Madert believed that he was displeased with her resolution of the issues; however, she treated him as she would any other employee.

[Cross-examination] Ms. Madert was operating under the premise that Mr. Harvey swiped his card every time he came and left the store. She believed the mistake in payroll arose from his night hours that started during one pay period [*52] and ended during the subsequent pay period. The assistant manager would be responsible for manually inputting those hours correctly.

Ms. Madert did not think that Mr. Harvey had witnessed the issue under investigation by loss prevention because the memo did not indicate so to her recollection.

Ms. Madert agreed with Mr. Harvey that he should have been given relief pay when he was handed the keys to the store and was responsible for closing the store and that is why she asked Mr. Wescott to look into the situation. The collective bargaining agreement specifically states that a food clerk who is given those added responsibilities is entitled

to relief pay. A non-designated non-trained food clerk should not be handed relief work but in Mr. Harvey's case he was. Ms. Madert does not know how the prior week adjustment for past due relief pay in the amount of $ 62.75 was calculated.

[ALJ examination] New Safeway employees should be: a) trained on the procedure for verifying hours worked the previous day, which includes reviewing the exceptions report; and, b) given an orientation where employees are taught how to properly clock in and out. When Ms. Madert tried to explain the exceptions [*53] procedure to Mr. Harvey during their July 21 meeting, he told her she did not need to pursue the discussion. Mr. Harvey told Ms. Madert about another night stocker who was experiencing the same problems of being improperly compensated.

[Redirect examination] Safeway provides an orientation or training session for its employees at the beginning of their employment. Mr. Harvey should have gone through a two to four hour computer based training program at the store level.

Sworn Testimony of Mr. William Wescott

(TR, pages 146 to 202)

Mr. Wescott is a human resources advisor for Safeway. He provides support to management and employees on human resources related issues, including work performance, assisting management on dealing with work performance issues, handling employee inquiries regarding pay and classification and dealing with the Union on issues they raise. Mr. Wescott's territory includes 17 stores in the Northern Virginia area. Mr. Wescott has worked for Safeway for 20 years, 16 years of which were in human resources with 7 of those years as a human resources advisor.

Mr. Wescott's supervisor, Ms. Donna Gwinn, Human Resources Director, asked him to contact Mr. Harvey regarding [*54] a letter he had sent to the division president on July 29, 2003, which addressed his concerns at the Rockville, Maryland store where he had worked. Mr. Wescott left Mr. Harvey a phone message and after a few return calls back and forth, they finally spoke on August 11 and planned to meet on August 14. Mr. Wescott also wrote a letter to Mr. Harvey indicating the company's interest in speaking with him regarding the issues he raised in his July 29 letter (RX 8).

Also in attendance at the meeting between Mr. Wescott and Mr. Harvey was Ms. Barbara Pemron, the human resources advisor for another district. Mr. Wescott asked her to sit in on the meeting so that a neutral person was present. They discussed the issues raised by Mr. Harvey in his letter. First, Mr. Wescott informed Mr. Harvey that he had not been terminated and explained the reason for the phone message from Ms. Tamara Barnes informing him not to come to work. According to Mr. Wescott, the schedule was published on July 26, 2003 and Mr. Harvey called in sick that day. Since he typically worked the following evening, a Sunday, a note was left for Ms. Barnes indicating that if Mr. Harvey reported to work, he should be told that [*55] he is not scheduled. Mr. Mercer, the store manager, led Mr. Wescott to believe that Ms. Barnes took it upon herself to give Mr. Harvey a courtesy call so that he did not unnecessarily travel into work.

Mr. Harvey told Mr. Wescott that he did not seek clarification from Ms. Barnes after she left him the phone message because he was angry at the time and assumed he had been terminated. Mr. Harvey, however, was on the schedule for 24 hours later that week. Mr. Mercer relayed this sequence of events to Mr. Wescott and explained that Mr. Harvey was not scheduled to work that Sunday because due to a slowing of sales after the July 4th holiday, the workforce at Safeway and in particular, the night crew, was reduced. Prior to that time, for a number of weeks, Mr. Harvey had worked overtime to prepare the store for a business review. When Mr. Wescott reviewed the work schedule (RX 4), it did not seem "to be out of norm."

The work schedule beginning July 27, 2003 and ending August 2, 2003 for the store that Mr. Mercer manages on Norbeck Road in Rockville, Maryland showed that Mr. Harvey was on the schedule to work that week (RX 4). The night stockers are scheduled in such a way that if a night [*56] stocker is scheduled for Sunday, July 27, he is due to

report on Saturday, July 26 at 11 p.m. and his shift would end Sunday morning at 7:30 a.m. So, in Mr. Harvey's case, the July 27th phone message meant that he was not on the work schedule for the Monday shift, which was to begin at 11 p.m. Sunday evening and carry over to Monday morning. n9

n9 RX 4 shows that for Monday, July 28, 2003, Mr. Harvey was "off," which means he did not have to report to work at 11:00 p.m. on Sunday, July 27, 2003.

Ms. Barnes did not tell Mr. Harvey when he was to report to work later in the week and he did not report to work or call to indicate his ability to work the remainder of the week. Safeway's policy is that the employee is responsible for checking the schedule to be certain when to report to work. The next shift Mr. Harvey was scheduled for was Wednesday, July 30, which required him to report Tuesday evening at 11 p.m. His only other scheduled day that week was Saturday, August 2, 2003, which required him to report to work at 11 p.m. on Friday evening. Mr. Harvey did not report for either of those shifts.

Mr. Mark Mercer, the store manager, never called to find out where Mr. Harvey was [*57] when he did not report into work. Mr. Wescott does not believe that is something managers typically do.

In preparation for his August 14 meeting with Mr. Harvey, Mr. Wescott contacted Mr. Mercer and asked him for information about Mr. Harvey, including whether he had been terminated. The manager's response was no, Mr. Harvey was not terminated. This conversation occurred on August 8 or 9, a few days after Mr. Wescott had been instructed to deal with this matter. After relaying this information to Mr. Harvey, Mr. Wescott asked him about his intentions with Safeway. Mr. Harvey indicated a willingness to continue to be employed by the company, preferring a reassignment.

They also discussed the underpayment concerns Mr. Harvey had brought to Ms. Madert's attention. Mr. Harvey explained that he was familiar with the scan card and exceptions report from his orientation but that no one fully explained how it worked until Ms. Madert did. Mr. Harvey reiterated to Mr. Wescott that he believed he had been clocking in and out properly and that the company was still not paying him for all of the hours documented. Mr. Harvey noted that the only unresolved pay issue was whether he was entitled to [*58] relief pay. Mr. Wescott agreed that if Mr. Harvey was left in charge of the store during the hours between 6 a.m. and midnight, when the store was considered open, he was entitled to additional pay for that time, whether or not he was appropriately qualified for that responsibility. Mr. Wescott told Mr. Harvey he would look into the matter.

Mr. Harvey next brought up concerns he had regarding statements by the new grocery manager, Cathy. Prior to July 27, 2003, she had criticized some of this work and asked whether he thought the store could really continue to employ five night stockers. This conversation played a role in Mr. Harvey forming the belief that he was terminated when Ms. Barnes called him.

Mr. Harvey and Mr. Wescott briefly spoke about the loss prevention investigation. Mr. Harvey indicated that he had no direct knowledge but based upon his interactions with the employee under investigation, he did not believe the employee was at fault. From a secondary source, he had learned that the employee under investigation was acting under approval from management. Mr. Wescott explained to Mr. Harvey that a fact-finding investigation was taking place and all that management could [*59] do was try and gather the truth. He also told Mr. Harvey that the individual under investigation could file a grievance to contest it.

Concerning his observations about store efficiency, Mr. Harvey was no longer interested in discussing the issue. Ms. Lori Raya had responded via letter, dated August 5, 2003, to Mr. Harvey's satisfaction (RX 5).

Mr. Harvey was also scheduled to work three days on the schedule for the Norbeck store ending August 9 (RX 6). Mr. Mercer told Mr. Wescott that Mr. Harvey did not attend work that week either. Safeway policy deemed missing three scheduled shifts to be job abandonment, so on Sunday, August 3, Mr. Harvey had missed his third scheduled day. Nonetheless, Mr. Mercer did not remove Mr. Harvey from the schedule for his remaining shifts that week.

2005 DOLSOX LEXIS 4, *59

Mr. Wescott's advice to a manager in Mr. Mercer's position is when an employee does not report to work as scheduled for three shifts in a row and does not contact the company at all, that person is subject to termination. Typically, if a person misses three scheduled shifts, the following week they are removed from the schedule and within two weeks, Mr. Wescott instructs the manager to submit separation paper [*60] work for job abandonment. In the rare exceptional situation, Safeway will contact an employee who has not reported for work for a number of days when the employee has worked for the company a long time and has a very reliable attendance record. Usually, Mr. Wescott does not suggest the store manager call an employee who has abandoned the job because the policy is clear. Mr. Wescott's understanding of Safeway's policy regarding absenteeism and job abandonment is accurate.

Mr. Harvey was not terminated despite his repeated absences from work because on Sunday, July 26, Mr. Harvey called in sick. Then, through the August 6th correspondence, Mr. Wescott became aware of Mr. Harvey's belief that he had been terminated. Because Mr. Harvey provided Safeway with notification about his whereabouts and his understanding that he had been terminated, Safeway allowed him to return to work. Had Mr. Harvey called Mr. Mercer the Monday after he received the phone message about not being on the schedule, he would have learned that he was not terminated

Mr. Wescott spoke with Mr. Harvey about his desire to return to the store location where he had worked or opt for a position at an alternate location. [*61] Mr. Harvey told Mr. Wescott where he would prefer to work geographically, specifying his desire to work in a different district based on his perception that the new grocery manager had a friendship with the district manager. After that meeting, Mr. Wescott spoke with other human resource advisors outside of Ms. Madert's territory and learned through Ms. Mary Dockery that a store was opening on Connecticut Avenue in Washington, D.C. Mr. Wescott contacted that store manager, Mr. Bob Weschler, to find out if the store was in need of night stockers as he had learned. Mr. Weschler was in favor of bringing on another night stocker, and so Mr. Wescott promised to get back to him after he spoke with Mr. Harvey about the assignment.

Mr. Wescott again spoke with Mr. Harvey on August 28, providing him with the store location, manager and contact number and asked him to contact the store manager on Saturday, August 30 for the work schedule that would be posted the following week. Mr. Wescott also explained to Mr. Harvey that he would be sending him a relief pay check for $ 62.50, which represented five hours of pay at the assistant manager's pay rate of $ 19.15 an hour less the hourly pay he [*62] already received for that time. Mr. Harvey continued to question the amount of night stocker relief pay he believed was due to him, and Mr. Wescott indicated that he did not think Mr. Harvey was entitled to it but would look into it more.

Mr. Wescott submitted a transfer form for Mr. Harvey on August 30, 2003 (RX 9). He had signed it and faxed it to the employee service center on September 4, 2003. The schedule for the week ending September 6 at the Connecticut Avenue store showed that Mr. Harvey was to work 48 hours on the night shift with Thursday being his day off (RX 10). Mr. Wescott learned from Mr. Weschler when he called him September 4 or 5 that Mr. Harvey had not reported to work yet. Mr. Weschler told Mr. Wescott that Mr. Harvey had called an assistant manager and said that he could not report to work. Mr. Wescott requested details of that conversation based on an internal report, Mr. Clifton Marlow. Mr. Marlow sent Mr. Wescott an e-mail explaining the conversation he had with Mr. Harvey, in which Mr. Harvey said he could not work because he was unable to bathe due to a power outage ( RX 11). Mr. Marlow asked Mr. Harvey how that affected his ability to work and Mr. Harvey [*63] stated he was concerned about his hygiene. Mr. Marlow did not believe that was a valid reason to miss work and by the end of the conversation, Mr. Harvey agreed to report to work. Mr. Harvey did not report to work on September 2, 3, 5, or 6.

Mr. Wescott had no further correspondence with Mr. Harvey. The only other conversation he had regarding Mr. Harvey's employment was with the human resources advisor for the district responsible for the Connecticut Avenue store, who asked about Mr. Harvey's work status based on an internal report she generated. Mr. Wescott told her since Mr. Harvey had missed three scheduled shifts, he would take care of the paperwork to terminate Mr. Harvey's employment. Mr. Wescott submitted an electronic form that separated Mr. Harvey from Safeway's payroll system. He then received a confirmation from the employee service center confirming Mr. Harvey's separation because of job

abandonment on September 20, 2003 (RX 12).

Mr. Wescott followed up on Mr. Harvey's relief pay by speaking with Mr. Mercer. Although Mr. Harvey could not recollect the specific dates to which he was entitled to relief pay, because he estimated he was left in charge on four or five occasions, [*64] the company paid him for one hour of relief pay for five days. The check was dated August 29, 2003 and issued to Mr. Wescott at that time; however, he placed it in Mr. Harvey's case file and forgot about it until Ms. Madert requested the case file and he discovered he had not mailed it. Ms. Madert agreed to send Mr. Harvey the check at that time.

At no point during their conversation did Mr. Harvey raise concerns about violations of securities laws, violations of the SEC or any commission of fraud on Safeway shareholders. Mr. Wescott treated Mr. Harvey like any other employee and believed that Mr. Harvey was sincere when he stated his interest in continuing to be employed with Safeway at their August 14 meeting.

[Cross-examination] Ms. Barnes called Mr. Harvey to inform him not to come to work because Mr. Harvey was not scheduled on a day that he was usually scheduled to work and he had called in sick the prior few days so that he may not have had the opportunity to review the newly published schedule for the week. She called him on July 27 around 6 in the evening to tell him not to come into work that Sunday evening at 11 p.m. Based on Mr. Mercer's explanation of why Mr. Harvey's [*65] schedule was reduced to only 24 hours that week, Mr. Wescott believes that the Norbeck store had gone from a busy period with a business review to a dead period during the summer months, which was typical in the Washington, D.C. area. Mr. Harvey was a part-time employee and his weekly hours were subject to change. Safeway tries to provide at least 35 hours a week. Even if the individual's weekly total is 40 hours or more, he is still considered a part-time employee.

Ms. Knolls left a note on July 27th indicating that if Mr. Harvey reported for work, Ms. Barnes should let him know that he is not scheduled to work that shift. Mr. Wescott believes the note triggered Ms. Barnes to let Mr. Harvey know ahead of time because he had not been into work since the schedule had been posted. Mr. Harvey wanted Mr. Wescott to know that he believed someone asked Ms. Barnes to call him and he was concerned about her suffering ramifications if management believed otherwise.

Mr. Wescott actually requested the check for relief pay on August 27 or 28, 2003 and received it shortly thereafter, but he did not send it. As a result, the check sat in Mr. Harvey's file until Ms. Madert found it after she requested [*66] his file several months later.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

### Specific Findings

Based on the evidence in the record and the probative sworn testimony, I make the following findings of fact.

June 2, 2003 to June 18, 2003. Mr. Harvey begins working for Safeway as a night stocker, earning $ 6.60 per hour plus a $ 1 premium for working the night shift. Due to an upcoming store visit, Mr. Harvey agrees to work more than 40 hours a week. Shortly after his arrival, Mr. Harvey starts moving pallets of merchandise from trucks into the store. On a few occasions, Mr. Harvey is left in charge of the store during the last hour it is open (11:00 p.m. to 12:00 a.m.).

June 19, 2003 to June 26, 2003. Mr. Harvey receives a paycheck that he believes does not compensate him for all of the hours he worked the prior week. He speaks with an assistant manager and eventually the manager, Mr. Mercer, about the situation. The paycheck that Mr. Harvey receives on June 26, 2003 contains an adjustment of pay from the prior week.

June 26, 2003 to July 7, 2003. Mr. Harvey continues to experience problems receiving pay for all of the hours he worked. On one occasion, when Mr. Harvey [*67] is delayed in opening a delivery door while trying to find a key, a

delivery truck driver uses obscene language towards him.

July 7, 2003, Mr. Harvey writes a letter to Safeway's corporate counsel, Mr. Gordon, explaining the various problems he has experienced. His weekly paychecks are consistently short. If computers are the problem, Mr. Harvey queries how many other employees could be similarly affected and not realize the problem. Mr. Harvey was dissatisfied with the assistant store manager's response to the paycheck issue. Mr. Harvey complained about the additional responsibilities he was being given, including moving pallets and being in charge of the store, without an adjustment in his paycheck. Mr. Harvey had been cursed by a truck driver. He was concerned about the unfair treatment two employees received concerning allegations that they sold outdated meat. Additionally, Mr. Harvey gave examples of operational inefficiencies. In response to his letter, Mr. Harvey anticipated either action by Safeway to deal with the noted problems or his termination.

July 17, 2003. Mr. Gordon replies to Mr. Harvey's correspondence. He confirms Safeway's policy of encouraging its employees [*68] to raise the type of issues presented by Mr. Harvey. Such good faith reports will not result in any adverse personnel action. Mr. Gordon indicates Mr. Harvey's concerns have been forwarded for resolution.

July 21, 2003. Mr. Harvey meets with the assistant manager of the store and a human resources advisor, Ms. Knolls and Ms. Madert, to discuss his payroll concerns. Ms. Madert explains some of the company's problems with its computer but advises Mr. Harvey that he is responsible for ensuring the accuracy of his weekly paycheck. She further indicates that the union contract sets his hourly wage.

July 23, 2003. Ms. Madert advises Mr. Harvey that the store's collective bargaining agreement sets the starting hourly rate of a night stocker at $ 6.60, with a one dollar premium for night work.

July 24, 2003 to July 27, 2003. Since the store visit has been completed, and due to the drop in business due to summer season, Mr. Harvey's weekly hours are reduced down to about 24 hours a week. Due to an illness on July 24 and July 25, Mr. Harvey does not work and is not aware of the next week's schedule. Based on his prior experience, Mr. Harvey plans to return to work around 11:00 p.m. [*69] on July 27, 2003.

July 27, 2003. In the evening of July 27, 2003, prior to his typical reporting time, Ms. Barnes, a person in charge, leaves Mr. Harvey a phone message advising him not to return to work because he is not on the schedule. Based on that message, Mr. Harvey believes that he has been terminated as a Safeway employee and does not report to work anymore.

July 28, 2003 through August 8, 2003. Mr. Harvey remains on the weekly schedule at Safeway, for 24 hours a week.

July 29, 2003. Believing that he has been terminated as an employee, Mr. Harvey writes a letter to inform the president of Safeway that despite Mr. Gordon's assurances to the contrary, he has been terminated. He describes the events and meetings that occurred since his July 7, 2003 letter to Mr. Gordon and expresses his belief that as a result of his activities he received a phone message on July 27, 2003 terminating his employment with Safeway. Mr. Harvey reminds the company president that under SOX termination of an employee who reports possible fraud against shareholders is illegal. Mr. Harvey also includes a complaint about the new grocery manager and requests senior executive intervention on [*70] behalf of two other employees who Mr. Harvey believes have suffered unfair adverse personnel actions.

Mid-August 2003. Due to Mr. Harvey's July 29, 2003 letter, Mr. Wescott is assigned to address Mr. Harvey's complaints. He sets up a meeting with Mr. Harvey to clarify that Safeway did not terminate him. Mr. Wescott offers Mr. Harvey the opportunity to transfer to another store, which Mr. Harvey accepts. After the meeting, Mr. Wescott finds Mr. Harvey a position at another store and gives the information about the new assignment to Mr. Harvey.

September 1, 2003 to September 8, 2003. Mr. Harvey is scheduled to work at the Connecticut Avenue store beginning at 11:00 p.m. on September 2, 2003. Sometime between 6:00 and 10:00 p.m., Mr. Harvey calls the store and

speaks to the assistant manger, Mr. Marlow, to let him know that he will not be able to come to work that night because he has no electricity and cannot take care of his personal hygiene. He requests that he be permitted to wait a day before he reports to work. Mr. Marlow finds the excuse unacceptable and tells Mr. Harvey that he expects to see Mr. Harvey at work. Mr. Harvey does not go to work that night and makes no other [*71] contact with Mr. Marlow, Mr. Wescott, or Safeway. Mr. Harvey remains on the schedule at the new store for one week.

September 20, 2003. After learning that Mr. Harvey never went to work at the new Safeway store and thus missed all six of his scheduled shifts the first week of September, Mr. Wescott completes the separation paperwork terminating Mr. Harvey pursuant to the company's absenteeism policy. After an employee has three consecutive, unexcused absences, Safeway will terminate his or her employment on the basis of job abandonment.

**Issue No. 1 -- Motion to Dismiss** n10

    n10 At the hearing, I deferred a decision on this motion and gave the parties an opportunity to address it in their closing briefs.

At the hearing, after the completion of Mr. Harvey's case-in-chief, Respondent's counsel presented a Motion to Dismiss the SOX complaint (TR, page 109). Counsel asserted that Mr. Harvey's allegations of wage violations of the FLSA were not protected activities under SOX because they did not involve violations of a federal law relating to fraud on the shareholders. In particular, Mr. Harvey did not report any violations of securities laws or cooperate in an investigation [*72] relating to securities. His simple assertion that the FLSA is a law relating to fraud against the shareholders is insufficient to establish that he engaged in protected activity. SOX was not intended to capture every complaint an employee might have as a violation of the Act.

In response, Mr. Harvey objected to the Motion to Dismiss because he reasonably believed that he had reported information involving a violation of federal law (Fair Labor Standards Act) that caused a fraud on the shareholders. When Mr. Harvey complained to store management and wrote a letter to company executives about not being paid for the hours he worked, he was reporting a violation of the FLSA. The violation of that law caused improper accounting of company funds and resulted in additional costs to the company, which adversely affects the investment of its shareholders.

Although 29 C.F.R. Part 18, Rules of Practice and Procedure for Administrative Hearings, does not contain a section pertaining to such a motion to dismiss, 29 C.F.R. § 18.1 (a) indicates that in situations not addressed in Part 18, the Federal Rules of Civil Procedure are applicable. In turn, FED. R. CIV. P. 12 (b) (1), addresses a motion [*73] to dismiss for lack of subject matter jurisdiction. The courts recognize two approaches in considering a 12 (b) (1) motion. n11 The first consideration of a 12 (b) (1) motion is whether the pleading, or complaint, on its face is sufficient. The second consideration under 12 (b) (1) concerns a factual consideration of the complaint. In this "factual" analysis, no presumption of truthfulness applies to the allegations in the complaint. Instead, I may rely on affidavits and other documents submitted in support of the motion. Due to the timing of the Motion to Dismiss, after the presentation of Mr. Harvey's evidence, I will focus on the factual, rather than facial, sufficiency of his SOX complaint.

    n11 *See Ohio National Life Insurance Co. v. United States, 922 F.2d 320 (6th Cir. 1990).*

The first requisite element to establish illegal discrimination against a whistleblower is the existence of a protected activity. The Secretary, U.S. Department of Labor, ("Secretary") has broadly defined protected activity as a report of an act, which the complainant reasonably believes is a violation of the subject statute. The standard for determining whether a complainant's [*74] belief is reasonable involves an objective assessment and the allegation need not be ultimately substantiated. *Minard v. Nerco Delamar Co.,* 92 SWD 1 (Sec'y Jan. 25, 1995), slip op. at 8. The alleged act must at least "touch on" the subject matter of the related statue. *Nathaniel v. Westinghouse Hanford Co.,* 91 SWD 2 (Sec'y Feb. 1, 1995), slip op. at 8-9; and *Dodd v. Polsar Latex,* 88 SWD 4 (Sec'y Sept. 22, 1994).

The implicit purpose of the employee protection provisions of SOX, to encourage the reporting of matters

involving or related to violations of any federal law or SEC violation, regulation, or standard concerning fraud against the shareholders, also affects the scope of protected activity. *18 U.S.C. § 1514A.* The Supreme Court noted in a parallel statute, that the statute's language must be read broadly because "[a] narrow hyper-technical reading" of the employee protection provision of the Act would do little to effect the statute's aim of protecting employees who raise safety concerns. *Kansas Gas & Electric Co., 780 F.2d 1505 (10th Cir. 1985), cert. denied, 478 U.S. 1011 (1986).* [*75] Such statutes have a "broad, remedial purpose for protecting workers from retaliation based on their concerns for safety and quality." *Mackowiak v. University Nuclear Systems, 735 F.2d 1159 (9th Cir. 1984).* As a result, the courts and the Secretary have broadly construed the range of employee conduct which is protected by the employee protection provision contained in nuclear and environmental acts. *See S. Kohn, The Whistle Blower Litigation Handbook,* pp. 35-47 (1990).

Although the above principles were developed in environmental whistleblower cases, the underlying purpose for whistleblower protection and associated principles are readily adaptable to SOX cases. Consequently, a protected activity under SOX has three components. First, the report or action must involve a purported violation of a federal law or SEC rule or regulation relating to fraud against shareholders. Second, the complainant's belief about the purported violation must be objectively reasonable. Third, the complainant must communicate his safety concern to either his employer, the federal government or a congressional member.

In addressing the Motion to Dismiss in Mr. Harvey's [*76] case, the central focus relates to the first component of a protected activity. The fundamental protected activity under SOX involves an employee providing information to supervisory authority based on a reasonable belief that at least one of six SOX violations has occurred. Under the statute, *18 U.S.C. § 1514A* (a) (1), the subject matter of that information, or the purported SOX violation, must relate to at least one of the following specific categories:

1. Title 18, Crimes and Criminal Procedure, Chapter 63, Section 1341, Frauds n12 and swindles. This provision establishes that use of the Post Service or private or commercial interstate carrier as a means to intentionally defraud or obtain property by false or fraudulent pretenses is a felony crime punishable by up to five years (or thirty years if the victim is a financial institution) imprisonment.

2. Title 18, Crimes and Criminal Procedure, Chapter 63, Section 1343, Fraud by wire, radio, or television. This provision establishes that use of wire, radio, or television communication as means to intentionally defraud or obtain property by false or fraudulent pretenses is a felony crime punishable [*77] by up to five years (or thirty years if the victim is a financial institution) imprisonment.

3. Title 18, Crimes and Criminal Procedure, Chapter 63, Section 1344, Bank fraud. This provision establishes that executing a scheme or artifice to defraud a financial institution is a felony crime punishable by not more than thirty years imprisonment.

4. Title 18, Crimes and Criminal Procedure, Chapter 63, Section 1348, Securities fraud. n13 This provision establishes that executing a scheme or artifice a) to defraud any person in connection with any security of an issuer of a class of securities registered under Section 12 of the Securities Exchange Act or that is required to file reports under Section 15 (d) of the Securities Exchange Act; or b) to obtain by means of false or fraudulent pretenses any money or property in connection with the purchase of such security identified in a) above is a felony crime punishable by not more than twenty-five years imprisonment.

5. Any rule or regulation of the Securities Exchange Commission.

6. Any provision of federal law relating to fraud against shareholders.

n12 Fraud is defined as "false representation of a matter of fact. . .which is intended to deceive another so that he will act upon it to his legal injury." BLACK'S LAW DICTIONARY 788 (4th ed. 1968).

[*78]

n13 This criminal provision was added by Section 807 of the Sarbanes-Oxley Act (2002).

Based on the presented evidence and my findings of fact, the first five types of SOX violations are not applicable in this case. As a result, I must determine whether any, or all, of Mr. Harvey's complaints about the underpayment of his weekly wages, to the assistant store manager, store manager, corporate counsel or company president involve the sixth category of SOX violation - a provision of federal law relating to fraud against shareholders. In turn, that determination requires consideration of whether an employer's actions or omissions which may violate the Fair Labor Standards Act n14 constitute violations of federal law relating to fraud against shareholders. For the reasons set out below, while complaints of systemic violations of FLSA might reach the necessary magnitude to effectively perpetrate a fraud on shareholders, I conclude Mr. Harvey's particular reports of discrepancies in his weekly paychecks do not constitute protected activities under SOX.

n14 Although Mr. Harvey filed a FLSA complaint with the U.S. Department of Labor, the final resolution of his complaint, and whether an FLSA violation was established, is not in the record.

[*79]

As a first step, I turn to a brief consideration of the two statutes. The Fair Labor Standards Act, *29 U.S.C. §§ 201 to 219*, as amended, provides for minimum standards for both wages and overtime entitlement, and spells out administrative procedures by which covered work time must be compensated. Its central focus is employee compensation and not the prevention of fraud against shareholders. In contrast, the Sarbanes-Oxley Act, is a prophylactic federal law aimed at preventing fraud against shareholders. As set out in the SOX preamble, Congress imposed additional, specific legal requirements and standards on corporations, directors, senior financial officers, lawyers, and accountants to protect shareholders by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws and for other purposes. For example, SOX includes Section 302 (corporate officer certification that a financial disclosure is accurate and does not contain any untrue statement of material fact), Section 401 (enhanced disclosure requirements for mandated financial reports), and Section 406 (code of ethics for senior financial officers).

Despite [*80] these contrasting statutory purposes, an argument may be made that in light of SOX's mandate for corporate accounting accuracy, a complaint about incorrect withholding of employees. wages in violation of FLSA within a publicly traded company draws in the FLSA as a federal law which includes a concern about fraud against shareholders. That is, Safeway's under-compensation of its employees could impermissibly alter the accuracy of its financial disclosures mandated by SOX.

While this presentation has some logical appeal, the connection between individual FLSA violations and SOX becomes tenuous upon close examination of SOX. Specifically, Section 302 establishes a requirement for the accuracy of material facts relating to finances. This provision demonstrates Congress. intention to protect shareholders by requiring accurate reporting of significant information concerning a corporation's financial condition.

In light of that congressional intention, Mr. Harvey's reports of the underpayment of his wages fail to reach the requisite level of materiality. Although understandably significant to Mr. Harvey, the shortages in his weekly paycheck of up to eight hours at an hourly rate [*81] of $ 6.60 to $ 7.60 an hour over the course of four weeks, if uncorrected, would have a microscopic, if any, effect on any financial report prepared by Safeway for the benefits of its shareholders. Additionally, since Safeway attempted to remedy Mr. Harvey's underpayments in a timely manner, its financial reports were not likely affected by the temporary wage shortages. n15

n15 By the time of Mr. Harvey's July 21, 2003 meeting with Ms. Madert, Safeway had paid him for the missing hours to his satisfaction.

In terms of systematic wage underpayments by Safeway, Mr. Harvey asserted in his October 20, 2003 complaint to

the Secretary that based on his wage problems and the inaccurate wage payments of at least ten other employees "it appears Safeway is increasing its profits on unaccounted wages from the salaries of employees which are not paid to these employees." However, in the June and July 2003 correspondence that represents his alleged protected activities, Mr. Harvey did not include factually or reasonably viable complaints of company-wide wage underpayments.

In his June 2003 complaints to the assistant store manager and store managers, Mr. Harvey presented only concerns about [*82] his own pay. Likewise, in his July 2003 letters to Safeway executives, Mr. Harvey only provided details about his own wage shortfall and a wage issue for one other employee while tangentially raising the possibility of a broader wage accounting problem without any specificity. In his July 7, 2003 letter to corporate counsel, Mr. Harvey simply asked Mr. Gordon to consider whether other employees could be experiencing the same underpayment problem. In his July 29, 2003 letter to the president of Safeway, Mr. Harvey merely commented he agreed with Ms. Madert's suggestion that he keep track of his hours because he and other employees were not being paid for hours worked.

In summary, Mr. Harvey's personal wage payment problems did not have necessary magnitude to raise a concern about fraud against the shareholders of Safeway. Additionally, Mr. Harvey's personal experience over the course of a couple of weeks with Safeway and an antidotal report of one other employee's wage concerns did not provide an objectively reasonable factual foundation for an additional complaint about systematic wage underpayment. As a result, Mr. Harvey's wage underpayment complaints to store managers and company [*83] executives relating to the FLSA did not include an objectively reasonable complaint that Safeway was also engaged in a significant, material and company-wide underpayment of its employees to the extent a fraud was being perpetrated on its shareholders. Since his wage complaints did not relate to federal law involving shareholder fraud, Mr. Harvey has failed to establish one of the necessary elements -- a SOX violation - for proving that he engaged in protected activity. Accordingly, Respondent's Motion to Dismiss Mr. Harvey's October 2003 SOX discrimination complaint must be granted.

**Case-in-Chief**

Although I have granted the Respondent's Motion to Dismiss, I will nevertheless proceed to adjudicate the remaining portion of Mr. Harvey's complaint as though his wage discrepancy reports were considered protected activities under SOX. Because the Sarbanes-Oxley Act was only recently enacted, applicable precedent is almost non-existent. Therefore, for purposes of judicial efficiency, and in the event appellate courts eventually conclude that a reported violation of FLSA is a *per se* violation of a federal law relating to fraud against shareholders, I will continue with the consideration [*84] of the remaining portion of Mr. Harvey's SOX case-in-chief.

As previously noted, Subsection 1514A (a) of the Act and 29 C.F.R. § 1980.102 of the implementing regulation prohibit a company subject to SOX from discharging, demoting, suspending, threatening, harassing or in any manner discriminating against an employee in the terms and conditions of employment because an employee engaged in a SOX protected activity. By reference, n16 SOX incorporates the procedural provisions and rules of the employee protection provisions of the Aviation Investment and Reform Act for the 21st Century ("AIR 21"), *49 U.S.C. § 42121* (b). Under *449 U.S.C. § 42121* (b) (2) (B) (iii) and 29 C.F.R.. § 1980.109 (a), to establish that a respondent has committed a violation of the employee protection provisions of SOX, a complainant must prove by a preponderance of the evidence that an activity protected under SOX was a contributing factor in the adverse or unfavorable personnel action alleged in the complaint. Courts have defined "contributing factor" as "any factor which, alone, or in connection with other factors, tends to affect in [*85] any way" the decision concerning the adverse personnel action, *Marano v. U.S. Dept. of Justice, 2 F.3d 1137 (Fed. Cir. 1993)*. Thus, based on these principles, to establish a violation of SOX, a complainant must prove three elements: 1) protected activity; 2) adverse or unfavorable personnel action; and 3) causation in terms of a contributing factor. Having previously discussed the first element, protected activity, I turn to the second element of entitlement, adverse personnel action.

n16 *18 U.S.C. § 1541A* (b) (2) (A).

**Issue No. 2 -- Adverse Personnel Action**

2005 DOLSOX LEXIS 4, *85

Based on the allegations in his October 2003 SOX complaint, Mr. Harvey claims to have suffered the ultimate adverse personnel action, twice. First, on July 27, 2003, he received a phone message indicating that he should not come into work because he was not on the schedule, which he believed was a termination action. Second, after he was reassigned to a new store, in the first week of September 2003, an assistant store manager refused his request to delay his start of work by one day due to personal hygiene problems which caused Mr. Harvey not to report [*86] to work. Mr. Harvey considers this second incident a constructive discharge. For the reasons discussed below, I find neither incident alleged in Mr. Harvey's SOX complaint represents an adverse personnel action.

At the same time, the evidentiary record provides support for a finding that Safeway took an unfavorable personnel action against Mr. Harvey on September 20, 2003.

July 27, 2003

Reviewing the events leading up to the July 27, 2003 phone message helps place into context Mr. Harvey's state of mind at that time and provides some understanding for his subjective conclusion that he had been terminated. Concerned about the consistent shortfall in his weekly paycheck, somewhat upset by the grocery manager's lack of concern, and apparently dissatisfied with Ms. Knoll's explanation about computer errors, Mr. Harvey authored his July 7, 2003 letter to the Safeway's corporate lawyer. In the letter, he hinted at his state of mind by indicating that one of the possible reactions he anticipated due to his correspondence was the termination of his employment by the company. Although Mr. Gordon seemed to react favorably to the letter and tried to alleviate Mr. Harvey's termination concerns, [*87] Mr. Harvey had also heard a rumor that Ms. Knoll was angry about inclusion of her letter of explanation in his July 7, 2003 letter to corporate counsel. Additionally, just before July 27th, the new grocery manager had questioned the quality of Mr. Harvey's stocking work and suggested Safeway couldn't keep all its night stockers. Thus, on July 27, 2003, when Mr. Harvey heard that Ms. Knoll wanted him informed the he should not to report to work because he wasn't on schedule, he assumed that he had been terminated.

However, despite Mr. Harvey's state of mind, which may also explain his failure to seek any type of clarification from Mr. Mercer, the store manager, about his employment situation and his subjective termination assumption, the preponderance of objective evidence demonstrates that Safeway did not terminate Mr. Harvey's employment on July 27, 2003. First, on its face, the simple phone message by Ms. Barnes did no more than pass on to Mr. Harvey the message by Ms. Knolls not to come to work at 11:00 p.m. on July 27, 2003 because he wasn't on the schedule. Second, though Mr. Harvey subjectively interpreted that message as a notice of termination, in fact, Ms. Knoll had not completely [*88] removed him from the schedule; he remained assigned to several shifts as a Safeway night stocker for another two weeks after the July 27th phone message.

Additionally, although understandable, Mr. Harvey's subjective interpretation of a termination by Ms. Knolls was not objectively reasonable. While Ms. Knolls, an assistant store manager, might have been unhappy with his July 7, 2003 letter, Mr. Harvey had received assurances from Safeway's corporate counsel that he would not be terminated for raising his concerns. Further, as evidence of the company's good faith response, Mr. Gordon's intervention lead to the July 21st meeting with Ms. Madert and Ms. Knolls. The focus of that meeting was forward-looking, with the intention to resolve Mr. Harvey's pay issues. After that meeting, on July 22, July 23, and July 24, Mr. Harvey worked at Safeway without any apparent interference from the assistant store manager, Ms. Knolls.

More importantly, another significant event, which occurred in mid-August 2003, definitively undermines Mr. Harvey's assertion in his October 2003 SOX complaint that he suffered an adverse personnel action on July 27, 2003. When Mr. Wescott met with Mr. Harvey in mid-August [*89] 2003, he explained that the July 27, 2003 phone message simply meant that he wasn't on the schedule that night. He told Mr. Harvey that for the following two weeks after July 27th, he remained on the work schedule. Consequently, as Mr. Harvey acknowledged during cross-examination during the hearing, at the conclusion of his mid August 2003 meeting with Mr. Wescott, he understood that he had not been terminated on July 27, 2003. n17

n17 Even though not included in Mr. Harvey's SOX complaint, I have considered whether the drop in Mr. Harvey's total weekly hours from near 40 hours to 24, which is a significant change in the terms and conditions of his employment, may represent an adverse personnel action. However, I find the Respondent provided a valid explanation for its business decision to reduce the number of hours for Mr. Harvey. Additionally, any harm Mr. Harvey may have suffered by that reduction in his weekly hours was rendered moot by his assumption on July 27th that he had been terminated and his corresponding failure to report to work after July 27th.

September 2, 2003

Mr. Harvey also alleges that he was constructively discharged on September 2, 2003 when Mr. Marlow [*90] refused his request to delay his report to work by one day due to loss of water and corresponding personal hygiene issues. Mr. Harvey stated he felt threatened by Mr. Marlow's words and believed he was continuing to be retaliated against for raising concerns about not being compensated for all of the hours he worked. However, the preponderance of the evidence in this case demonstrates that Safeway did not engage in a termination action; and, the circumstances of that evening do not establish a constructive discharge.

Mr. Marlow's negative response to Mr. Harvey's request did not represent a termination action for two reasons. First, in a pattern similar to the July 27th incident, Mr. Harvey never clarified whether he was to report to work for a subsequent shift at the new store and again acted under another incorrect assumption that he had been again terminated by Safeway. In fact, also once again, Mr. Harvey remained on the work schedule at the new Safeway store for a week after his September 2, 2003 conversation with Mr. Marlow. Mr. Wescott initiated the final separation action in compliance with company policy only after Mr. Harvey failed to report to work for three consecutive [*91] shifts.

Second, at the conclusion of their phone conversation, Mr. Marlow believed he and Mr. Harvey had come to the agreement that Mr. Harvey would come into work. Yet, after their conversation, Mr. Harvey chose not to report to work that night, or ever again at Safeway. At the hearing, Mr. Harvey explained that due to the assistant manager's apparent insensitivity to his personal situation, he became "angry," was "fed up," and decided he was "just through" with the company. On cross-examination, Mr. Harvey admitted his understanding that by not reporting to work as directed he was effectively terminating his employment with Safeway. Mr. Harvey's admission at the hearing establishes that Safeway did not take a terminate action against Mr. Harvey's employment on September 2, 2003.

Establishing a constructive discharge claim requires the showing of an even more offensive and severe work environment than is needed to prove a hostile work environment. *Berkman* (ARB Feb. 29, 2000); *Brown v. Kinney Shoe Corp., 237 F. 3d 556, 566 (5th Cir. 2001).* To demonstrate that he was constructively discharged, a complainant must show that his employer created [*92] "working conditions so intolerable that a reasonable employee would feel compelled to resign." *Williams, 376 F.3d at 480* (quoting *Hasan v. U.S. Dept. of Labor, 298 F.3d 914, 916 (10th Cir. 2002)); see also Talbert v. Washington Public Power Supply System,* 1993-ERA-35 (ARB Sept. 27, 1996). In other words, the working conditions were rendered so difficult, unpleasant, and unattractive that a reasonable person would have felt compelled to resign, such that the resignation is effectively involuntary. *Johnson v. Old Dominion Security, 1985 CAA 3* to 5 (Sec'y May 29, 1991). Such an environment may be established by evidence of a pattern of abuse, threats of imminent discharge, and marked lack of response by supervisors to the complainant's concerns (emphasis added). *Taylor v. Hamilton Recreation and Hamilton Manpower Services,* 1987 STA 13 (Sec'y Dec. 7, 1988). If the resignation was not a constructive discharge, then a complainant is not eligible for post-resignation damages, pay, and reinstatement. *Derr v. Gulf Oil Corp., 796 F.2d 340, 343 (10th Cir. 1986).* [*93]

In terms of constructive discharge, Mr. Marlow's refusal of Mr. Harvey's request to delay his reporting one day, even if coupled with Mr. Harvey's prior one month employment history with Safeway, does not establish the requisite pattern of abusive associated with an intolerable work environment. Further, in his sole exchange with Mr. Harvey concerning a request to delay his report to work by one day, Mr. Marlow, the assistant store manager at the new store: a) clearly expressed his expectation that Mr. Harvey was to report to work that night; and, b) implicitly stressed the importance of his attendance by adding, "or else." While the threatening tone of the phrase is evident, Mr. Marlow's one

statement did not represent a series of threats. Finally, although Mr. Marlow arguably was somewhat insensitive to Mr. Harvey's hygiene concerns, his denial of Mr. Harvey's request was not so intolerable that a reasonable person would have been compelled to resign. n18

> n18 Even if Mr. Marlow's refusal constituted a constructive discharge, Mr. Harvey would be unable to prove that his protected activities caused or contributed to Mr. Marlow's response. The record contains no evidence that Mr. Marlow, an assistant store manager at the new store, had any knowledge of Mr. Harvey's previously stated concerns about the payment of his wages.

[*94]

For these reasons, I conclude Mr. Harvey did not suffer the adverse personnel action of termination on September 2, 2003 when Mr. Marlow told him to report to work as scheduled.

September 20, 2003

During the first week of September 2003, although Mr. Harvey was scheduled to work at the new Safeway store in Chevy Chase, he did not report for work at any of the scheduled shifts. When Mr. Wescott was informed about Mr. Harvey's absences, he initiated separation paperwork for job abandonment, which became effective September 20, 2003. That employment termination was an adverse personnel action and satisfies the second requisite element for a viable SOX complaint.

**Issue No. 3 -- Causation**

As previously mentioned, to establish a violation of the SOX employee protection provisions, a complainant must prove that his protected activities were a contributing factor in the alleged unfavorable personnel action. I have determined that the preponderance of the evidence does not support Mr. Harvey's assertions of adverse personnel actions on July 27, 2003 and September 2, 2003. Nevertheless, again on the premise that Mr. Harvey's stated concerns about potential FLSA violations might be protected [*95] under SOX, and in light of Safeway's subsequent termination action, I must determine whether Safeway's separation of Mr. Harvey from its employment on September 20, 2003 was caused in part by these potential protected activities.

In terms of circumstantial evidence supporting causation, the record establishes that the Safeway executive who took the separation action was aware of Mr. Harvey's potential protected activities. Specifically, having been detailed to address Mr. Harvey's concern about his perceived discharge on July 27, 2003, Mr. Wescott, who signed the final separation paperwork, was very familiar with Mr. Harvey's wage concerns. Additionally, within two months of Mr. Harvey's correspondence to the company president about his situation, Mr. Harvey's employment was terminated by Safeway.

While I have considered the above noted circumstances, the direct evidence in this case (Mr. Wescott's credible testimony) overwhelms the circumstantial evidence because it clearly demonstrates that the sole cause of Mr. Wescott's administrative action to separate Mr. Harvey on September 20, 2003 was Mr. Harvey's self-imposed failure to report to duty at his newly assigned store for [*96] three consecutive shifts during the first week of September 2003. As a result, in accordance with the company's written absenteeism policy, Mr. Wescott ended its employment relationship with Mr. Harvey due to abandonment of his job

Accordingly, Mr. Harvey is unable to establish by a preponderance of the evidence that any SOX-related protected activity contributed to the unfavorable personnel action taken by Safeway on September 20, 2003.

**CONCLUSION**

Mr. Harvey's complaints of individual wage irregularities by Safeway as violations of the FLSA do not fall under any of the six categories of SOX violations, including a provision of federal law involving fraud against shareholders.

Consequently, his stated wage concerns were not protected activities under SOX. Accordingly, the Respondent's Motion to Dismiss Mr. Harvey's complaint of illegal discrimination under SOX must be granted.

Even if Mr. Harvey's wage complaints were considered protected activities, the preponderance of the evidence indicates that he did not suffer the requisite adverse personnel action on July 27, 2003 or September 2, 2003. Additionally, even though Safeway took an adverse personnel action against Mr. Harvey [*97] by terminating his employment on September 20, 2003, a SOX protected activity did not cause or contribute to that adverse personnel action. Thus, Mr. Harvey has failed to prove by a preponderance of the evidence that a SOX protected activity contributed to his loss of employment at Safeway. Accordingly, because Mr. Harvey failed to carry his burden of proof, his SOX discrimination complaint must be dismissed. n19

> n19 Even if a complainant proves that his protected activity was a contributing factor in the unfavorable personnel action, *49 U.S.C. § 42121* (b) (2) (B) (iv) and 29 C.F.R. § 1980.109 (a) state no relief is available to the complainant if the respondent proves by clear and convincing evidence that it would have taken the same unfavorable personnel action even in the absence of any protected activity. Since Mr. Harvey cannot establish that his employer took adverse action against him based on a SOX protected activity, I need not address the fifth issue, whether the employer would have taken the same action against Mr. Harvey in the absence of his alleged protected activity.

**ORDER**

1. The Motion to Dismiss the employment discrimination [*98] complaint of MR. COLIN HARVEY against SAFEWAY, INC., brought under the employee protection provisions of SOX, is **GRANTED.**

2. The employment discrimination complaint of MR. COLIN HARVEY against SAFEWAY, INC., brought under the employee protection provisions of SOX, is **DISMISSED.**

**SO ORDERED:**

Washington, D.C.

**NOTICE OF APPEAL RIGHTS:** This decision shall become the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1980.110, unless a petition for review is timely filed with the Administrative Review Board ("Board"), US Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington DC 20210, and within 30 days of the filing of the petition, the ARB issues an order notifying the parties that the case has been accepted for review. The petition for review must specifically identify the findings, conclusions or orders to which exception is taken. Any exception not specifically urged ordinarily shall be deemed to have been waived by the parties. To be effective, a petition must be filed within ten business days of the date of the decision of the administrative law judge. The date of the postmark, facsimile transmittal, or e-mail communication will [*99] be considered to be the date of filing; if the petition is filed in person, by hand-delivery or other means, the petition is considered filed upon receipt. The petition must be served on all parties and on the Chief Administrative Law Judge at the time it is filed with the Board. Copies of the petition for review and all briefs must be served on the Assistant Secretary, Occupational Safety and Health Administration, and on the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, D.C. 20210. *See* 29 C.F.R. §§ 1980.109(c) and 1980.110(a) and (b) as found in "OSHA, Procedures for the Handling of Discrimination Complaints under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002"; 29 C.F.R. Part 1980