UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ROSEMARY O'MAHONY,                                    07 cv. 7916 (vm)

                              Plaintiffs,

        -against-

ACCENTURE LTD. and ACCENTURE LLP,

                              Defendants.
---------------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW IN
## <u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>


KAISER SAURBORN & MAIR, P.C.
Attorneys for Plaintiff
111 Broadway
New York, New York 10006
(212) 338-9100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Ms. O'Mahony's Employment With Accenture . . . . . . . . . . . . . . . . . . . . 1

    B.    Accenture's Fraudulent Scheme to Evade Social Security
          Taxes owed Pursuant to the U.S. Social Security Treaty . . . . . . . . . . . . 2

    C.    Ms. O'Mahony's Opposition to, and Complaints About,
          Accenture's Fraudulent Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.    Accenture's Retaliation Against Ms. O'Mahony Because
          of Her Complaints and Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    POINT I

    Because the Fraudulent Scheme and the Retaliation Were Perpetrated by
    U.S. Executives of Accenture from Within the U.S. this Case Does Not
    Involve the Extraterritorial Application of the Sarbanes-Oxley Act . . . . . . . . . . . 7

    A.    *Carnero* is Inapposite Because Both the Misconduct
          Complained of and the Retaliation Occurred Oversees . . . . . . . . . . . . . 8

    B.    General Rules of Statutory Construction Apply Where, as
          Here, No Extraterritorial Application of the Statute is Sought . . . . . . . . 16

    POINT II

    The Complaint Demonstrates That Plaintiff Was Engaged in Protected
    Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## TABLE OF AUTHORITIES

### CASES

*Barnhart v. Thomas,* 540 U.S. 20, 124 S.Ct. 376, 157  L.Ed.2d 333 (2003)  . . . . . . .  22

*Bingham v. United States,* 724 F.2d 921 (11th Cir.1984) . . . . . . . . . . . . . . . . . . . . . .  22

*Carnero v. Boston Scientific Corp.,* 433 F.3d 1 (1st Cir. 2006)  . . . . . . . . . . .  8-12, 16-18

*CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217 (11th Cir.2001)  . . . . . . . . .  21

*Cervantes-Ascencio v. United States Immigration and Naturalization
Service*, 326 F.3d 83 (2d. Cir. 2003), *cert. Denied*, 124 S. Ct. 483 (2003) . . . . . . . . .  17

*Collins v. Beazer Homes*, 334 F.Supp.2d 1365 (N.D.Ga. 2004) . . . . . . . . . . . . .  20, 24

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . .  17, 21

*E.E.O.C. v. Arabian Am. Oil Co.*, 449 U.S. 244 (1991) . . . . . . . . . . . . . . . . . . . . . .  9, 11

*Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528 (D.C. Cir. 1993) . . . . . .  11

*Fed. Reserve Bank of Atlanta v. Thomas,* 220 F.3d 1235 (11th Cir.2000) . . . . . . . . .  *21*

*In re Florsheim Group Inc.*, 336 B.R. 126 (N.D. Ill. 2005) . . . . . . . . . . . . . . . . . . . . .  11

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999)  . . . . . . . . . . . . . . . . . . . . . . .  17

*Los Angeles News Service v. Reuters Television International Limited*,
149 F.3d 987 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Morefield v. Exelon Services, Inc.*, 2004 SOX 00002 (ALJ Jan 28, 2004) . . . . . . . . .  17

*Penesso v. LCC International, Inc.*, 2005 SOX 00016 (ALJ March 4, 2005)  . . . .  12, 13

*Reyna v. ConAgra Foods, Inc.*, 506 F.Supp.2d 1363 (M.D. Ga. 2007)  . . . . . . . . . 20-23

*Shekoyan v. Sibley International Corp.*, 217 F.Supp 2d 59 (D. D.C. 2002)  . . . . .  14, 15

*Shotz v. City of Plantation, Fla.,* 344 F.3d 1161 (2003)  . . . . . . . . . . . . . . . . . . . . . . .  21

*Stevens v. Premier Cruises, Inc.,* 215 F.3d 1237 (11th Cir. 2000) . . . . . . . . . . . . . . .  10

## STATUTES

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 19-23

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 19, 21-23

18 U.S.C. § 1514A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 12, 16-21

31 U.S.C. § 3730(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

49 U.S.C. § 42121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## PRELIMINARY STATEMENT

Plaintiff, Rosemary O'Mahony, submits this Memorandum of Law in opposition to the motion by defendants, Accenture Ltd. and Accenture LLP, to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF FACTS

The following is a summary of the facts that are alleged in plaintiff's complaint.

**A.    Ms. O'Mahony's Employment With Accenture**

From 1984 until August 31, 2004, Ms. O'Mahony was employed by Accenture's United States subsidiary, Accenture LLP, and its predecessor, Andersen Consulting LLP.  In September 1992, while remaining an employee of Accenture LLP, Ms. O'Mahony began an expatriate assignment for Accenture in France to establish and head a new Accenture office in Sophia Antipolis.  (Complaint ["Compl.], ¶¶ 7-9)

Initially her assignment involved working part-time in France, but from September 1993 onwards her expatriate assignment was on a full time basis.  In 1996, at Accenture's request, Ms. O'Mahony moved to Paris to lead the Technology Competency division for Accenture's West Europe region.  In 2000, again at Accenture's request, Ms. O'Mahony assumed global responsibility for the Technology Competency division in the Resources Industry Group.  Throughout this period she remained a U.S. employee of Accenture LLP.  (Compl., ¶¶ 9-12)

On September 1, 2004, Ms. O'Mahony's employment was transferred from defendant Accenture LLP to Accenture SAS, the French operating subsidiary of

1

Accenture.  She remained an employee of Accenture SAS until October 31, 2006.
(Compl., ¶ 12)

From 1988 until October 2006 Ms. O'Mahony was one of the most senior
employees of Accenture, having the designation of "partner."  (Compl., ¶ 7)

## B.    Accenture's Fraudulent Scheme to Evade Social Security Taxes owed Pursuant to the U.S. Social Security Treaty

Beginning in or about 1997, American executives of Accenture undertook a
concerted course of action to deliberately evade paying millions of dollars of French
social security payments that Accenture was legally obligated to make.  This fraudulent
scheme violated the U.S. mail and wire fraud statutes (18 U.S.C. § 1341 and 18 U.S.C.
§ 1343).  (Compl., ¶ 13)  The details of the fraud are as follows.

Under the terms of the Agreement on Social Security Between the United States
of America and the French Republic, dated March 2, 1987 ("U.S. Social Security
Treaty"), employees that are sent by United States employers to work in the territory of
France are subject to the provisions of the French social security system and their
employers are legally obligated to make employer-contributions with respect to each
such employee in France.  The only exception to this rule applies to employees for
whom "the period of work in the territory of [France] is not expected to exceed 5 years"
and with respect to whom the employer obtains a Certificate of Coverage. (Compl., ¶
14)

Accenture obtained the requisite Certificate of Coverage, exempting it from
paying social security contributions in France during the first five years of Ms.
O'Mahony's assignment in France.  This Certificate of Coverage expired in August 1997

but Ms. O'Mahony's assignment to France continued.  (Compl., ¶ 15)  Accordingly, as

of September 1997 Accenture had a legal obligation to begin paying social security

contributions ("French Social Security Contributions") with respect to Ms. O'Mahony to

the French social security system.  The French Social Security Contributions included

URSSAF contributions (basic healthcare, life insurance and basic retirement fund),

ASSEDIC (unemployment insurance fund) and ARRCO and AGIRC (supplemental

retirement funds).  (Compl., ¶ 16)

Accenture deliberately and wilfully concealed Ms. O'Mahony's expatriate

assignment in France from the French authorities and fraudulently withheld payment of

the French Social Security Contributions that were legally owed.  The contributions that

Accenture fraudulently evaded paying amounted to approximately 36% of Ms.

O'Mahony's total compensation for the period September 1997 through September 1,

2004.  (Compl., ¶¶ 17-18)

During the period September 1997 through September 2004, Ms. O'Mahony

received more than $10.5 million in earnings from Accenture.   Hence, Accenture's

fraud for this period related solely to Ms. O'Mahony, amounted to approximately $3.7

million.  Moreover, during the same period Accenture LLP had multiple other senior

employees and partners on similar expatriate assignments in France so the fraud could

have amounted to tens or hundreds of millions of dollars.  (Compl., ¶¶ 20-21)

**C.    Ms. O'Mahony's Opposition to, and Complaints About, Accenture's Fraudulent Scheme**

Beginning in or about November 2001, Ms. O'Mahony made repeated demands

to Accenture that it comply with its legal obligation to pay French Social Security

3

Contributions to the French authorities. These demands were initially made, *inter alia*, to Steven Brown, an associate partner in Accenture's corporate finance group in New York, and Carine De Bontridder, a manager in that group. (Compl., ¶¶ 22-23)

Some of Accenture's most senior executives in the United States repeatedly admitted to Ms. O'Mahony that Accenture was legally obligated to pay the French Social Security Contributions. These executives informed Ms. O'Mahony that Accenture had deliberately decided not to make these payments and had deliberately decided to conceal from the French authorities the fact that she was working in France. (Compl., ¶ 24)

In conversations on or about February 28, 2004 and June 10, 2004 with Pamela Craig, Accenture's Global Financial Controller in New York, Ms. O'Mahony reiterated her demand that Accenture make payment of the French Social Security Contributions that were legally mandated by the U.S. Social Security Treaty. On July 28, 2004, Ms. Craig told Ms. O'Mahony that she (Craig) and Michael McGrath, Accenture's Global Risk Officer in the United States, would make a final decision as to whether or not Accenture would pay the French Social Security Contributions. (Compl., ¶¶ 25-26)

During a series of telephone conversations with Ms. Craig in August and September 2004, Ms. O'Mahony continued to insist that Accenture pay the French Social Security Contributions and expressly informed Ms. Craig that she would not agree to conceal the 'fraud' being committed by Accenture. On September 23, 2004, Ms. Craig informed Ms. O'Mahony that Jamey Shachoy, Accenture's global tax partner based in California, had affirmatively decided that Accenture's "interests" would be better served by not making any of the French Social Security Contributions and

4

continuing to affirmatively conceal from the French authorities the fact that Ms.

O'Mahony had been working in France since 1992. Ms. O'Mahony expressly told Ms.

Craig that she objected to Accenture's actions and that she would not be a party to tax

fraud. (Compl., ¶¶ 27-29)

**D.**     **Accenture's Retaliation Against Ms. O'Mahony Because of Her Complaints
and Objections**

The Accenture partnership structure comprises nine tiers, called "levels of

responsibility" ("Level of Responsibility"). A partner's compensation range is a function

of the Level of Responsibility assigned to the partner. On November 19, 2004, less

than two months after Ms. O'Mahony's told Ms. Craig she would not agree to conceal

Accenture's tax fraud, Ms. O'Mahony was informed by Accenture that her Level of

Responsibility was being reduced from B1 to A3 effective December 1, 2004. (Compl.,

¶¶ 30-31)

Ms. O'Mahony was given no prior warning of this unprecedented reduction of her

role. The reduced level of A3 represents the Level of Responsibility typically given to

partners with between four and six years of seniority as partners, rather than Ms.

O'Mahony's 16 years as a partner. (Compl., ¶¶ 32-33)

The decision to reduce Ms. O'Mahony's level of responsibility was made in New

York by Tom Pike, Accenture's global business operations director, who is based in

New York. Pike had no direct contact or reporting relationship with Ms. O'Mahony in

2004. However, Pike had multiple discussions with Pamela Craig during the summer of

2004 regarding Ms. O'Mahony's complaints about, and opposition to, Accenture's

fraudulent scheme to evade payment of the French Social Security Contributions. Pike

reduced Ms. O'Mahony's level of responsibility in retaliation for her complaints about, and opposition to, Accenture's fraudulent scheme to evade payment of the French Social Security Contributions. (Compl., ¶¶ 35-37)

As a direct result of the reduction of Ms. O'Mahony's Level of Responsibility her compensation for the period December 1, 2004 through October 31, 2006 was decreased by an amount estimated to exceed $670,000. (Compl., ¶ 34)

E.    **Procedural Background**

On March 24, 2005, Ms. O'Mahony filed a complaint with the United States Department of Labor alleging that Accenture had retaliated against her in violation of the anti-retaliation provision of the Sarbanes-Oxley Act set forth in 18 U.S.C. § 1514A. On May 9, 2005, the Department of Labor issued its Findings and Preliminary Order dismissing the complaint on the basis that 18 U.S.C. § 1514A does not apply extraterritorially..

On June 10, 2005, Ms. O'Mahony timely filed an Objection and Request for a Hearing with the Office of Administrative Law Judges of the Department of Labor.  In a decision dated January 20, 2006, Administrative Law Judge Paul H. Teitler upheld the dismissal of the Complaint

On January 26, 2006, Ms. O'mahony timely filed a Petition for Review with the Administrative Review Board ("ARB") of the Department of Labor.  Briefs were filed on behalf of both parties and the matter was fully submitted to the ARB on April 28, 2006

On August 15, 2007, after waiting more than 15 months for the ARB to render a decision, Ms. O'Mahony gave notice to the ARB pursuant to 29 C.F.R. § 1980.114 that she intended to file an action for *de novo* review in the appropriate District Court of the

United States.  Thereafter, on September 7, 2007, Ms. O'Mahony commenced this

action.


**ARGUMENT**

**POINT I**

**BECAUSE THE FRAUDULENT SCHEME AND THE RETALIATION WERE PERPETRATED BY U.S. EXECUTIVES OF ACCENTURE FROM WITHIN THE U.S. THIS CASE DOES NOT INVOLVE THE EXTRATERRITORIAL APPLICATION OF THE SARBANES-OXLEY ACT**


The anti-retaliation provisions of the Sarbanes-Oxley Act are set forth in 18

U.S.C. § 1514A:

> (a) Whistleblower protection for employees of publicly traded companies. – No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee–
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by–
>
> \* \* \*

7

> **(C)** a person with supervisory authority over the
> employee (or such other person working for the
> employer who has the authority to investigate,
> discover, or terminate misconduct) . . .

The language of the statute therefore does not restrict its application to

employees who are located in the United States.  Rather, the statute's jurisdictional

nexus is contained in the requirement that the respondent be subject to the provisions

of the Securities Exchange Act of 1934, namely by offering securities within the United

States.

**A.**    ***Carnero* is Inapposite Because Both the Misconduct Complained of and the
Retaliation Occurred Oversees**

Defendant bases its argument concerning extraterritorial enforcement of the

Sarbanes-Oxley anti-retaliation section on the First Circuit's decision in *Carnero v.*

*Boston Scientific Corp.*, 433 F.3d 1 (1st Cir. 2006), which held that section 806 of the

Sarbanes-Oxley Act does not apply extraterritorially.  However, the *Carnero* case is

distinguishable from the instant case in a fundamental respect.  In *Carnero* both the

misconduct complained of and the retaliation occurred oversees.  Here, however, both

the fraudulent scheme and the retaliation were undertaken by U.S. executives of

Accenture from within the territory of the United States.  Hence, this case does not

present an issue of extraterritorial application of the Sarbanes-Oxley Act and the

defendant's reliance on the *Carnero* decision is entirely misplaced.

The plaintiff in *Carnero* was an Argentinian citizen who was hired in Brazil to

work for the Brazilian and Argentinian subsidiaries of the defendant, a United States

company.  The plaintiff alleged that he was fired by the subsidiaries in retaliation for

8

complaining to officials employed by the foreign subsidiaries about accounting

misconduct carried out by the foreign subsidiaries.  The issue before the First Circuit,

therefore, was "whether the whistleblower provision of the [Sarbanes Oxley] Act has

extraterritorial effect, so that a foreign employee . . . who complains of <u>misconduct

abroad by oversees subsidiaries</u> may bring suit under the whistleblower provision of

Sarbanes-Oxley against the listed United States parent company."  433 F.3d at 5

(emphasis added)

The First Circuit began its analysis with the well-established principle that

"[w]here, as here, a statute is silent on its extraterritorial reach, and no contrary

congressional intent clearly appears, there is generally a presumption against its

extraterritorial application."  *Id.*  The court noted that in *E.E.O.C. v. Arabian Am. Oil Co.*,

449 U.S. 244, 248 (1991) the Supreme Court had reiterated "[the] longstanding

principle of American law that legislation of Congress, unless a contrary intent appears,

is meant to apply only within the territorial jurisdiction of the United States."  The

*Carnero* court then examined both the text and the legislative history of the Sarbanes-

Oxley Act and concluded that the presumption against extraterritoriality was not

rebutted with respect to the civil whistleblower protection provision at issue.  The

*Carnero* court made clear, however, that "[w]e decide this case necessarily on its own

facts [and] [o]ne can imagine many other fact patterns that may or may not be covered

by our reasoning in today's decision."  433 F3d at 18.  In other words, not all cases in

which an employee is physically located abroad would implicate the analysis which is

required for extraterritorial application of the statute.

In *Carnero* both the plaintiff and the company officials who allegedly retaliated

were located oversees, *i.e.* outside the territorial jurisdiction of the United States, and the retaliating officials were employed abroad by a foreign subsidiary.  Here, on the other hand, the retaliation against Ms. O'Mahony, was undertaken <u>within</u> the territorial jurisdiction of the United States by executives located in the United States and employed by Accenture's United States subsidiary.  Ms. O'Mahony simply seeks to enforce the anti-retaliation prohibition of Sarbanes Oxley with respect to conduct within the territory of the United States by employees and officers of Accenture who work within the United States.  It is irrelevant that Ms. O'Mahony herself was working at that time in France because the conduct sought to be regulated occurred within the United States.  The adjudication of this case simply does not involve the exercise of extraterritorial jurisdiction.

Courts have repeatedly held that enforcement of a United States statute with respect to actions carried out within the territory of the United States does not implicate the presumption against extraterritorial jurisdiction relied upon in *Carnero*.  For example, in *Stevens v. Premier Cruises, Inc.,* 215 F.3d 1237 (11th Cir. 2000) the Eleventh Circuit reversed a decision of the district court which had refused to extend the provisions of the Americans with Disabilities Act to a passenger on a foreign-flag cruise ship in United States waters.  As the Eleventh Circuit noted in its opinion, "[t]he district court based its determination about foreign-flag cruise ships on the presumption against extraterritoriality set out in *EEOC v. Arabian Am. Oil Co.*"  *Id.* at 1242.  However, the Eleventh Circuit held that the case did not involve the extraterritorial application of the statute because the conduct occurred within U.S. borders:

10

> By definition, an extraterritorial application of a statute
> involves the regulation of conduct *beyond U.S. borders.*
> Accordingly, a foreign-flag ship sailing in United States
> waters is not extraterritorial.  The presumption against
> extraterritoriality, therefore, is inapposite to this case.

*Id.* (emphasis in original)

Similarly, in *Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528 (D.C.

Cir. 1993), the D.C. Circuit held that the National Environmental Policy Act, which

requires all United States federal agencies to prepare an environmental impact

statement before making a decision that could significantly affect the quality of the

human environment, applied to a decision by the National Science Foundation ("NSF")

to incinerate waste in Antarctica.  While the decision to incinerate was made by the

NSF within the United States, the effects of the decision on the environment occurred

entirely outside the United States, *i.e.,* in Antarctica.   The D.C. Circuit began its

analysis as did the *Carnero* court by noting that "the Supreme Court recently reaffirmed

the general presumption against the extraterritorial application of statutes in *Equal'*

*Employment Opportunity Commission v. Arabian American Oil Co."* However, the D.C.

Circuit held that "the presumption against extraterritoriality is not applicable when the

conduct regulated by the government occurs within the United States." *Id.* The court

explained that:

> By definition, an extraterritorial application of a statute
> involves the regulation of conduct beyond U.S. borders.
> <u>Even where the significant effects of the regulated conduct
> are felt outside U.S. borders, the statute itself does not
> present a problem of extraterritoriality, so long as the
> conduct which Congress seeks to regulate occurs largely
> within the United States.</u>

986 F.2d at 531 (emphasis added); *See also In re Florsheim Group Inc.*, 336 B.R. 126, 130 (N.D. Ill. 2005) ("The first question a court must address when considering whether a U.S. law applies to a transaction with international components is whether application of the statute presents an extraterritoriality problem at all. That is, a court must determine whether the statute seeks to regulate conduct in the United States or in another sovereign country.")

Likewise, it is well established that, although the U.S. Copyright Act does not apply extraterritorially, where there is a predicate act of infringement within the United States the plaintiff can nevertheless recover damages for distribution of the infringing materials abroad. *Los Angeles News Service v. Reuters Television International Limited*, 149 F.3d 987 (9th Cir. 1998).

At least one ALJ has held that, even where the complainant is employed abroad, the Department of Labor had jurisdiction to enforce the anti-retaliation provision of Sarbanes-Oxley where the complaints about fraud are directed to United States officials and the retaliatory decision is made from within the United States. *Penesso v. LCC International, Inc.*, 2005 SOX 00016 (ALJ March 4, 2005). (A copy of the decision is attached hereto as Exhibit A) In *Penesso*, the complainant, who was employed in Italy by the Italian subsidiary of an American corporation, was retaliated against after he complained to corporate officers in the United States about improper financial dealings which had taken place in Italy. In holding that the Department of Labor had jurisdiction under § 1514A, the ALJ distinguished the *Carnero* case because, *inter alia*, Penesso had directly communicated his concerns to corporate officials in the United States and

"at least one of the alleged retaliatory actions – the decision not to issue bonuses in 2003 – took place in the United States." *Id.* at p. 3.

Notably, in the *Penesso* case the United States Department of Labor – which is charged under the Sarbanes-Oxley Act with investigating civil whistleblower complaints – initially dismissed the complaint on the grounds that the statute could not be applied extraterritorially but then argued to the ALJ that its own initial decision had been wrong. Specifically, in a letter to the ALJ dated December 20, 2004, the Department of Labor argued that "[b]ecause Mr. Penesso alleges that the adverse [action] taken against him by Respondent LCC International, Inc. occurred in the United States, it is OSHA's position that the presumption against extraterritoriality is not implicated in this case." (A copy of the letter is attached hereto as Exhibit B)

Accordingly, because enforcement of the Sarbanes-Oxley anti-retaliation provision in this case does not require extraterritorial application of the statute, it is irrelevant that, at the time of the retaliation, Ms. O'Mahony was employed oversees or that the effects of the retaliation were felt by Ms. O'Mahony primarily abroad. Rather, the determinative factor for this Court to exercise jurisdiction is that the conduct at issue occurred within the territory of the United States. Indeed, in view of the Sarbanes-Oxley Act's application to multinational companies that have securities listed on U.S. exchanges, there exists no reason to presume that Congress intended the statute's whistle blower protections to apply only to employees working within the United States provided that the retaliation itself was orchestrated from within the United States. In the context of the global economy in which many publicly-traded U.S. companies now operate, an employee of a multi-national company anywhere in the world may possess

13

information concerning fraud within a company whose securities are traded on a United States exchange. Nothing in the language of the statute limits the law's protections to U.S.-based employees, and to read such a restriction into the language of the statute where the misconduct and retaliation were orchestrated within the United States would be contrary to the statute's central legislative purpose.

The absence of any statutory language limiting coverage of the Sarbanes Oxley whistleblower protection to those employees that are physically located in the United States makes that statute's whistleblower protection similar to the whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"). In *Shekoyan v. Sibley International Corp.*, 217 F.Supp 2d 59 (D. D.C. 2002), the plaintiff, whose primary workstation was in the Republic of Georgia, reported misappropriation of U.S. government funds to management officials at his employer's headquarters in Washington, D.C. In finding that the FCA anti-retaliation protection applied to the plaintiff, notwithstanding his employment abroad, the court relied upon the fact that:

> [T]the plaintiff's allegations, if proven true, demonstrate that the crux of the inappropriate conduct occurred within the United States. As the nature of the protection offered by the whistleblower provision of the FCA is to remedy retaliation for a false claims disclosure, it is noteworthy that the plaintiff allegedly notified [defendant's] officials in Washington, D.C. of the fraudulent misappropriation of United States government funds by its employees in the Republic of Georgia, the officials informed him to "keep it quiet", and he was subsequently terminated when his contract with the defendant was not renewed.

217 F.Supp.2d at 71-72. Notably, the court distinguished the plaintiff's FCA whistleblower claim from a Title VII claim that the plaintiff had also asserted because the Title VII claim related entirely to conduct abroad:

14

> This conduct regarding the plaintiff's FCA claim is
> distinguishable from the conduct complained about in the
> plaintiff's Title VII claim because the genesis of the FCA
> whistleblower claim is the disclosure of the misappropriation
> of government funds and the subsequent retaliation for such
> disclosure, conduct that occurred within the United States,
> whereas the plaintiff's Title VII claim involves discrimination
> at the workplace, conduct that occurred abroad.

*Id.* at 72.

As in *Shekoyan*, the "genesis" of Ms. O'Mahony's claims in this case – the orchestration of the underlying fraud about which she complained and the retaliation against her – took place here in the United States.  Accordingly, the whistleblower protections of the Sarbanes Oxley statute, like those of the FCA in *Shekoyan*, provide protection for Ms. O'Mahony's complaints, notwithstanding that her actual place of employment was abroad.

Finally, defendant's argument that Ms. O'Mahony's Sarbanes-Oxley claim in this action somehow stands "in conflict" with a proceeding she previously brought in France – which has already been adjudicated – is baseless.  The French proceeding was brought primarily to compel Accenture to make payment of the unpaid French social security payments.[1]  It also sought a finding that Accenture had constructively discharged Ms. O'Mahony by violating the terms of her French employment contract and sought damages for the breach of her contract.  All of these claims arose under French law and were based on the violation of her French contract..

---

[1]    Defendant disingenuously claims that the French tribunal "dismiss[ed] Plaintiff's claims ... for cotisations (social security contributions] between 2002 and 2004 without disclosing to this Court that the reason for such a dismissal was that Accenture finally made payment of such cotisations while the French proceeding was pending, in an obvious attempt to avoid an adverse finding..

15

In this action, by contrast, Ms. O'Mahony does not assert any claims for payment of the social security contributions Accenture fraudulently evaded. Nor does she assert a claim for constructive termination or breach of any contract. Rather, she seeks damages for the reduction of her Level of Responsibility, and resulting reduction in compensation, which were undertaken in retaliation for engaging in protected activity under Sarbanes-Oxley. To the extent that any portion of the damages attributable to the Sarbanes-Oxley retaliation claim have already been reimbursed in the French proceeding, Ms. O'Mahony's damages in this action will be correspondingly reduced by such an amount.[2] However, there simply is no conflict between the claims or remedies Ms. O'Mahony seeks in this action and the claims and remedies she asserted in France under French law.

**B.    General Rules of Statutory Construction Apply Where, as Here, No Extraterritorial Application of the Statute is Sought**

In its brief to the Administrative Review Board, Defendant relied heavily on the *Carnero* court's review of the Sarbane Oxley Act's legislative history, which led that court to conclude that "the statute's legislative history indicates that Congress gave no consideration to either the possibility or the problems of overseas application" of 18 U.S.C. § 1514A. 433 F.3d at 8. However, the *Carnero* court examined Congress's intent solely as part of its analysis of whether or not the statute could be applied extraterritorially. Thus, the *Carnero* court began its analysis by noting that, under Supreme Court precedent, "the presumption [against extraterritorial application] can be

---

[2]    Notably, Ms. O'Mahony does not seek reinstatement in this action and, consequently, defendants' argument that reinstatement may conflict with French law is irrelevant.

16

overcome only if there is an affirmative intention of the Congress clearly expressed" and

that "[i]n searching for clear evidence of Congress's intent, courts consider all available

evidence about the meaning of the statute, including its text, context, structure, and

legislative history." *Id.* at 6 (citations and quotations omitted).

However, outside of the limited context of determining whether a statute may be

applied extraterritorially, different rules of statutory interpretation apply.  It is well

established that the starting point for such general statutory interpretation must be the

language of the statute itself.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438

(1999).  Moreover, when the language of the statute is clear on its face, judicial inquiry

is complete.  *Id.*; *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We

have stated time and again that courts must presume that a legislature says in a statute

what it means and means in a statute what it says there."); *Cervantes-Ascencio v.

United States Immigration and Naturalization Service*, 326 F.3d 83, 86 (2d. Cir. 2003)

("When construing statutes, we look to the statutory language which, if clear on its face,

ends our analysis."), *cert. Denied*, 124 S. Ct. 483 (2003).

Here, the language of 18 U.S.C. § 1514A is clear on its face that it applies to all

employees of companies that have securities which are traded on United States

exchanges.  There is no limitation in the language of the statute that restricts the

whistleblower protection to employees who are physically located within the United

States.  Moreover, the statutory language, together with the Department of Labor

regulations promulgated pursuant thereto, make clear that such protection is extended

to employees of subsidiaries of companies that are publicly traded in the U.S.  *Carnero*,

433 F.3d at 5-6; *Morefield v. Exelon Services, Inc.*, 2004 SOX 00002 (ALJ Jan 28, 2004). Hence, in cases, such as this case, that do not involve the extraterritorial application of the statute – because the illegal decision was made by United States employees located within the territory of the United States – the statutory definition of an employee must be given its plain meaning and resort to the statute's legislative history to place unwritten limitations on the definition is not permitted.

In any event, where the prohibited conduct <u>occurred within the United States</u>, the federal court venue provisions relied upon by the *Carnero* court in its analysis of Congress's intent are entirely consistent with affording protection to whistleblowers who reside abroad. The *Carnero* court described the provisions relating to federal venue for whistleblower complaints as follows:

> For whistleblower complaints brought under 18 U.S.C. § 1514A, the Act incorporates by reference the procedural structure for whistleblower complaints filed with the United States Department of Labor under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), 49 U.S.C. § 42121 (2005). *Id.* § 1514A(b)(2)(A) ("An action under paragraph (1)(A) shall be governed under the rules and procedures set forth in section 42121(b) of title 49 United States Code."). AIR21 contains nothing prescribing a federal venue for whistleblower complaints or appeals based on conduct abroad, brought by employees resident and working in a foreign country. While *de novo* review, such as in this case, may be sought "in the appropriate district court of the United States," the "appropriate court" is not defined, 18 U.S.C. § 1514A(b)(1)(B). 49 U.S.C. § 42121(b)(6) and related provisions suggest that the appropriate <u>court is one in the jurisdiction of which the whistleblower violation occurred</u> or the complainant resided. Hence 49 U.S.C. § 42121(b)(4)(A) provides that appeal from the Secretary's final order should be directed to the federal court of appeals "for the <u>circuit in which the violation</u>, with respect to which

18

> the order was issued, <u>allegedly occurred</u> or the circuit in
> which the complainant resided on the date of such violation."
> Section 42121(b)(5) provides that the Secretary may enforce
> a final order by filing a civil action "in the United States
> district court for the <u>district in which the violation was found
> to occur</u>."

433 F.3d at 16-17 (emphasis added)

Thus, with respect to each of the federal venue provisions relating to civil

whistleblower complaints, venue is expressly provided in the district or circuit in which

the violation occurred.  Here, that venue would be the district or circuit within the United

States where the illegal decisions were made.


## POINT II

### THE COMPLAINT DEMONSTRATES THAT
### PLAINTIFF WAS ENGAGED IN PROTECTED
### CONDUCT

Defendant's second basis for arguing that this case should be dismissed is its

contention that Ms. O'Mahony's actions did not constitute "protected conduct" under the

whistleblower provisions of the Sarbanes-Oxley Act because they did not related to

"fraud against shareholders" of Accenture.  This argument is premised on a flawed

reading of the statutory provision.

Section 1514A provides that an employee engages in protected conduct when

he or she "provide[s] information, cause[s] information to be provided, or otherwise

assist[s] in an investigation regarding any conduct which the employee reasonably

believes constitutes a violation of section 1341, 1343, 1344, or 1348 [of Title 18 of the

United states Code], any rule or regulation of the Securities and Exchange

Commission, or any provision of Federal law relating to fraud against shareholders." (emphasis added)  Sections 1341 to 1344 of Title 18 constitute the United States mail and wire fraud statutes.  Hence, the unambiguous language of the whistleblower statute makes clear that, where the fraudulent activity could reasonably constitute a violation of the mail and wire fraud statutes, it does not also have to meet the additional requirement of constituting a "fraud against shareholders."  Rather, it is only where the fraud violates another "provision of federal law" that the conduct must meet the additional requirement of being perpetrated against shareholders.  *See Reyna v. ConAgra Foods, Inc.*, 506 F.Supp.2d 1363 (M.D. Ga. 2007); *Collins v. Beazer Homes*, 334 F.Supp.2d 1365, 1376 (N.D.Ga. 2004) (citing 18 U.S.C. § 1514A(a)(1)) ("The threshold is intended to include all good faith and reasonable reporting of fraud.").

In *Reyna*, plaintiffs, two human resource department employees, alleged they were terminated in retaliation for reporting two incidents of fraud.  First, plaintiffs alleged they had reported an incident in which their supervisor had permitted another employee to add his sister and nephew to the company-provided health insurance plan by falsely listing them as his wife and son.   Second, they alleged they had reported another incident in which their supervisor produced a fake social security card for an employee in order to satisfy I-9 form requirements.   The plaintiffs alleged that these fraudulent activities necessarily involved the use of mail or the internet and, consequently, that they had engaged in protected activity under Sarbanes-Oxley by reporting instances of mail and wire fraud.

The defendants moved for summary judgment, arguing that because plaintiffs' reports of mail fraud and wire fraud did not relate to "fraud against shareholders," those

reports were not protected activity under the statute.  The Court began its analysis by reciting the general rule of statutory construction which provides that, where the meaning of a statute is plain on its face, the analysis must end there:

> The Court presumes that "a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).  If the words in the statute are plain and unambiguous, judicial inquiry is complete. *Id.* Only if the plain-meaning of the statute "produces a result that is not just unwise but is clearly absurd" will the Court not abide by the plain-meaning of the statutory text. *CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1225 (11th Cir.2001).  It is unnecessary (and inappropriate) to rely upon the legislative history of a statute to derive Congress' intent when that intent is readily revealed by a plain reading of the statute. *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1167 (2003) (citing *Fed. Reserve Bank of Atlanta v. Thomas,* 220 F.3d 1235, 1239 (11th Cir.2000)).

506 F.Supp.2d at 1382

The court then turned to the language of Section 806 and held:

> The Court finds section 806 to be clear.  Thus, fidelity to the plain meaning of the provision is required.  The pertinent language of section 806 states that a publicly traded company may not retaliate against an employee who provides information that employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."  18 U.S.C. § 1514A(a)(1) (emphasis added).  The statute clearly protects an employee against retaliation based upon that employee's reporting of mail fraud or wire fraud regardless of whether that fraud involves a shareholder of the company.

*Id.*

21

The *Reyna* court rejected the argument that was advanced by the defendant in that case that the last phrase of the provision, "relating to fraud against shareholders," served to modify each of the preceding phrases in the provision:

> Defendants' redrafting of the statute conflicts directly with the "doctrine of the last antecedent." That rule of statutory construction requires that the phrase "relating to fraud against shareholders" be applied only to the last antecedent, which is "any provision of Federal law." Thus, the statute protects reports of "mail fraud" and "wire fraud" in addition to "any provision of Federal law relating to fraud against shareholders." Under the doctrine of the last antecedent, relative and qualifying words, phrases, and clauses (here, the relative clause "relating to fraud against shareholder") are to be applied to the words or phrase immediately preceding them (here, "any provision of Federal law"), and are not to be construed as extending to or including others more remote (here, "section 1341 [mail fraud], 1343 [wire fraud]...."). *See Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003); *Bingham v. United States,* 724 F.2d 921, 926 n. 3 (11th Cir.1984) (citation omitted).
>
> Defendants' proposed interpretation also conflicts with the supplementary rule that "[w]here the modifier is set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' teaches that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent." *Bingham,* 724 F.2d at 926 n. 3 (citation omitted). Here, the drafters did <u>not</u> set off "relating to fraud against shareholders" with a comma. Instead, they chose to set off from the preceding phrases the entire last phrase, "any provision of Federal law relating to fraud against shareholders," with a comma. This indicates the drafters' intent that this entire last phrase stand alone rather than intending for a part of it to be stretched to modify each of the phrases preceding the comma.
>
> \* \* \*
>
> If the drafters meant for section 806 to only protect employees who report fraud against shareholders, then they could have easily done so by inserting a comma before

22

> "relating to fraud against shareholders."   The drafters,
> however, did not do so.

506 F.Supp.2d at 1382-83

The court therefore expressly held that "reporting alleged violations of mail fraud

or wire fraud does not have to relate to shareholder fraud in order to be protected

activity under the statute."  506 F.Supp.2d at 1383.

Here, Ms. O'Mahony's complaint alleges that:

> American executives of Accenture undertook a concerted
> course of action to deliberately evade paying millions of
> dollars of French social security payments that Accenture
> was legally obligated to make.  Upon information and belief,
> Accenture violated 18 U.S.C. § 1341 and/or 18 U.S.C. §
> 1343 in perpetration of the fraud.

(Complaint, ¶ 13)  The Complaint goes on to set forth a scheme in which United States

officials of Accenture engaged in a conspiracy to evade millions of dollars of social

security contributions that were required under the provisions of the U.S. Social

Security Treaty.  Accenture was well aware that it had an obligation to pay social

security contributions beginning in September 1997.  By deliberately deciding not to pay

these contributions, deliberately concealing Ms. O'Mahony's expatriate assignment in

France from the French government, and conspiring with French officials in perpetration

of the fraud, U.S. Accenture officials committed mail and wire fraud pursuant to 18

U.S.C. § 1341 and/or 18 U.S.C. § 1343 and thereby exposed the company to

substantial penalties and fines in addition to accruing an unrecorded financial obligation

to make the multimillion dollar social security payments.  Indeed, the U.S. executives

must necessarily have accomplished this by the use of the mails, internet and/or

telephones, as it required communications between the United States and French

23

participants in the scheme.  Accordingly, because Ms. O'Mahony reasonably believed that Accenture violated the provisions of the U.S. mail or wire fraud laws, she engaged in "protected activity" by repeatedly complaining and objecting to U.S. officials of Respondent.

Moreover, one of the few federal District Courts to have considered the Sarbanes-Oxley whistleblower statute has held that "a plaintiff is not required to show an actual violation of the law, but only that she 'reasonably believed' that there was a violation of one of the enumerated laws or regulations." *Id.*   The *Collins* court noted that "[t]he legislative history of Sarbanes-Oxley states that the reasonableness test 'is intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts.'" *Id.* (citing Legislative History of Title VIII of HR 2673: Sarbanes-Oxley Act of 2002, Cong. Rec. S7418, S7420 (daily ed.  July 26, 2002) Thus, "[t]he threshold is intended to include all good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise, absent specific evidence." *Id.*

## **CONCLUSION**

For all of the foregoing reasons, Defendant's motion to dismiss should be denied

in its entirety.

Dated:     New York, New York
           November 30, 2007

                         KAISER SAURBORN & MAIR, P.C.
                         Attorneys for plaintiffs


           By:     _____
                         David N. Mair [DM-8883]
                         111 Broadway
                         New York, New York 10006
                         (212) 338-9100

25

# EXHIBIT A

**U.S. Department of Labor**     Office of Administrative Law Judges
800 K Street, NW, Suite 400-N
Washington, DC 20001-8002

(202) 693-7300
(202) 693-7365 (FAX)



**Issue Date: 04 March 2005**

In the Matter of

MARC C. PENESSO
    Complainant

    v.

LCC INTERNATIONAL, INC.
    Respondent

Case No.: 2005 SOX 00016

### ORDER DENYING MOTIONS FOR DISMISSAL
### and SUMMARY JUDGMENT

On February 1, 2005, Respondent filed a motion to dismiss or for summary judgment. Respondent contended that: (1) the complaint is untimely; (2) Complainant cannot show that protected behavior was the cause of any unfavorable personnel action; and (3) the whistleblower provisions of the Sarbanes-Oxley Act do not have extraterritorial application. Complainant responded on February 25th, contending that: (1) a motion for summary judgment was premature; (2) there are genuine issues of material fact between the parties; (3) the complaint alleges numerous acts of discrimination which occurred within 90 days of the filing of the complaint; and (4) the complaint does not require the extraterritorial application of the Sarbanes-Oxley Act. Claimant also points out that during a January 25, 2005 conference call, the respondent agreed to limit its impending motion for summary judgment to the issue of the timeliness of the complaint since complainant's counsel was recently retained and discovery was ongoing. Nevertheless, since complainant answered all of respondent's arguments in his response to the motion, and ruling on them at this time will permit the parties to focus on their trial preparation rather than wasting their time filing or responding to similar motions closer to the June 13th hearing date, I will address all of the issues raised by the respondent.

The complaint in this case was filed on May 28, 2004. Apparently, it was filed by telephone with a follow-up letter dated the same day. *See* Regional Investigator's Final Investigative Report at 1. In a nutshell, complainant, who was employed in Italy by the Italian subsidiary of an American Corporation headquartered in McLean, Virginia, which is listed on NASDAQ exchange, alleges that he reported improper and fraudulent financial dealings which took place in Italy to corporate officers in the United States both by telephone and in person. He alleges he was retaliated against for raising these concerns by being demoted, denied commissions for the year 2003, and subjected to a hostile work environment.

2

In *Williams v. Lockheed Martin Corp.*, ARB Nos. 99-54 & 99-064, OALJ Nos. 1998-ERA-40, 42 (Sept. 29, 2000), the Administrative Review Board stated:

> The standards applicable to summary decision are rooted in the Office of Administrative Law Judges (OALJ) regulations as well as Board and federal court case law. OALJ Rule 18.40, 29 C.F.R. §18.40, which is modeled on Rule 56 of the Federal Rules of Civil Procedure, permits an ALJ to enter a summary decision for either party where "there is no genuine issue as to any material fact and . . . a party is entitled to summary decision." *Id.* . . . In deciding a motion for summary decision, we view the factual evidence in the light most favorable to the nonmoving party.

### *Timeliness of Complaint*

Under §806, the employee protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. §1514A, actions "shall be commenced not later than 90 days after the date on which the violation occurs." §1514A(b)(2)(D). Respondent contends that all of the violations of which it is accused occurred more than 90 days prior to May 28, 2004. In his response to respondent's motion, complainant provides documentary evidence that he was still the Director of Sales and Business Development on February 10, 2004 (EX 3) and alleges that he was not notified he was demoted to Marketing and Sales Director until March 1, 2004; provides documentary support for his contention that he was not denied commissions for 2003 until March 18, 2004 (EX 8 - accepting complainant's translation as correct); [1] and cites his exclusion from a monthly sales and budget meeting on March 8, 2004 and Carlo Baravelle's threat to fire him on March 18, 2004 as examples of incidents promoting a hostile work environment which occurred within 90 days of the complaint. Since at this stage of the proceeding the factual evidence must be viewed most favorably to the non-moving party, the motion to dismiss based on the untimeliness of the complaint is denied.

### *Relationship of Protected Activity to Adverse Actions*

Respondent contends that the complainant cannot establish that his protected conduct was related to respondent's decision not to pay him commissions for the year 2003 or to change his job title. Respondent alleges that the determination not to pay commissions was made before the complainant engaged in protected activities, and applied to all its employees; and likewise, the complainant's job title had changed well before he engaged in protected activity. Complainant responds that the decision not to pay him the 2003 commissions he had earned was made sometime after he had engaged in protected activity, and as late as February 10, 2004 his job title had not changed. Both parties support their contentions with affidavits and documentary evidence. It is clear that there are material facts in dispute between the parties which makes summary decision on this issue inappropriate.

---

[1] Complainant also cites Exhibit 7 attached to respondent's motion to dismiss to support his position, while respondent cites it to support its position that 2003 commissions were cancelled early in 2003. Clearly, this document is ambiguous.

3

*Extraterritoriality*

Finally, respondent argues that §1514A – the employee protection provision of the Sarbanes-Oxley Act – has no extraterritorial application, and therefore there is no jurisdiction over this claim which concerns the complainant's employment in Italy.  In support of its position, respondent, *inter alia*, cites the cases of *Concone v. Capital One Financial Corp.*, 2005-SOX-00006 (ALJ Dec. 3, 2004), and *Carnero v. Boston Scientific Corp.*, 2004 WL 1922132 (D. Mass. Aug. 27, 2004).  In holding that §1514A does not apply to an employment relationship which takes place out of the United States, both Judge Kaplan in *Concone* and Judge Zobel in *Carnero* relied on the canon of construction that laws of the United States are presumed not to have extraterritorial effect in the absence of a clear contrary intent.  Section 1514A is silent regarding extraterritorial effect, leading both judges to hold that the employees in their respective cases were not covered by the protections afforded under §1514A.

However, the facts in this case are materially different.  For one thing, Mr. Penesso is a United States citizen, whereas the employees in *Concone* and *Carnero* were not.  Second, much of the protected activity in this case took place in the United States, when complainant came to respondent's headquarters in McLean, Virginia to inform corporate officers of the financial improprieties he believed were taking place in Italy.  On other occasions, he directly communicated his concerns with corporate officials in the United States.  Third, respondent admitted in its response to the first pre-hearing order that at least one of the alleged retaliatory actions – the decision not to issue bonuses in 2003 - took place in the United States.  Accordingly, unlike *Concone* and *Carnero*, this case has a substantial nexus to the Unites States, and it is appropriate for the complainant to bring this claim under §1514A of the Sarbanes-Oxley Act.[2]

Therefore, respondent's motion to dismiss or for summary judgment is **denied**.

Finally, seeing the exhibits attached to the parties' pleadings has brought a problem to light, *i.e.*, that much of the documentary evidence which is liable to be offered into evidence in this case is written in Italian.  Each party is ordered to provide **an English translation** of any document listed on its pre-hearing statement (*see* the January 26, 2005 *Pre-Hearing Order*) which is in any language other than English.  The translations shall be exchanged with opposing counsel at the time the documents are exchanged.  Specific objections to the opposing party's translations shall be filed not later than June 3, 2005.  The failure to object to a translation filed by the opposing party shall be considered an admission that the translation is accurate.

A

JEFFREY TURECK
Administrative Law Judge

---

[2] It is possible that during discovery and through evidence presented at the hearing, further activities relevant to this case which took place in the United States will come to light, making the claim for jurisdiction under §1514A even more persuasive.

# EXHIBIT B

**U.S. Department of Labor**    Office of the Solicitor
Washington, D.C. 20210



December 20, 2004


The Honorable Thomas Burke
Associate Chief Administrative Law Judge
United States Department of Labor
Suite 400, Techworld
800 K Street, N.W.
Washington, D.C. 20001-8002

Re:  Penesso v. LCC International, Inc., ALJ No. 2005-SOX-15

Dear Judge Burke:

This is to request that the above-referenced matter be remanded to the
Occupational Safety and Health Administration ("OSHA"). On November 17,
2004, OSHA dismissed the complaint in this case on jurisdictional grounds, i.e ,
on the ground that Complainant Marc C. Penesso was living and working in Italy
at the time of the protected activity and adverse action, and that, therefore,
principles of exterritoriality applied.  OSHA now believes that Mr. Penesso's
complaint was erroneously dismissed. Because Mr. Penesso alleges that the
adverse taken against him by Respondent LCC International, Inc. occurred in the
United States, it is OSHA's position that the presumption against
extraterritoriality is not implicated in this case.  Accordingly, we request on behalf
of the Assistant Secretary of Occupational Safety and Health that this matter be
returned to OSHA to enable the agency to conduct an investigation into the merits
of Mr. Penesso's complaint.

Sincerely,

Ellen R. Edmond
Senior Attorney

cc:    Marc C. Penesso
       Peter Deliso, LCC International, Inc.