UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------- X
ROSEMARY O'MAHONY,                    :
                                      :
              Plaintiff,              :    07 Civ. 7916
                                      :
       - against -                    :    **DECISION AND ORDER**
                                      :
ACCENTURE LTD and ACCENTURE           :
LLP,                                  :
                                      :
              Defendants.             :
--------------------------- X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Rosemary O'Mahony ("O'Mahony") brought this action against defendants Accenture LTD ("Accenture") and Accenture LLP ("Accenture LLP") (collectively, "Defendants") under Title VIII of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A ("§ 1514A"), alleging violation of the statute's whistleblower protection for employees of publicly traded companies. Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the reasons stated below, Defendants' motion is DENIED.

## I. BACKGROUND[1]

Accenture is a Bermuda company that is listed on the New York Stock Exchange. O'Mahony was a partner and employee of

---

[1] The following facts are taken primarily from the complaint and Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss dated November 30, 2007 ("Pl.'s Mem."). Except where specifically referenced, no further citation to these sources will be made.

Accenture LLP, Accenture's United States subsidiary, from 1984 through August 31, 2004. From September 1, 2004, through October 31, 2006, O'Mahony was a partner and employee of Accenture SAS ("Accenture SAS"), Accenture's French subsidiary. In or about September 1992, O'Mahony left the United States to begin an expatriate assignment that entailed establishing and heading a new office for Accenture in Sophia Antipolis in France. O'Mahony remained in France for the balance of her employment at Accenture LLP and Accenture SAS.

Accenture obtained a certificate of coverage ("Certificate of Coverage")[2] exempting it from paying social security contributions to France[3] on behalf of O'Mahony from September 1992 to August 1997. Beginning in or about October 2001, O'Mahony informed various executives at Accenture LLP that Accenture LLP was responsible for paying French social security contributions owed on her behalf pursuant to the Social Security Agreement since the Certificate of Coverage expired in September 1997. O'Mahony alleges that on September 23, 2004 Pamela Craig ("Craig"), Accenture's Global Financial

---

[2] It is unclear from the record whether Accenture or Accenture LLP obtained the Certificate of Coverage.

[3] Under the terms of the Agreement on Social Security Between the United States and the French Republic dated March 7, 1987 (the "Social Security Agreement"), an employee sent by a United States employer to work in France pays social security contributions to France instead of the United States unless the employee is expected to work in France less than five years and the employer obtains a certificate of coverage exempting the employee from social security taxes in France.

Controller in New York, informed her that Jamey Shachoy, Accenture's global tax partner in California, decided "that Accenture's 'interests' would be better served by not making any of the French social security contributions and continuing to affirmatively conceal from the French authorities the fact that [O'Mahony] had been working in France since 1992." (Pl.'s Mem. 4-5.) O'Mahony told Craig that "she objected to Accenture's actions and that she would not be a party to tax fraud." (Id.)

On November 19, 2004, O'Mahony was informed by Mark Spelman, the partner to whom she reports, that her level of responsibility[4] was being reduced from B1 to A3 effective December 1, 2004. The decision to reduce O'Mahony's level of responsibility was made by Tom Pike ("Pike"), Accenture LLP's Global Business Operations Director in New York. (See Letter dated Mar. 24, 2005 (the "DOL Complaint"), attached as Ex. A to Defendants' Request for Judicial Notice in Support of their Motion to Dismiss Plaintiff's Compl., dated Nov. 2, 2007.) As a result of the reduction in her level of responsibility, O'Mahony's compensation for the period December 1, 2004 through October 31, 2006 decreased by approximately $670,000.

On March 24, 2005, O'Mahony filed a complaint with the

---

[4] Accenture's partnership structure is comprised of nine tiers called "levels of responsibility." A partner's compensation range is a function of the level of responsibility assigned to that partner.

-3-

United States Department of Labor's Occupational Safety & Health Administration (the "DOL") alleging that Accenture and its subsidiaries violated § 1514A "by retaliating against [O'Mahony] because of her investigation of, and objection to, a fraudulent scheme to evade the payment of social security contributions that were due in France for United States' employees on secondment to that country." (<u>Id.</u>) On May 9, 2005, the DOL issued a letter setting forth its findings and conclusions stating that O'Mahony's "employment and each of the alleged elements of her compliant occurred in France," and dismissed the DOL Complaint on the ground that the DOL lacked jurisdiction over the claim because § 1514A does not apply extraterritorially. (<u>Id.</u>)

O'Mahony filed an objection and requested a hearing with the Office of Administrative Law Judges ("ALJ"). ALJ Paul H. Teitler upheld the dismissal of the DOL Complaint. O'Mahony then filed a Petition for Review with the Administrative Review Board (the "ARB").

On August 15, 2007, pursuant to 29 C.F.R. § 1980.114, O'Mahony notified the ARB that she intended to file an action for de novo review in the appropriate United States District Court because the ARB did not issue a final decision within 180 days of the date the DOL Complaint was filed. On September 7, 2007, O'Mahony commenced this action.

-4-

## II. <u>DISCUSSION</u>

A.    <u>LEGAL STANDARD</u>

    1.    <u>Failure to State a Claim</u>

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court construes the complaint broadly, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002). However, mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 771 (2d Cir. 1994) (citation and quotation marks omitted). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007).

    2. <u>Lack of Subject Matter Jurisdiction</u>

Although Defendants brought this motion under Rule 12(b)(6) for failure to state a claim, the issue of the extraterritorial application of a federal statute implicates subject matter jurisdiction. See <u>Sorex Petroleum Ltd. v. Access Indus., Inc.</u>, No. 02 Civ. 1499, 2007 WL 2766731, at *3 (S.D.N.Y. Sept. 24, 2007). As the Second Circuit stated in <u>Da Silva v. Chance Intern. Corp.</u>,

> [t]he clearest case for considering an issue to concern subject matter jurisdiction is one requiring determination as to whether the federal question ... jurisdiction of a district court is properly invoked .... Thus, whether a plaintiff has pleaded a colorable claim arising under the Constitution or laws of the United States [is] undoubtedly [an issue] of subject matter jurisdiction.

229 F.3d 358, 363 (2d Cir. 2000) (citations and internal quotation marks omitted).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994). "When considering a motion to dismiss for lack of subject matter jurisdiction ... a court must accept as true all material factual allegations in the complaint," however, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Fin. Servs. Corp v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations omitted). The preliminary showing that must be made by the plaintiff, however, is not meant to be overly burdensome, "allowing for subject matter jurisdiction so long as 'the federal claim is colorable.'" Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 467 (S.D.N.Y. 2001) (quoting Savoie v. Merchants Bank, 84 F.3d 52, 57 (2d Cir. 1996)); see Europe Overseas Commodity Traders, S.A. v. Banque

Paribas London, 147 F.3d 118, 121 n.1 (2d Cir. 1998) ("Banque Paribas") ("[A] plaintiff ... should not be deprived of its day in an American court by a Rule 12(b)(1) order based on erroneous facts ... In a close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time." (internal citations and quotation marks omitted)).

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") challenges to subject matter jurisdiction may contest either the facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction in fact. See Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002). "In a facial challenge, the court accepts as true the uncontroverted factual allegations in the complaint." Id. In resolving a factual challenge to subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. See Makarova, 201 F.3d at 113; see also Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). The Court may "weigh the evidence on the record accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute." Dow Jones, 237 F. Supp. 2d at 404.

B.    <u>APPLICATION</u>

   1.   <u>Extraterritorial Application of § 1514A</u>

   Section 1514A(a)(1) provides whistleblower protection to

employees who

> provide information, cause information to be provided, or
> otherwise assist in an investigation regarding any
> conduct which the employee reasonably believes
> constitutes a violation of section 1341, 1343, 1344, or
> 1348, any rule or regulation of the Securities and
> Exchange Commission, or any provision of Federal law
> relating to fraud against shareholders, when the
> information or assistance is provided to or the
> investigation is conducted by (A) a Federal regulatory or
> law enforcement agency; (B) any Member of Congress or any
> committee of Congress; or (C) a person with supervisory
> authority over the employee (or such other person working
> for the employer who has the authority to investigate,
> discover, or terminate misconduct).

18 U.S.C. § 1514A(a)(1).

   To state a claim under § 1514A, a plaintiff must show by

a preponderance of the evidence that "(1) he engaged in

protected activity; (2) the employer knew of the protected

activity; (3) he suffered an unfavorable personnel action; and

(4) circumstances exist to suggest that the protected activity

was a contributing factor to the unfavorable action." <u>Fraser</u>

<u>v. Fiduciary Trust Co. Int'l</u>, 417 F. Supp. 2d 310, 322

(S.D.N.Y. 2006) (citation omitted).

   Defendants, relying primarily on <u>Carnero v. Boston</u>

<u>Scientific Corp.</u>, 433 F.3d 1 (1st Cir. 2006), move to dismiss

this claim on the ground that § 1514A does not apply

extraterritorially, that is, "beyond the territorial

-8-

jurisdiction of the United States." <u>Kollias v. D & G Marine Maintenance</u>, 29 F.3d 67, 70 (2d Cir. 1994).  In <u>Carnero</u>, plaintiff, a citizen of Argentina and resident of Brazil, sued Boston Scientific Corporation ("BSC"), the United States parent of plaintiff's former Latin American employers, under § 1514A, alleging that BSC terminated him in retaliation for informing BSC about fraud occurring at two Latin American subsidiaries.

The court held that a foreign employee complaining of misconduct abroad by overseas subsidiaries could not bring a claim under § 1514A against the United States parent company. The court found that, under the facts of the case, "§ 1514A does not reflect the necessary clear expression of congressional intent to extend its reach beyond the nation's borders." <u>Id.</u> at *18.  The court reasoned that the text of § 1514A was silent as to its extraterritorial application, the legislative history indicated that Congress gave no consideration to the possibility of its application outside the United States, and, unlike § 1514A, Congress expressly provided in other provisions of SOX for extraterritorial enforcement.  The <u>Carnero</u> Court also noted the potential problems that would ensue from extraterritorial application of § 1514A, including empowering United States courts and agencies to "delve into the employment relationship between

-9-

foreign employers and their foreign employees." <u>Id.</u> at 15.

However, three notable factual differences distinguish the present case from <u>Carnero</u>.  First, the plaintiff in <u>Carnero</u> was a foreign employee, employed and compensated exclusively by Latin American subsidiaries of a United States corporation.  Unlike the plaintiff in <u>Carnero</u>, O'Mahony was employed and compensated by a United States subsidiary of a foreign corporation.  O'Mahony worked in the United States from 1984 through 1992 and was compensated by Accenture LLP, the United States subsidiary of Accenture, from 1984 through 2004.  Because O'Mahony was employed within the United States until 1992 and compensated by a United States company until 2004, the concerns raised in <u>Carnero</u> are not present here.  The <u>Carnero</u> Court was concerned with the United States interfering with the employment relationship of a foreign employer and their foreign employees, and wanted to avoid opening "the door for U.S. courts to examine and adjudicate relationships abroad that would normally be handled by a foreign country's own courts and government agencies pursuant to its own laws." <u>Id.</u>  Unlike the parties in <u>Carnero</u>, the employment relationship in this case, until 2004, was between a United States employer and its employee.

Second, in <u>Carnero</u>, the alleged wrongful conduct that gave rise to the claim occurred in Latin America.  In

contrast, O'Mahony alleges that the conduct related to the alleged fraud involved employees of Defendants located in the United States and occurred in the United States. Specifically, Accenture LLP, perpetrated the alleged fraud by deciding in the United States not to pay French social security contributions owed on O'Mahony's behalf pursuant to the Social Security Agreement and then acting upon that decision in the United States by not making the payments in question.    In addition, O'Mahony alleges the retaliation against her was undertaken by executives located in the United States, who were employed by Accenture LLP.  The <u>Carnero</u> Court recognized this distinction because, after determining that the plaintiff was an "employee" of BSC within the meaning of § 1514A, it stated "that if [the plaintiff's] whistleblowing had occurred in this country relative to similar alleged domestic misconduct by domestic subsidiaries, [the plaintiff] might well have a potential claim under [§ 1514A]." <u>Id.</u> at 6.

Last, in <u>Carnero</u>, the plaintiff brought an action against the United States parent for the alleged misconduct abroad by its Latin American subsidiary.  Here, O'Mahony brings an action against the foreign parent and its United States subsidiary for the alleged misconduct of the United States subsidiary in the United States. Because the facts of <u>Carnero</u> and the instant case are readily distinguishable, <u>Carnero</u>

offers limited guidance to the Court.

As a point of departure, the Court must determine whether application of § 1514A raises an extraterritorial question under the facts in the instant case. When a court "is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than [to] leave the problem to foreign countries." Securities and Exchange Commission v. Berger, 322 F.3d 187, 192 (2d Cir. 2003) (citing Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975)); see also In re Alstom, 406 F. Supp. 2d 346, 367-76 (S.D.N.Y. 2005). "The presumption in such a case is against extending jurisdiction." In re National Australia Bank Securities Litigation, No. 03 Civ. 6537, 2006 WL 3844465, at *3 (S.D.N.Y. October 25, 2006) (citations omitted), see also U.S. v. Gatlin, 216 F.3d 207, 211 (2d Cir. 2000) ("In determining whether a statute applies extraterritorially, we are guided by a general presumption that Acts of Congress do not ordinarily apply outside our borders.") (citations and internal quotation marks omitted). The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." E.E.O.C. v. Arabian Am. Oil Co.,

499 U.S. 244, 248 (1991) (<u>citing</u> <u>McCulloch v. Sociedad Nacional de Marineros de Honduras</u>, 372 U.S. 10, 20-22 (1963)).

In applying these principles, courts in the Second Circuit look at two factors: (1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial adverse effect in the United States or upon United States citizens. <u>See</u> <u>Berger</u>, 322 F.3d at 192 (citations omitted). "In evaluating these two factors," Second Circuit courts apply "what are known respectively as the 'conduct test' and the 'effects test.'" <u>Id.</u> A plaintiff need only satisfy either the "conduct" or the "effects" test to support a finding of subject matter jurisdiction. <u>See</u> <u>Psimenos v. E.F. Hutton & Co.</u>, 722 F.2d 1041, 1045 (2d Cir. 1983) (finding that courts need not "reach the question whether the effects test provides an independent basis for jurisdiction" when there is subject matter jurisdiction under the conduct test).

O'Mahony asserts that this case does not present an issue of extraterritorial application of § 1514A because the alleged wrongful conduct by the Defendants giving rise to the claim occurred within the United States. Specifically, she alleges that the fraudulent scheme to evade social security taxes owed to France and the retaliation against her occurred in the United States. Because O'Mahony does not allege that the

-13-

wrongful conduct had a substantial adverse effect in the United States or upon United States citizens, the court will consider whether it has subject matter jurisdiction over the claim as to each defendant by applying the "conduct test."

While no precise test has emerged from the various decisions in this Circuit discussing the application of the "conduct test," a number of factors have been considered in the ultimate determination as to whether subject matter jurisdiction exists such as: (1)the elements of the wrongful conduct in question as pled in plaintiff's theory of fraud in relation to the specific acts to which the statute apply; (2) the location of domestic conduct and contacts associated with the transaction in relation to those located in foreign states; (3) the timeline identifying when and where the relevant domestic and foreign acts occurred; (4) the materiality/substantiality of the domestic conduct relative to the particular fraudulent transaction the pleadings describe; (5) the causal connection between the domestic conduct and the alleged financial losses resulting from the alleged fraudulent transaction; and (6) an overarching measure of reasonableness gauged by the intent of congressional policy and principles of fairness in the circumstances surrounding the particular case. See, e.g., Berger, 322 F.3d at 193-95; Banque Paribas, 147 F.3d at 129-30; Psimenos, 722 F.2d at

-14-

1044-46; <u>Bersch</u>, 519 F.2d at 987, 993, 1018; <u>Alstom</u>, 406 F. Supp. 2d at 376.  None of these factors are meant to be weighed independent of the others, rather they must be considered in conjunction, and no particular factor is dispositive.  <u>See</u> <u>IIT v. Cornfeld</u>, 619 F.2d 909, 918 (2d Cir. 1980) (stating that "[i]t should be evident by now that 'the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction ... is not necessarily dispositive' in future cases") (<u>quoting</u>  <u>Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.</u>, 592 F.2d 409, 414 (8th Cir. 1979)).

    (a) <u>Application of Factors to Accenture LLP</u>

    In applying these factors to the instant case, the Court finds that it has subject matter jurisdiction over Accenture LLP.  First, as to the theory of fraud and particulars of the statutory violation charged, O'Mahony's pleadings must assert sufficient operative facts describing acts that, if proved, would constitute a violation of the statute.  Under § 1514A, O'Mahony must prove that: (1) she engaged in a protected activity; (2) Accenture LLP knew of the protected activity; (3) she suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action.  <u>See</u> <u>Fraser</u>,

-15-

417 F. Supp. 2d at 322.

The Court is persuaded that O'Mahony has alleged sufficient facts that, if proved, would constitute a violation of § 1514A. Specifically, O'Mahony alleges that she engaged in a protected activity by reporting that Accenture LLP committed fraud pursuant to 18 U.S.C. § 1341 ("§ 1341") and 18 U.S.C. § 1343 ("§ 1343"). In addition, O'Mahony asserts that she informed Accenture LLP that it was committing fraud by refusing to pay and concealing the fact that it was obligated to pay French social security contributions pursuant to the Social Security Agreement. O'Mahony also alleges that she received a reduction in her level of responsibility in retaliation for her reporting Accenture LLP's fraudulent scheme. Finally, O'Mahony alleges sufficient facts to indicate that she may have been retaliated against for her reporting the fraud. Notably, less than two months after O'Mahony informed Craig that she would not be a "party to tax fraud," O'Mahony was told that an executive of Accenture LLP reduced her level of responsibility to A3, with a corresponding reduction in compensation.

Second, as to the location of the conduct, the Court looks at the "essential core" or center of gravity of the wrongdoing, and thus where the predominant activities of the alleged fraudulent transaction have taken place. See Fidenas

-16-

<u>AG v. Compagnie Internationale Pour L'Informatique CII</u> <u>Honeywell Bull S.A.</u>, 606 F.2d 5, 8 (2d Cir. 1979). This determination is made by enumerating and situating, according to place of occurrence, the pertinent material acts that, combined, constitute the alleged fraudulent scheme. While it is true that O'Mahony was employed in France from 1992 through October 31, 2006, and she was compensated by Accenture SAS, Accenture's French subsidiary, from September 1, 2004 through October 31, 2006, O'Mahony alleges that the conduct giving rise to the fraud occurred in the United States and involved employees of Defendants. Further, O'Mahony contends that the retaliation against her for reporting the fraud was undertaken by Accenture LLP executives located within the United States. Based on the facts on the record, the Court concludes that the pertinent material acts as alleged, <u>i.e.</u>, the commission of the alleged fraud and the decision by Accenture LLP to retaliate against O'Mahony, occurred primarily in the United States. Weighing these pertinent material acts against the fact that O'Mahony was employed in France and that Accenture SAS allegedly carried out the retaliation against O'Mahony at the command of Accenture LLP, which presumably was issued from the United States, the Court finds the center of gravity of the alleged misconduct was located within the United States.

Third, as to the timeline of the relevant acts, the Court

-17-

considers the point at which the alleged fraudulent conduct in
the United States takes place and when the alleged foreign
fraudulent conduct occurs.  Here, O'Mahony alleges that the
conduct by Accenture LLP giving rise to the fraud occurred in
the United States beginning in 1997, when the French social
security contributions became due pursuant to the Social
Security Agreement.  O'Mahony claims that during the period
for which such contributions were owed, 1997 through September
1, 2004, she was employed by Accenture LLP.  And, O'Mahony
alleges, it was the decision of Accenture LLP, upon the advice
given in the United States by executives of Accenture LLP, not
to pay such contributions and to conceal from French officials
that such contributions were owed.  Although O'Mahony was
employed by Accenture SAS beginning September 1, 2004, she
continued complaining to executives in the United States
through September 23, 2004 that the French social security
contributions were owed.  On November 19, 2004, O'Mahony
alleges that the retaliation began when she was informed that
her level of responsibility was being reduced.  Although at
that time she was working for Accenture SAS, O'Mahony alleges
that Pike, Accenture LLP's Global Business Operations Director
in New York, decided to reduce her level of responsibility.
The decision to reduce O'Mahony's level of responsibility
occurred in very close proximity to her allegations of fraud

-18-

against Accenture LLP, indicating that Accenture LLP may have been the driving force behind the alleged retaliation against O'Mahony.

The fourth and fifth factors are clearly met. As to the materiality/substantiality of the domestic conduct relative to the particular fraudulent transaction the pleadings describe, O'Mahony alleges that all the conduct giving rise to the fraud and the retaliation against her for reporting the fraud occurred in the United States and these actions were taken by executives of Accenture LLP. O'Mahony has sufficiently pled that the conduct of Accenture, i.e., the conduct that gives rise to the alleged fraud and the determination to reduce O'Mahony's level of responsibility allegedly in retaliation for reporting Accenture LLP's misconduct, is material. As to causation, O'Mahony has sufficiently pled that there is a causal connection between O'Mahony reporting the alleged fraudulent scheme and the loss of income she suffered as a result of the alleged retaliation against her.

Sixth, the Court considers whether extending jurisdiction in this case is reasonable and in accordance with Congressional policy. In analyzing this factor, the Court assesses what vital United States interest would be served by providing a forum here and giving effect to American laws to adjudicate foreign claims. In the instant case, the Court is

not confronted with a transaction that is predominately foreign which would require it to decide whether Congress would have wanted to extend American jurisdiction. Nor is the Court seeking to protect a foreign citizen working outside the United States for a foreign subsidiary of a corporation covered under § 1514A complaining about alleged misconduct of a foreign subsidiary. See, e.g., Carnero, 433 F.3d at 4. Instead, O'Mahony was an employee of Accenture LLP, Accenture's United States subsidiary, during the time the alleged fraudulent misconduct occurred, complaining about misconduct of Accenture LLP in the United States. Therefore, the Court is not being asked to intervene to apply American law in a dispute between foreigners that occurred abroad concerning a foreign transaction.

Nor does this case present any possible clash between our laws and those of France. O'Mahony is not seeking enforcement of American law in France by requiring payment of French social security contributions. Instead, O'Mahony is seeking application of American law for money damages she suffered because of the alleged retaliation by Accenture LLP occurring in the United States.

Congress enacted § 1514A as a civil action to protect employees of publicly traded companies against retaliation in fraud cases. See § 1514A. The plain text of the statute

indicates that it is meant to protect employees[5], like O'Mahony, from retaliation for reporting misconduct. The Court finds that it would not be unreasonable nor against Congressional policy to extend jurisdiction over Accenture LLP. The Court need not decide whether Congress intended § 1514A to confer extraterritorial jurisdiction or whether any extraterritorial application of § 1514A that Congress may have authorized extends to the instant case. It suffices to state that, under the facts in this case, the Court has subject matter jurisdiction over Accenture LLP because the alleged wrongful conduct and other material acts occurred in the United States by persons located in the United States, and hence the exercise of jurisdiction by this Court to resolve the dispute before it would not implicate extraterritorial application of American law.

(b) <u>Application of Factors to Accenture</u>

Whether the conduct test can be met with respect to Accenture is less clear from the pleadings. However, accepting all relevant allegations in the complaint as true, O'Mahony has met her preliminary showing that her claim against ACcenture is sufficiently colorable. <u>See Cromer</u>, 137 F. Supp. 2d at 467; <u>Drakos</u>, 140 F.3d at 131. O'Mahony's

---

[5] Defendants do not dispute that O'Mahony is an employee or that Accenture LLP is an employer within the meaning of § 1514A, therefore, for purposes of this motion, the Court assumes that O'Mahony is a covered employee and Accenture LLP is a covered employer.

pleadings contain allegations that Accenture along with Accenture LLP was also responsible for the commission of the alleged fraud and the retaliation against O'Mahony.  On the record before it, and absent discovery as to the pertinent inquiry, it is unclear to what extent Accenture participated in the alleged fraud or retaliation, whether Accenture maintained control over Accenture LLP, or whether the Court can pierce the corporate veil to hold Accenture liable for the acts of its subsidiary, Accenture LLP.  See, e.g., De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69-70 (2d Cir. 1996) (stating that a "showing of actual domination" by a corporate parent over a subsidiary is "required to pierce the corporate veil.") (citations and internal quotation marks omitted)).  Accordingly, the Defendants' motion to dismiss is denied with respect to subject matter jurisdiction.  The Court notes that the issue of subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, dismissal may be warranted.  See Banque Paribas, 147 F.3d at 121 n.1. (citations and internal quotation marks omitted).

    2.   Protected Activity

Section 1514A provides protection for an employee who provides information which the employee "reasonably believes constitutes a violation" of any Security and Exchange

-22-

Commission ("SEC") rule or regulation or "Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). "While a plaintiff need not show an actual violation of law, or cite a code section he believes was violated, general inquiries do not constitute protected activity." <u>Fraser</u>, 417 F. Supp. 2d at 322 (citations and internal quotation marks omitted). "Rather, the 'context' of the disclosure and 'the circumstances giving rise to the communication,' if closely related to potential fraud against shareholders, may be sufficient to satisfy the pleading requirements of a [§ 1514A] claim." <u>Ports v. Wyeth Pharm., Inc.</u>, No 06 Civ. 2689, 2007 WL 2363356, at *4 (S.D.N.Y. Aug. 20, 2007) (<u>quoting</u> <u>Fraser</u>, 417 F. Supp. 2d at 323). "Thus, protected activity must implicate the substantive law protected in Sarbanes-Oxley definitively and specifically." <u>Fraser</u>, 417 F. Supp. 2d at 322 (citations and internal quotation marks omitted).

Defendants allege that O'Mahony's claim should be dismissed on the ground that O'Mahony cannot show she engaged in activity protected under § 1514A. Specifically, Defendants argue that the protection of § 1514A applies only to an employee's reporting of "fraud against shareholders." Defendants assert that, since O'Mahony's complaints regarding Defendants' alleged violations of §§ 1341 and 1343 do not

include any allegations of fraud against "shareholders," she is not protected under the statute.  The Court disagrees.

The Second Circuit has not addressed the issue of whether § 1514A limits the activity protected only to reporting conduct that involves "fraud against shareholders."  The few courts which have considered the issue of whether violations of the statutes enumerated in § 1514A are limited by that phrase have not been consistent.  Compare Bishop v. PCS Admin. (USA), Inc., No. 05 Civ. 5683, 2006 WL 1460032, at *9 (N.D. Ill. May 23, 2006) (finding that the phrase "relating to fraud against shareholders" must be read as modifying all violations enumerated under section § 1514A) (citations omitted) with Reyna v. ConAgra Foods, Inc., 506 F. Supp. 2d 1363, 1381 (M.D. Ga. 2007) (finding that § 1514A "clearly protects an employee against retaliation based upon that employee's reporting of mail fraud or wire fraud regardless of whether that fraud involves a shareholder of the company").

General principles of statutory construction weigh against reading § 1514A as providing whistleblower protection only to employees who provide information concerning fraud against shareholders.  In any matter involving statutory construction, judicial inquiry begins with the text of the statute.  See United States Nat'l Bank v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993) ("Statutory

construction is a holistic endeavor, ... and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.") (citations and internal quotation marks omitted).  The court must first examine whether the plain language is unambiguous, and there end the search if on its face the wording is clear enough to leave no room for doubt or further interpretation.  See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, 'the sole function of the courts' - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.") (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)(internal quotations omitted)); Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first cannon is also the last: judicial inquiry is complete.") (citations and internal quotation marks omitted).  "If the meaning of a statute is ambiguous, the court may resort to legislative history to determine the statute's meaning .... But in so doing, we must construct an interpretation that comports with the statute's primary purpose and does not lead to anomalous or unreasonable results." Puello v. Bureau of Citizenship and Immigration Servs., No. 06 Civ. 0735, 2007 WL 4440916, at *3 (2d Cir.

-25-

2007) (citations omitted).

The Court finds that the plain language of § 1514A is unambiguous. Section 1514A states, in pertinent part, that a publicly traded company may not retaliate against an employee who provides information that the employee "reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). Section 1514A contains six provisions that enumerate six specific forms of misconduct which, if reported by an employee, protect the whistleblower from employer retaliation: (1) § 1341 (mail fraud); (2) § 1343 (wire fraud); (3) 18 U.S.C. § 1344 (bank fraud); (4) 18 U.S.C. § 1348 (securities fraud); (5) any rule or regulation of the SEC; or (6) any provision of federal law relating to fraud against shareholders. The first four provisions are statutes that, as written by Congress, are not limited to types of fraud related to SOX. By listing certain specific fraud statutes to which § 1514A applies, and then separately, as indicated by the disjunctive "or", extending the reach of the whistleblower protection to violations of any provision of federal law relating to fraud against securities shareholders, § 1514A clearly protects an employee against retaliation based upon the whistleblower's reporting of fraud

under any of the enumerated statutes regardless of whether the misconduct relates to "shareholder" fraud.

Defendants' argument that the phrase "relating to fraud against shareholders" serves to modify each of the preceding phrases of the provision conflicts with the "doctrine of the last antecedent." <u>See</u> <u>Barnhart v. Thomas</u>, 540 U.S. 20, 26 (2003) (stating that according to the "rule of the last antecedent ... a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows") (citations and internal quotation marks omitted). Although this grammatical rule "is not an absolute and can assuredly be overcome by other indicia of meaning, ... construing a statute in accord with the rule is quite sensible as a matter of grammar." <u>Id.</u> (citations and internal quotation marks omitted). Here, Defendants offer no evidence that Congress intended the phrase "relating to fraud against shareholders" to limit all the preceding phrases. <u>See</u> <u>Kahn Lucas Lancaster, Inc. v. Lark Int'l. Ltd.</u>, 186 F.3d 210, 215 (2d Cir. 1999) ("the plain meaning of a text will typically heed the commands of its punctuation.") (<u>citing</u> <u>United States Nat'l Bank v. Independent Ins. Agents of Am.</u>, 508 U.S. 439, 454 (1993); <u>Ron Pair Enters.</u>, 489 U.S. at 241-42 (holding that the "grammatical structure of the statute," specifically the placement of commas, mandated a specific

-27-

construction)). Nor does it lead to an unreasonable result to hold that an employee who alleges fraud under any of the enumerated statutes is protected under § 1514A. Accordingly, O'Mahony engaged in a protected activity under § 1514A when she reported that she reasonably believed that Accenture and Accenture LLP had violated § 1341 and § 1343 by engaging in the misconduct alleged here.

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion to dismiss (Docket no. 11) of defendants Accenture LTD and Accenture LLP is DENIED.

**SO ORDERED**.

Dated:     New York, New York
           5 February 2008

VICTOR MARRERO
U.S.D.J.

-28-